**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN, | Case No. 25-4452 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs,* | |
| v. | |
| NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation, | |
| *Defendants.* | |

**INTRODUCTION**

1.     The United States' leading role in science, technology, engineering, and mathematics ("STEM") is the result of decades of sustained attention and funding from Congress.  For three quarters of a century, much of that progress has been made through the efforts of the National Science Foundation ("NSF"), an independent federal agency established by Congress in 1950 with a mission to "provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States."  National Science Foundation Act of 1950, Pub. L. 81-507; 42 U.S.C. § 1862k(a)(6)(A).

1

2.     NSF is to accomplish these aims "by making contracts or other arrangements (including grants, loans, and other forms of assistance) to support such scientific, engineering, and educational activities . . . ." *Id.* From developing AI technology that predicts weather patterns to protect communities, to developing sustainable solutions for environmental and economic challenges, to making power grids more sustainable, NSF-funded research at American universities ensures this nation's status as a global leader in scientific innovation. Indeed, Congress has found that fundamental STEM research and education supported by NSF "and conducted by the Nation's universities and colleges are essential to our national security, and to our health, economic welfare, and general well-being[.]" 42 U.S.C. § 1862a(a)(1).

3.     Over the decades, global competition has threatened to undermine America's preeminent position in STEM. Since at least 1980, Congress has recognized that for the United States to maintain its competitive edge, the nation would need to encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Congress consequently declared that "the highest quality science over the long-term requires substantial support, from currently available research and education funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516, § 32. Congress later expanded this declaration to include increasing participation for people with disabilities. 42 U.S.C. § 1885(b). Pursuant to these Congressional directives, much of the NSF-funded research at universities supports the participation in STEM fields by women, minorities, and people with disabilities.

4.     Additionally, federally sponsored research conducted by universities requires those universities to maintain and staff substantial infrastructure. That can include cutting edge

laboratories, advanced computer systems and networks, appropriate security, and specialized heating or cooling systems.

5.      NSF has recently taken aim at these twin pillars sustaining the United States' STEM preeminence.  These actions violate the law and jeopardize America's longstanding global leadership in STEM.

6.      *First*, NSF announced that it would no longer abide by Congress's longstanding policy to promote a robust STEM workforce that draws in underrepresented populations.  On April 18, 2025, NSF announced on its website that it was adopting new priorities for NSF funding programs.  Specifically, the then-NSF Director Sethuraman Panchanathan wrote that "efforts [to broaden participation in STEM] should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups," and that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."  Ex. 1, Statement of NSF priorities, https://www.nsf.gov/updates-on-priorities ("Priority Directive").   On the same day—pursuant to this Directive—NSF began issuing termination notices *en masse* to projects, including many in Plaintiff States, that seek to increase STEM participation by women, minorities, and people with disabilities; that study misinformation; and that address environmental justice.

7.      *Second*, NSF announced that it would slash support for the infrastructure necessary for cutting edge American research.  Specifically, on May 2, NSF announced that beginning on May 5, it would not cover indirect costs at a rate higher than "15% of modified total direct costs (MTDC), as defined in 2 CFR 200.1" for grants and cooperative agreements awarded to Institutions of Higher Education ("IHE").  Ex. 3, Policy Notice: Implementation of Standard 15% Indirect  Cost  Rate,   https://www.nsf.gov/policies/document/indirect-cost-rate ("Indirect  Cost

Directive"). Indirect cost rates fund a range of vital research infrastructure, including facilities costs like obtaining and maintaining lab space, keeping the lights on and the temperature controlled, and providing custodial services and information services, and administration costs like the cost of staff who ensure the protection of research subjects, the proper handling and disposal of biological, chemical and biochemical materials used in research, manage specialized procurement and security requirements for sensitive research, prevent technologies and other sensitive information from inappropriate access by foreign adversaries, and prevent financial conflicts of interests.

8.    Because the costs associated with such infrastructure often are not attributable solely to one federally sponsored research project, the federal government negotiates indirect cost rates that ensure research grants are sufficient to actually sustain university research efforts. The rate cap in the Indirect Cost Directive is far below the rates that IHEs have negotiated with the federal government pursuant to federal statute and regulations. It will result in NSF divesting millions of dollars from the university-driven research Congress has directed it to support. Nearly-identical directives capping indirect cost rates at 15% by the National Institutes of Health ("NIH") and the Department of Energy ("DOE") have been enjoined in recent weeks.[1]

9.    Plaintiffs New York, Hawai'i, California, Colorado, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Washington, and Wisconsin bring this action to protect their states and institutions from NSF's unlawful actions that will devastate critical STEM research at higher education institutions.

---

[1] *See Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025); *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-cv-10912, 2025 WL 1414135 at *1 (D. Mass. May 15, 2025) (granting preliminary injunction).

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § § 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA.  5 U.S.C. §§ 702, 704.

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202, and 5 U.S.C. §§ 705–706.

12.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are an agency of the United States government and an officer sued in their official capacities.  Plaintiff the State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

*Plaintiffs*

13.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

14.     Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States.  The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

15.     Plaintiff the State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California.  The Attorney General

acts as the chief legal representative of the state and is authorized by the California state constitution, article V, section 13, to pursue this action.

16.     Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

17.     Plaintiff the State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18.     Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America.  The Attorney General is the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  29 Del. C. Ann. § 2504.

19.     Plaintiff the State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul.  The Attorney General of Illinois is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.  Ill. Const. art V, §15; 15 ILCS 205/4.

20.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

21.     Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America.  Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

22.     Plaintiff the State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford.  The Attorney General has authority to file this suit to protect and secure the interests of the State.  NRS 228.170.

23.     Plaintiff the State of New Jersey, represented by and through its Attorney General is a sovereign state of the United States.  The Attorney General of New Jersey, Matthew Platkin, is the chief law enforcement officer of New Jersey and is authorized to sue on the State's behalf.

24.     Plaintiff the State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

25.     Plaintiff the State of Oregon is a sovereign state in the United States of America. The State of Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of the State of Oregon.  Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the state.  Or. Rev. Stat. §180.060.

26.     Plaintiff the State of Rhode Island is a sovereign state in the United States of America.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

27.     Plaintiff the State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney

General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

28.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin, who is the chief law enforcement officer of Wisconsin and is authorized to sue on the State's behalf.

**Defendants**

29.    Defendant National Science Foundation is an independent agency of the federal government that supports fundamental research and education in all the non-medical fields of science and engineering.

30.    Defendant Brian Stone is the Acting Director of NSF.  He is sued in his official capacity.

## **ALLEGATIONS**

**Congressional Directives to Increase STEM Participation by Women, Minorities, and People with Disabilities**

31.    The importance of STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics, to have equal opportunity in education, training, and employment in scientific and technical fields, and thereby to promote scientific literacy and the full use of the human resources of the Nation in science and technology.

Pub. L. 96-516 § 32.

32.    Promoting the full use of available human resources for STEM remains the Congressionally declared policy of the United States.  *See* 42 U.S.C. § 1885(b).  Across 45 years,

the only substantive amendment to the declaration from 1980 has been to specifically recognize that the goal of promoting "the full use of the human resources of the Nation" also requires ensuring that people with disabilities acquire STEM skills and enjoy equal opportunity in STEM fields. *See* 42 U.S.C. § 1885(b); Pub. L. 107–368, § 16, Dec. 19, 2002, 116 Stat. 3059.

33.     Also since 1980, Congress has directed that "the highest quality science over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516 § 32. This has been substantively amended only to specifically recognize the importance of increasing the participation of disabled people in STEM. *See* 42 U.S.C. § 1885(b); Pub. L. 107– 368, § 16, Dec. 19, 2002, 116 Stat. 3059.

34.     Congress, accordingly, has declared that the participation of women, minorities, and persons with disabilities in STEM fields must be increased. Congress has not wavered from this policy.

35.     Congress has adopted this policy in the context of its consistent observation that the overall STEM workforce in the United States is not large enough to meet demand. In the Scientific and Advanced-Technology Act of 1992, for example, Congress noted that "the workforce of the United States must be better prepared for the technologically advanced, competitive, global economy," and identified strategies to address "shortages of scientifically and technically trained workers." Pub. L. 102-476 § 2. In 2017, Congress noted that "by 2018, there could be 2,400,000 unfilled STEM jobs" and that "there is currently a disconnect between the availability of and growing demand for STEM-skilled workers." Pub. L. 114-329 § 305. Congress also observed that "underrepresented populations are the largest untapped STEM talent pools" and

repeated that "the United States should encourage full participation of individuals from underrepresented populations in STEM fields." *Id.*

36.     To that end, Congress instructed that a "core strategy" of NSF's overall work shall be to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

37.     Consistent with that core strategy, 42 U.S.C. §§ 1885a and 1885b directly authorize NSF to undertake activities for the specific purpose of increasing STEM participation by women, minorities, and people with disabilities.

38.     Congress not only authorized such programs—it expressly directed NSF to pursue them.  Congress directed that "[t]he Director of the Foundation shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields."  42 U.S.C. § 1862s-5(c).

39.     42 U.S.C. § 1862s-5 further provides that:

- NSF "shall award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields, including [women, minorities, and people with disabilities]."

- NSF "shall make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers" on a merit-reviewed competitive basis. Congress has appropriated $8 million annually for this program specifically.

- NSF "shall make awards to institutions of higher education (or a consortium of such institutions) to implement or expand research-based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields" on a merit-reviewed competitive basis.  Congress has appropriated $15 million annually for this program specifically.

42 U.S.C. § 1862s-5(d) - (f).

40.     NSF has also been instructed to pursue these Congressional goals across all of its work.  NSF is specifically required to "apply a broader impacts review criterion to identify and demonstrate project support of" enumerated goals, including "expanding participation of women and individuals from underrepresented groups in STEM."  42 U.S.C. § 1862p-14.  This "broader impacts criterion" applies to every proposal NSF receives.

41.     On top of these clear Congressional prescriptions of United States policy, 42 U.S.C. Chapter 16 contains dozens of additional authorizations for NSF to fund, and directives for NSF to prioritize, projects to specifically increase the participation of women, underrepresented minorities, and persons with disabilities in STEM.  *See* 42 U.S.C. §§ 1862i(a)(1)(3)(B); 1862i(c)(3);   1862i(d)(2)(D);   1862i(e)(3)(C);   1862i(f)(2)(C);   1862n(a)(3)(K);   1862n(a)(5); 1862n(b)(1)(B)(iv);   1862n(b)(2)(G);   1862n-1(b)(2)(F);   1862n-1(c)(2);   1862n-1(d)(2);   1862n-1a(d)(3)(F);   1862n-1a(d)(4)(B);   1862n-1a(k)(2)(D);   1862n-2(b)(3);   1862n-7(e);   1862n-8(a); 1862n-10(a);   1862o;   1862o-4;   1862o-12;   1862o-14(c)(2)(A)(ii);   1862p-2(b)(2)(A);   1862p-4; 1862p-6; 1862p-13; 1862q(c)(2)(C); 1862s-7(b)(2)(C).

42.     As demonstrated by the above, Congress has clearly articulated and repeatedly reinforced a comprehensive national policy that specifically seeks to increase the participation of women, minorities, and people with disabilities in STEM.  And it has directed, empowered, and funded NSF to carry it out.

43.     This policy has had success. Between 1995 and 2017, the number of women in science and engineering occupations, or with science or engineering degrees, doubled; minorities, meanwhile, went from representing about 15% of those groups to about 35%.  National Science Board, Science & Engineering Indicators 2020: Science and Engineering Labor Force, tables 3-16 and 3-18, https://ncses.nsf.gov/pubs/nsb20198/assets/ nsb20198.pdf, accessed May 20, 2025.

44.     Yet even with those gains, NSF's National Science Board estimated in 2020 that to reach the point where women and minorities are contributing fully to STEM fields by 2030, "the number of women must nearly double, Black or African Americans must more than double, and Hispanic or Latinos must triple the number that are in the 2020 U.S. [science and engineering] workforce." National Science Board, Vision 2030, https://nsf-gov-resources.nsf.gov/nsb/publications/2020/nsb202015.pdf, accessed May 19, 2025.

45.     For Fiscal Year 2025, Congress appropriated approximately $7.18 billion to NSF for research and related activities to carry out the National Science Foundation Act of 1950, 42 U.S.C. § 1861 et seq. ("NSF Act"), and other statutory obligations, and $1.172 billion to NSF for STEM education to carry out the NSF Act and other statutory obligations. Pub. L. No. 119-4, § 1102(a)(2), 139 Stat. 9, 10-11; Pub. L. No. 118-42, 138 Stat. 25, 161-62.

*NSF "Updates" Its Priorities*

46.     NSF recently discarded the national policy ordained by Congress. Rather than prioritizing and funding programs "designed to broaden participation of underrepresented populations in STEM fields," as required by 42 U.S.C. § 1862s-5(c) specifically and 42 U.S.C. Ch. 16 in general, NSF announced new priorities that are irreconcilable with its statutory mandates, and began *en masse* terminations of awards pursuant to those new priorities.

47.     On April 18, 2025, the Priority Directive was posted to the NSF website. Although the Directive purports to recognize that "NSF priorities are . . . modulated by statutory directives," the Directive ignores relevant statutory mandates by announcing that "research on broadening participation, must aim to create opportunities for all Americans everywhere," and that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." Ex. 1.

48.     On the same day that the Priority Directive was posted, and in explicit reliance on the Priority Directive, NSF began terminating awards it claimed were not aligned with its changed priorities.  NSF stated in its "Frequently asked questions" ("FAQs") that "[a]wards that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation."  Ex. 2, FAQs following the Priority Directive, https://www.nsf.gov/updates-on-priorities#frequently-asked-questions-731.  As of May 27, 2025, the FAQs included a list of 1,752 awards terminated pursuant to the Priority Directive, including numerous awards for projects conducted within Plaintiff States.  *Id.*

49.     In Hawaiʻi, for example, terminations have affected a project exploring a cultural approach to improve Native Hawaiian participation in undergraduate engineering studies, and two Louis Stokes Alliances for Minority Participation programs seeking to increase minority participation in STEM.  This is despite Congress having instructed that NSF "shall continue to support . . . the Louis Stokes Alliances for Minority Participation program[,]" 42 U.S.C. § 1862p-4, and having directed that NSF "shall make awards to institutions of higher education . . . to implement or expand research-based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields," 42 U.S.C. § 1862s-5(f)(1).  Per the Priority Directive, these awards were terminated *for the very same reason* they align with statutorily prescribed priorities.

50.     An affected project at the University of Delaware studied associations between health factors and suicidality or post-traumatic stress disorder among Veterans Health Administration patients to better identify high-risk populations.  An affected project in New Jersey established a new doctoral program in Computer Science, focusing on critical areas of study such

as artificial intelligence, data science, and cybersecurity, with the purpose of promoting increased participation in STEM PhDs by underrepresented minorities. A project sponsored in Washington to connect Indigenous communities and Western scientists to integrate their knowledge to support the health of the Great Lakes ecosystem and develop a model that could be applied to other ecosystems, will not be implemented. In many states, including Maryland and Oregon, terminations have affected projects focused on improving STEM instruction for K-12 students. A termination affecting one such project at the University of Oregon will deprive an estimated 20,000 students of computer science learning experiences at a time when technology is increasingly shaping opportunities and outcomes in society.

51.     Some terminations affected collaborative projects for which Plaintiff States' institutions are one of multiple collaborators. Collaborative research sponsored by NSF sometimes involves a lead organization, which then manages the project. But sometimes separate awards are given to all collaborating organizations. NSF, Proposal & Award Policies & Procedures Guide, Ch. II:E.3, May 20, 2024, https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf. For collaborative projects of the second type, terminating an award to one collaborating organization endangers the entire project.

52.     All of the terminations affecting projects conducted within Plaintiff States were effectuated without prior notice and through identical boilerplate language asserting that the project "no longer effectuates the program goals or agency priorities."

53.     No termination notice alleges that any project was operated in a way that violated any law. In fact, NSF has explicitly disclaimed any basis to terminate the grants other than its decision to depart from Congressionally mandated priorities. Ex. 2 ("NSF does not allege a

deficiency occurred (e.g., noncompliance with award terms and conditions or research misconduct of the awardee)," and, thus, there are "no allegations of deficiencies by the awardee to dispute.").

54.    NSF's FAQs suggest that NSF "will continue to operate programs that contain elements of broadening participation for individuals based on protected characteristics that are explicitly established in law and prioritized in NSF appropriations language." *Id.* But NSF immediately goes on to explain that it will do so only through projects that are "broadly impactful to Americans from all backgrounds[.]" *Id.* And NSF's initial statement is belied by its own actions to implement the Priority Directive, namely its termination of grants precisely because they are designed to increase participation by underrepresented populations, the very priority Congress set.

55.    NSF's abandonment of the Congressionally mandated goal to promote "full use of the human resources of the Nation" in STEM fields, 42 U.S.C. § 1885(b), will harm states as well as the nation. As a result of the implementation of the Priority Directive, institutions (including in Plaintiff States) have already stopped work on projects focused on STEM education and training in engineering, mathematics, environmental sciences, geosciences, computer sciences, atmospheric sciences, cryospheric sciences, and aquatic sciences. Data collection and analysis efforts have been impeded, which will affect the timely publication and dissemination of research findings on critical topics. The loss of these projects constrains innovation and slows down the development of future proposals that could advance national STEM priorities and benefit Plaintiff States. Postdoctoral scholars, project managers, undergraduate students, faculty and staff have lost or will lose their jobs, and those who depart take their training and expertise with them, requiring new investment in recruitment and training. The loss of such personnel in STEM fields will have compounding effects, with fewer teachers and mentors to recruit and retain future talent. Targeting projects that specifically promote participation in STEM by underrepresented groups,

including women, minorities, and disabled people, will close pathways that bring underrepresented groups into STEM, damaging Plaintiff States'—and the nation's—development of the STEM workforce.

### Regulatory Framework for Indirect Costs

56.     Congress has authorized federal agencies, including NSF, to "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates."  41 U.S.C. § 4708.

57.     Congress directed the Office of Management and Budget ("OMB") to "establish general management policies for executive agencies," including as to grant management. 31 U.S.C. § 503(b)(2)(C).  OMB has accordingly established uniform administrative requirements, cost principles, and audit requirements for federal awards, codified in 2 C.F.R. part 200.

58.     NSF "has formally adopted 2 CFR part 200."  2 C.F.R. § 2500.100.

59.     Appendix III of 2 CFR part 200 "provides criteria for identifying and computing indirect (or indirect (F&A)) rates at IHEs (institutions)."

60.     NSF publishes an "implementation document, the NSF Proposal & Award Policies & Procedures Guide, [which] may be found at:  http://www.nsf.gov/publications/pub_summ.jsp?ods_key=papp."  2 C.F.R. § 2500.100.

61.     NSF competitive grants are awarded based on applications solicited in response to a notice of funding opportunity.  2 C.F.R. § 200.204.

62.     NSF must issue a notice of award, which must contain the total amount of federal funds obligated by the award.  2 C.F.R. § 200.211(b)(7)-(8).

63.     NSF grants have two types of costs.  2 C.F.R. § 200.412-.414.  The first is direct costs, *i.e.*, costs that can be attributable to a specific research project supported by the grant. 2

16

C.F.R. § 200.413(a). The second is indirect costs—*i.e.*, costs that are necessary for research but cannot be attributed and allocated directly to a specific research project. 2 C.F.R. § 200.1.

64.    Indirect costs for grants include two broad categories: facilities and administration. 2 C.F.R. § 200.414(a).

65.    "Facilities" is defined as "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." 2 C.F.R. § 200.414(a).

66.    "Administration" is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically" under the definition of "Facilities." 2 C.F.R. § 200.414(a).

67.    Research institutions identify their indirect costs by determining the proportion of their total costs that fall under the allowed administrative or facilities categories. 2 C.F.R. pt. 200, Appendix IV(B)(2).

68.    A Federal agency must include the policies relating to indirect cost rate in the notice of funding opportunity and, as appropriate, should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity. 2 C.F.R. § 200.414(c)(4).

69.    Each grant terminated by NSF as described above included an indirect cost rate that was negotiated. Typically, the indirect cost rate is similar or the same across grants from one agency to one institution.

70.    In most cases, university rates are negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly

to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, Appendix III(C)(11)(a)(1).

71.    That indirect cost rate is then binding on the entire federal government and "continue[s] for a five-year period." 2 C.F.R. pt. 200, Appendix III(C)(11)(a)(2).

72.    Negotiated indirect cost rates must be accepted by all Federal agencies. 2 C.F.R. § 200.414(c)(1).

73.    A Federal agency may deviate from the negotiated rate "for either a class of Federal awards or a single Federal award" only under two circumstances: (1) "when required by Federal statute or regulation," or (2) "when approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1).

74.    As to the second exception, 2 C.F.R. § 200.414(c)(3) states that: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." This exception only applies to a particular individual grant or class of grants, and once the agency has made publicly available its policies, procedures, and decision-making criteria that justify deviation from negotiated rates.

75.    NSF's Proposal and Award Policies and Procedures Guide—which is cross-referenced in NSF's regulations implementing OMB's uniform guidance, *see* 2 C.F.R. § 2500.100—states that "it is NSF policy that recipients are entitled to reimbursement from award funds for indirect costs" and that "[t]he awarded indirect cost rate is generally based upon a recipient's current Federally negotiated indirect cost rate agreement." NSF, Proposal and Award Policies and Procedures Guide at X-5, May 20, 2024, https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf ("Guide").

76.    That Guide also states that "[e]xcept where specifically identified in an NSF program solicitation, the applicable U.S. Federally negotiated indirect cost rate(s) must be used in computing indirect costs (F&A) for a proposal.  Use of an indirect cost rate lower than the organization's current negotiated indirect cost rate is considered a violation of NSF's cost sharing policy."  Guide at II-20.

77.    After NSF grant funds are awarded, researchers and IHEs must document their incurred expenses during the grant term.  Expenses may be reviewed and audited and, if necessary, the indirect cost rate can be adjusted to account for actual expenses that deviated from the negotiated rate.  *Id.* at VII-7 to VII-8.

***NSF's Indirect Cost Directive***

78.    On May 2, 2025, NSF published the Indirect Cost Directive on its website.  Ex. 3. The Indirect Cost Directive announced that NSF "is updating its policy regarding the reimbursement of indirect costs in federally funded financial assistance."  *Id.*

79.    The Indirect Cost Directive states that "[e]ffective May 5, 2025, NSF will apply a standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable."  *Id.*

80.     The Indirect Cost Directive further states that "[t]he 15% rate maximum" applies to all "new awards made to IHEs on or after May 5, 2025."  *Id.*

81.    Although the Indirect Cost Directive states that it "serves as public notification of the policies, procedures and general decision-making criteria that NSF has used to justify deviation from negotiated rates for all awards in accordance with 2 CFR 200.414(c) for the class of NSF financial assistance awarded to IHEs," the Indirect Cost Directive does not actually include any policy, procedure, or criteria.

*Examples of Existing Negotiated Amounts*

82.     The State University of New York receives millions of dollars in NSF grants.  Most grants have indirect cost rates between 50% and 61%, with each rate based on either the HHS or DOD negotiated rate for the entire institution.  The rates for on-campus programs are higher than for off-campus programs.  For SUNY Albany, for example, the on-campus rate for research projects is 56.5%, the on-campus DOD research rate is 60.5%, and the on-campus rate for projects involving student instruction is 55%.  Off-campus projects and projects that do not involve research or student instruction are subject to lower rates.  Albany's DOD off-campus research rate is 30%, and the on-campus rate for activities outside of research and instruction is 33%.  The lowest rate for SUNY schools is 26.5%, and that applies only to school administrative activities.  All of these rates are set based on the institution's negotiation with either HHS or DOD.  None are as low as 15%.

83.     The University of Hawai'i system's negotiations with HHS have likewise resulted in indirect cost rates that vary across campuses, are generally highest for research, and depend on whether federally sponsored projects are undertaken on or off campus.  Indirect cost rates for on-campus research run from 45.5% to 56.5%, while the rate for off-campus research is 26%.  Instruction rates and rates for other sponsored activities fall between 26% and 45%.

84.     Other Plaintiff States' negotiated indirect cost rates fall within a similar range.  Colorado State University has negotiated a rate of 54% for on-campus organized research and 26% for off-campus research.  Chicago State University has negotiated rates of 50.5% and 26%, respectively.

85.     The vast majority of NSF-funded projects at Plaintiff States' institutions are on-campus research projects, with indirect cost rates of 40-60%.  Specific examples include a 56%

rate for on-campus research at the University of Colorado at Denver, 60% at the University of Delaware, 47% at the University of Nevada, Reno, and 50.5% at the New Jersey Institute of Technology.

86.     The blanket 15% indirect cost cap does not fall into the limited exception available for agencies to deviate from institutions' negotiated indirect cost rates under specific conditions. *See* 2 C.F.R. § 200.414(c)(1).  NSF is not making specific exceptions to the negotiated rates "for either a class of Federal awards or a single Federal award." A 15% cap on indirect cost rates is neither "required by Federal statute or regulation," nor "approved . . . in accordance with [2 C.F.R. § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1).  And NSF has not implemented or made "publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3).

87.     Plaintiff States will be harmed by the Indirect Cost Directive because their institutions cannot sustain NSF-sponsored research at a 15% indirect cost rate.  Plaintiff States' institutions will not be able to maintain essential research infrastructure and will be forced to significantly scale back or halt research, abandon numerous projects, and lay off staff.  The unreasoned rate cap will directly thwart Congress's direction that NSF is to "support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels" along with engineering research and education.  42 U.S.C. § 1862(a)(1).

88.     The Indirect Cost Directive came on the heels of two nearly identical directives, one at the National Institutes of Health ("NIH") and one at the Department of Energy ("DOE"), both of which were swiftly enjoined by courts based on the same patent deficiencies and immediate harm that warrant an injunction here.  *See Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025); *Ass'n of Am. Universities v. Dep't of*

*Energy*, No. 25-cv-10912, 2025 WL 1414135, at *1 (D. Mass. May 15, 2025) (granting preliminary injunction).

89.    On May 5, 2025, a group of universities and university associations filed a lawsuit challenging NSF's Indirect Cost Directive.  *Am. Ass'n of Am. Universities v. Nat'l Sci. Found.*, No. 25-cv-11231 (D. Mass.).  A hearing on cross-motions for summary judgment is scheduled for June 13, 2025.  At the invitation of the court, NSF has agreed not to implement the Indirect Cost Directive through June 13.  *See id.* ECF No. 50.

## CAUSES OF ACTION

### Count I

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious
### (Priority Directive)

90.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

91.    The Administrative Procedure Act ("APA") requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

92.    NSF is an "agency" under the APA, 5 U.S.C. § 551(1), and the Priority Directive and its implementation are agency action subject to review under the APA.

93.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency action is also arbitrary and capricious if, when departing from

a prior policy, an agency does not "display awareness that it *is* changing position" or does not "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

94.    The Priority Directive is arbitrary and capricious because it does not provide a reasoned explanation or any "good reasons for" the change in priorities. *Id.*

95.    The Priority Directive is arbitrary and capricious because Defendants failed to consider several important aspects of the issues before them, including: (1) Plaintiff States' reliance interests in the Congressionally mandated NSF policy that NSF has followed for decades and (2) whether Defendants could have adopted less extreme measures to effectuate their new "priorities."

96.    The Priority Directive is arbitrary and capricious because it relies on factors Congress has not intended Defendants to consider.  Congress has been consistent in its observations about the "untapped STEM talent pools" where broader participation must be "encourage[d]," 42 U.S.C. § 1862s-5(b), and has never suggested that all such efforts must be diluted to also encourage STEM participation amongst populations that are already participating in STEM fields at higher rates.

97.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Priority Directive and enjoining any act to implement the Priority Directive.

### Count II

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to Law
### (Priority Directive)

98.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

99.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5. U.S.C. § 706(2)(C), or "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

100.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am.*, *Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

101.    The Priority Directive is contrary to law and beyond statutory authority because it defies Congress's statutory directives to NSF to not only support, but pursue the very priorities the Directive rejects.

102.    Specifically, the Priority Directive defies statutory directives requiring NSF to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering," 42 U.S.C. § 1862k(b)(1), as well as statutory directives requiring the NSF Director "to support programs designed to broaden participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(c), "award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields, including [women, minorities, and people with disabilities]," 42 U.S.C. § 1862s-5(d)(1), "make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from

24

underrepresented minority groups in academic STEM careers," 42 U.S.C. § 1862s-5(e)(1), and to "make awards to institutions of higher education (or a consortium of such institutions) to implement or expand research-based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields," 42 U.S.C. § 1862s-5(f)(1).

103.    In addition, refusing to sponsor projects precisely because they support "expanding participation of women and individuals from underrepresented groups in STEM" effectively eliminates one of the Congressionally mandated components of NSF's Broader Impacts criterion. 42 U.S.C. § 1862p-14(a)(7).

104.    No law permits NSF to categorically refuse to sponsor broad areas of research pursuant to agency priority changes that contradict clear Congressionally mandated priorities.

105.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Priority Directive and enjoining any act to implement the Priority Directive.

### Count III

### U.S. Constitution, Separation of Powers
### (Priority Directive)

106.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

107.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

108.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

109.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1.

110.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I § 9, cl. 7 (Appropriations Clause). "Among Congress's most important authorities is its control of the purse." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).

111.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

112.    Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress and declines to spend duly appropriated funds, it violates the separation of powers doctrine.

113.    Here, Congress has adopted a clear, longstanding national policy to advance and promote "full use of the human resources of the Nation" in STEM fields by encouraging participation of women, minorities, and persons with disabilities. 42 U.S.C. § 1885(a). It has explained that "the highest quality science and engineering over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and engineering by women, minorities, and persons with disabilities." *Id*. § 1885(b). To that end, Congress has instructed that "[t]he Director of [NSF] shall continue to support programs

designed to broaden participation of underrepresented populations in STEM fields." 42 U.S.C. § 1862s-5(c).  As discussed above, dozens of other passages in 42 U.S.C. Chapter 16 authorize or instruct NSF to pursue this Congressional policy to specifically increase participation in STEM fields by women, minorities, and people with disabilities.

114.    NSF has rejected this policy and announced that it will only pursue projects that seek to broadly expand participation in STEM, not projects that specifically seek to expand participation by women, minorities, or people with disabilities.

115.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

116.    Defendants do not have authority to categorically refuse to support research that comports with the Congressionally enacted policy of the United States.  Nor do they have the authority to unilaterally refuse to spend duly authorized and appropriated funds from Congress.

117.    Plaintiff States are entitled to preliminary and permanent injunctive relief barring Defendants from implementing the Priority Directive.

118.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are also entitled to a declaration that the Priority Directive and its implementation violate the constitutional separation of powers by impermissibly arrogating to the executive powers that are reserved to Congress.

### Count IV

### U.S. Constitution, Separation of Powers – Take Care Clause
### (Priority Directive)

119.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

27

120.    The Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ."  U.S. Const. art. II, § 3; *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them" (cleaned up)).

121.    The Executive violates the Take Care Clause when it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.  *See Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the Executive with faithful execution of the laws, the Take Care Clause "implies a power to forbid their execution"); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

122.    By rejecting the Congressionally mandated policy to expand STEM participation by women, minorities, and people with disabilities, and by determining that projects that specifically advance those Congressional goals can be terminated precisely for that reason, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

123.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment."  *Youngstown Sheet & Tube Co.*, 103 F. Supp. at 576.

124.    Plaintiff States are entitled to preliminary and permanent injunctive relief barring Defendants from implementing the Priority Directive.

125.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are also entitled to a declaration that the Priority Directive and its implementation violate the Take Care Clause.

## Count V

### *Ultra Vires* Executive Action
### (Priority Directive)

126.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs.

127.    An agency cannot take any action that exceeds the scope of its statutory authority.

128.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong*, 575 U.S. at 326-27.  Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

129.    The actions challenged herein are outside of Defendants' authority.  Defendants cannot unilaterally adopt policies contrary to those established for them by Congress.  Much less may Defendants then use that policy to justify refusal to sponsor projects precisely because those projects are consistent with the Congressional policies that Defendants have rejected.

130.    Plaintiff States are entitled to preliminary and permanent injunctive relief barring Defendants from implementing the Priority Directive.

131.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are also entitled to a declaration that the Priority Directive and its implementation are *ultra vires*.

## Count VI

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Agency Action Contrary to Law
### (Indirect Cost Directive)

132.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

133.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134.     NSF is an "agency" under the APA, 5 U.S.C. § 551(1), and the Indirect Cost Directive is agency action subject to review under the APA, 5 U.S.C. § 551(13).

135.     2 C.F.R. § 200.414(c)(1) states that "[n]egotiated indirect cost rates must be accepted by all Federal agencies.  A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."

136.     2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

137.     By pronouncing a single, uniform "policy" setting an indirect cost rate maximum for universities at 15% regardless of the otherwise applicable negotiated rate, NSF is violating 2 C.F.R. § 200.414(c)(1) and (c)(3).

138.     These provisions authorize agencies to announce procedures governing subsequent decisions to make individualized deviations from the baseline negotiated rate for individual awards or classes of awards. They do not authorize NSF to make a unilateral decision to impose an arbitrary cap on the rate applicable to all universities that does not attempt to approximate actual indirect costs.

139.    Section 200.414(c)(3) authorizes "deviations" from negotiated rates, but that authority does not empower NSF to eliminate the standard use of negotiated rates; rather, negotiated rates must remain the norm, with any deviations as exceptions.

140.    Insofar as NSF applies the Indirect Cost Directive to awards issued after May 5, 2025, for which the corresponding notices of funding opportunity did not identify the departure from the negotiated rate, the Directive violates Section 200.414(c)(4).

141.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Indirect Cost Directive and enjoining any act to implement the Indirect Cost Directive.

**Count VII**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(Indirect Cost Directive)**

142.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

143.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    NSF is an "agency" under the APA, 5 U.S.C. § 551(1), and the Indirect Cost Directive is agency action subject to review under the APA, 5 U.S.C. § 551(13).

145.    The Indirect Cost Directive is arbitrary and capricious because it does not provide a reasoned explanation.

146.    The Indirect Cost Directive is conclusory and violates NSF's obligation to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision,

'including a rational connection between the facts found and the choices made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43).

147.    The Indirect Cost Directive says it "reduce[s] administrative burdens for awardee institutions" by "eliminating the need for individualized indirect cost negotiations." Ex. 3.  But IHEs' indirect costs rates are, and still must be, negotiated with each IHE's "[c]ognizant agency for indirect costs"—which is either the Department of Health and Human Services or the Department of Defense Office of Naval Research.  2 CFR Part 200, Appendix III C.11.  The need for those negotiations is not eliminated or even diminished by the Indirect Cost Directive.

148.    The Indirect Cost Directive states, without explanation or justification, that it "[e]nsures consistent treatment of all IHE financial assistance recipients." Ex. 3.  NSF provides no rationale for subjecting different institutions to a single uniform rate that ignores actual indirect costs, which reasonably vary among institutions of varying types.

149.    The Indirect Cost Directive ignores that indirect costs are necessary for research to take place when it claims to "[i]ncrease the proportion of federal funds allocated to direct research costs" and "ensure that more resources are directed toward direct scientific and engineering research activities."  Ex. 3.  In fact, indirect costs are critical to supporting and maintaining research, and imposing a categorical 15% rate cap will devastate research nationwide. NSF arbitrarily and capriciously ignores this reality.

150.    The Indirect Cost Directive is also arbitrary and capricious because it does not explain its substantial change from current indirect cost rates, which typically range from 40% to 60% for Plaintiff States' IHEs.  The Indirect Cost Directive thus slashes indirect cost recovery by up to three quarters with no explanation.

32

151.    The Indirect Cost Directive is also arbitrary and capricious because it fails to account for the reliance interests of Plaintiff States and their institutions.  Plaintiff States have structured their budgets with the understanding that federal agencies will pay their legally required cost reimbursements according to the longstanding practice of using negotiated indirect costs and rates.  Plaintiff States have accordingly made costly decisions about long-term investments, such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies.  Plaintiff States have also relied on the OMB regulations generally requiring agencies to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances.

152.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Indirect Cost Directive and enjoining any act to implement the Indirect Cost Directive.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

a.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Priority Directive;

b.  Enter a declaratory judgment finding that the Priority Directive and its implementation are invalid, arbitrary and capricious, contrary to law, *ultra vires*, and violative of the United States Constitution;

c.  Issue preliminary and permanent injunctive relief barring implementation of the Priority Directive as to Plaintiff States and their institutions;

d.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Indirect Cost Directive;

e.  Enter a declaratory judgment finding that the Indirect Cost Directive is invalid, arbitrary and capricious, and contrary to law;

f.  Issue preliminary and permanent injunctive relief barring implementation of the Indirect Cost Directive or otherwise modifying negotiated indirect cost rates except as permitted by statute and regulation;

g.  Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

h.  Award such other relief as this Court may deem just and proper.


[*Signatures on following page*]


Dated: May 28, 2025

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Special Counsel for Federal Initiatives
Colleen K. Faherty
Special Trial Counsel
Jessica Ranucci
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Attorneys for the State of New York*


**ROB BONTA**
Attorney General for the State of California

By: */s/ José Pablo Galán de la Cruz*
José Pablo Galán de la Cruz*
Deputy Attorney General
Maureen C. Onyeagbako*
Supervising Deputy Attorney General
Cheryl L. Feiner*
Senior Assistant Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3439
Pablo.Galan@doj.ca.gov
Maureen.Onyeagbako@doj.ca.gov
Cheryl.Feiner@doj.ca.gov

*Attorneys for the State of California*


**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
Caitlyn B. Carpenter*
Deputy Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
caitlyn.b.carpenter@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Lauren Peach*
Shannon Stevenson*
Solicitor General
Lauren Peach*
First Assistant Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Lauren.Peach@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: /s/ Ashley Meskill
Ashley Meskill*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorney for the State of Connecticut*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ Cara Hendrickson
Cara Hendrickson*
Assistant Chief Deputy Attorney General
Rebekah Newman*
Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Rebekah.Newman@ilag.gov

*Attorneys for the State of Illinois*

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: /s/ Vanessa L. Kassab
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: /s/ Virginia A. Williamson
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General for the State of
Massachusetts

/s/ Katherine Dirks
Katherine Dirks*
Chief State Trial Counsel
Jak Kundl*
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

**AARON D. FORD**
Attorney General for the State of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Farng-Yi Foo*
Angela Cai
Executive Assistant Attorney General
Farng-Yi D. Foo*
Anaiis Gonzalez*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Farng-Yi.Foo@law.njoag.gov

*Attorneys for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New
Mexico

By: /s/ Astrid Carrete
Astrid Carrete*
Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504
(505) 490-4060
acarrete@nmdoj.gov

*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: /s/ *Anuradha Sawkar*
Anuradha Sawkar*
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
anu.sawkar@doj.oregon.gov

*Attorneys for the State of Oregon*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: /s/ *Ellen Range*
Ellen Range*
Assistant Attorney General
Office of the Washington State Attorney
General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

*Attorney for the State of Washington*

*Pro hac vice application forthcoming*

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: /s/ *Leonard Giarrano IV*
Leonard Giarrano IV*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Attorney for the State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: /s/ Aaron J. Bibb
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorney for the State of Wisconsin*