**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN<br><br>*Plaintiffs,*<br><br>v.<br><br>NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,<br><br>*Defendants.* | Case No. 25-4452 |

**PLAINTIFF STATES' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .............................................................................................................. 2

I.    NSF's Mandate to Diversify STEM Fields ......................................................... 2

II.   NSF Changes its Priorities in Clear Contravention of Congressional Policy. .................... 3

III.  NSF's Indirect Cost Directive Upends Decades-Long Practice of Compensating Universities for their Administrative and Facilities Expenditures. ..................................... 7

A.    An Array of Statutes and Regulations Provide for Calculating and Negotiating Indirect Cost Rates. ........................................................................ 7

B.    NSF Caps Indirect Costs at 15% Across-the-Board ................................ 10

ARGUMENT ................................................................................................................. 12

I.    Plaintiff States Are Likely to Succeed on the Merits of their Claims Challenging the Priority Directive. ........................................................................ 12

A.    The Priority Directive Violates the APA. ................................................ 13

1.    The Priority Directive is Subject to Review Under the APA. ................ 13

2.    The Priority Directive is Arbitrary and Capricious. ............................. 13

3.    The Priority Directive Is Contrary to Law. .......................................... 16

B.    The Priority Directive Is Unconstitutional and *Ultra Vires*. ................ 18

II.   Plaintiffs Are Likely to Succeed on the Merits of their Claims Challenging the Indirect Cost Directive. ........................................................................................ 20

A.    The Indirect Cost Directive Is Subject to Review Under the APA. ........... 21

B.    The Indirect Cost Directive Is Arbitrary and Capricious. ......................... 21

C.    The Indirect Cost Directive Is Contrary to Law. ..................................... 25

III.  Plaintiff States Will Suffer Irreparable Harm Absent Injunctive Relief. .......... 27

IV.   The Balance of the Equities and the Public Interest Favor a Preliminary Injunction. ....... 28

CONCLUSION ............................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of Colls. for Teacher Educ. v. McMahon*,
No. 1:25-cv-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025)......................................28

*Am. Assoc. of Univ. Professors v. Rubio*,
No. CV 25-10685-WGY, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ...............................13

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ...............................................................................................14

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).................................................................................................................20

*Ass'n of Am. Universities v. Dep't of Energy*,
No. 25-CV-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ..................... 11, 21-26

*Ass'n of Am. Universities v. Nat'l Sci. Found.*,
No. 25-cv-11231 (D. Mass.) .....................................................................................................21

*Bennett v. Spear*,
520 U.S. 154 (1997)...........................................................................................................13, 21

*Brown & Williamson Tobacco Corp. v. FDA*,
153 F.3d 155 (4th Cir. 1998) ...................................................................................................18

*City & Cnty of S. F. v. USCIS*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...................................................................................28

*City and Cnty of S. F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................................................ 18-19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019).........................................................................................................15, 23

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)..........................................................................................................14, 16, 24

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................................................................................................15, 24, 26

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021)................................................................................. 13-14

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
    23 F.3d 412 (D.C. Cir. 1994) .....................................................................18

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) ............................................................ 19-20

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................28

*Marasco & Nesselbush, LLP v. Collins,*
    6 F.4th 150 (1st Cir. 2021).........................................................................23

*Massachusetts. v. Nat'l Inst. of Health,*
    No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)..................... 11, 21, 23-26, 29

*Michigan v. EPA,*
    576 U.S. 743 (2015)............................................................................ 15-16, 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)............................................................................. 14-15, 23

*Myers v. United States,*
    272 U.S. 52 (1926).............................................................................18, 20

*Nat'l Env'tl. Dev. Ass'n's Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ...................................................................26

*Nat'l Fed. of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022).....................................................................................20

*New York v. Trump,*
    133 F.4th 51 (1st Cir. 2025).......................................................................13

*New York v. U.S. Dep't of Educ.,*
    477 F. Supp. 3d 279 (S.D.N.Y. 2020)........................................................12

*Nken v. Holder,*
    556 U.S. 418 (2009).....................................................................................28

*Packard Elevator v. ICC,*
    782 F. 2d 112 (8th Cir. 1986) ....................................................................28

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015).........................................................................................23

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018)............................................................28

*Pulsifer v. United States*,
    601 U.S. 124 (2024).......................................................................................25

*Rhode Island v. Trump*,
    No. 25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025)...............................13

*Sec. & Exch. Comm'n v. Chenery Corp.*,
    332 U.S. 194 (1947).......................................................................................15

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020).......................................................................................18

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024).........................................................................28

*Textron Inc. v. Comm'r*,
    336 F.3d 26 (1st Cir. 2003).............................................................................25

*Trump v. United States*,
    603 U.S. 593 (2024).......................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................27

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).......................................................................................20

## Constitutions

U.S. Const.
    art. I, § 1.......................................................................................................18
    art. I, § 9.......................................................................................................19
    art. II § 3.......................................................................................................19

## Federal Statutes

2 U.S.C.
    § 683(b)..........................................................................................................19

iv

5 U.S.C.
    § 704.................................................................................................13
    § 706(2)(A) ...........................................................................12-13, 16, 21

20 U.S.C.
    § 1001(a) ..............................................................................................8

41 U.S.C.
    § 4708.......................................................................................8-9, 25-26

42 U.S.C.
    § 1862k(b)(1) ...................................................................................2, 16
    § 1862n(a)(5) ......................................................................................17
    § 1862p-4 ............................................................................................17
    § 1862p-14(a)(7) ............................................................................17-18
    § 1862s-5(b)(3), (4)............................................................................16
    § 1862s-5(c) .....................................................................................2, 16
    § 1862s-5(d)(1) ..................................................................................17
    § 1862s-5(e)(1) ....................................................................................2
    § 1862s-5(f)(1) .....................................................................................2
    § 1885(a) ............................................................................................14
    § 1885(b) .......................................................................................1, 16

## Federal Regulations

2 C.F.R.
    pt. 200 ...............................................................................................9
    pt. 200, Appendix III..........................................................................22
    § 200.414(c) ...................................................................8, 9, 22, 25, 26
    § 200.501(b)........................................................................................9
    § 2500.100..........................................................................................8-9

## PRELIMINARY STATEMENT

Following World War II, the United States emerged as a global leader in science, technology, engineering, and mathematics ("STEM"). By 1970, however, it became clear that lack of educational opportunity left women and minorities disproportionately underrepresented in STEM fields, leading to tremendous untapped potential. In response, Congress charged the National Science Foundation ("NSF"), starting in 1980, with promoting "increased participation in science and technology by women and minorities," later expanding this charge to include people with disabilities. Pub. L. No. 96-516, § 32(b), 94 Stat. 3007, 3011; Pub. L. 107-368, § 16, 116 Stat. 3034, 3059; 42 U.S.C. § 1885(b). Since then, congressional appropriations have consistently supported statutory mandates for NSF to promote the participation of women, minorities, and people with disabilities in STEM fields.

In complete derogation of the policies and priorities set by Congress, NSF has abruptly decided to abandon its congressional mandate to promote increased participation of women, minorities, and people with disabilities in STEM fields, now asserting that projects that follow such a mandate "do not effectuate NSF priorities." Ex. 1 to Ranucci Decl. (the "Priority Directive").[1] NSF also imposed a 15% cap on indirect cost rates for all NSF research projects awarded to Institutes of Higher Education—devastating critical research and its contributions to Plaintiff States' economies and causing budgetary and operational chaos for Plaintiff States' institutions. Ex. 3 (the "Indirect Cost Directive").

These actions violate numerous constitutional and statutory provisions, causing Plaintiff States immediate and irreparable harm. Because each of the preliminary injunction factors is met

---

[1] All citations to exhibits herein refer to exhibits to the Declaration of Jessica Ranucci, unless otherwise noted.

in this case, Plaintiff States respectfully request that this Court issue an order enjoining the Priority Directive, the Indirect Cost Directive, and their implementation.

## BACKGROUND

### I.    NSF's Mandate to Diversify STEM Fields.

Since "Congress declare[d] it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics," it has recognized that this policy "requires substantial support, from currently available research and educational funds, for increased participation in science and technology by women and minorities."   Pub. L. No. 96-516 § 32, 94 Stat. 3007, 3011.  Congress has advanced this policy principally though NSF, which fulfills its mission "chiefly by making grants" that "account for about 25% of federal support to America's colleges and universities for basic research[.]"  *About NSF*, U.S. National Science Foundation, https://www.nsf.gov/about.  Congress has gone so far as to specifically instruct NSF that a "core strategy" of its overall work shall be to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in [STEM]."  42 U.S.C. § 1862k(b)(1).

Congress has specifically directed the NSF Director "to support programs designed to broaden participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(c), "make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers," 42 U.S.C. § 1862s-5(e)(1), and to "make awards to institutions of higher education (or a consortium of such institutions) to implement or expand research-based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields," 42 U.S.C. § 1862s-5(f)(1).

2

For Fiscal Year 2025, Congress appropriated approximately $7.18 billion to NSF for research and related activities to carry out the National Science Foundation Act of 1950, 42 U.S.C. § 1861 et seq. ("NSF Act"), and other statutory obligations, and $1.172 billion to NSF for STEM education to carry out the NSF Act and other statutory obligations.  Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10-11; Pub. L. No. 118-42, 138 Stat. 25, 161-62.

## II.    NSF Changes its Priorities in Clear Contravention of Congressional Policy.

NSF declared a priority reversal on April 18, 2025, abandoning longstanding, congressionally prescribed policy.  In the Priority Directive, NSF's then-Director announced that NSF's efforts "should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups," and that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." Ex. 1.  The Priority Directive purports to recognize that NSF's priorities are "modulated by statutory directives," and represents that "NSF will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates," but the Directive nonetheless discards the specific goal Congress assigned to NSF by statute—to increase STEM participation by underrepresented groups.  *Id*.

Following issuance of the Priority Directive, NSF started terminating grants en masse to projects run by public institutions in Plaintiff States in explicit reliance on the Priority Directive. In FAQs following the Directive, NSF stated that "[a]wards that are not aligned with program goals or agency priorities have been terminated, including … those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation."    Ex. 2.    Each of the terminations was effectuated using identical boilerplate notices stating that "termination of certain awards is necessary because they are not in alignment with current NSF Priorities."  *See, e.g.*, HI-

3

Irwin Decl. Ex. B.[2]  The notices contain no explanation of how specific projects fail to effectuate program goals or agency priorities.  And principal investigators of the affected projects were not provided any prior notice or any process.  *See, e.g.*, WI-Simcox Decl. ¶15.  Indeed, the notices state that the relevant termination is a "final agency decision and not subject to appeal."  *See, e.g.*, CA-Raman Decl. ¶24; *see also* Ex. 2 ("Terminations of awards on the basis that they no longer effectuate program goals or agency priorities are the final agency decision and are not appealable to NSF.").

The vast majority of terminated grants—which Defendants awarded after a thorough review process for intellectual merit and broader impact—support a wide range of research and efforts to broaden participation in STEM.  *See, e.g.*, CO-Schwartz Second Decl. ¶7(f) (grant to advance gender equity in computing and engineering academia); HI-Bruno Decl. ¶12 (grants to promote the participation of Native Hawaiians in engineering); MD-Steiner Decl. ¶6(c) (grant to enhance the number and competitiveness of STEM undergraduates, especially from underrepresented backgrounds); NJ-Porterfield Decl. ¶24 (grant to increase participation in STEM PhDs by underrepresented minority students through the establishment of a new doctoral program in Computer Science); NY-Friedman Decl. ¶33 (grant to improve participation rate of women and women of color in STEM faculty); WA-Blaser Decl. ¶7 (grant to promote increased participation in STEM fields by women with disabilities); WI-Mueller Decl. ¶7 (grant to ensure people with disabilities have the same opportunities to participate in physics and STEM); WI-Simcox Decl. ¶7 (grant to promote increased participation in STEM by Native American scientists).  A small

---

[2] A table listing the 61 declarations in support of this motion is attached as Exhibit 4.

minority of the affected projects relate to what NSF termed "environmental justice" and "misinformation/disinformation." Ex. 2.

NSF made clear that the grant terminations were undertaken to implement the Priority Directive. The termination notices cite "current NSF priorities," with many even hyperlinking to the Priority Directive. *See, e.g.*, HI-Irwin Decl. Ex. B. NSF's FAQs state that "[a]wards that are not aligned with program goals or agency priorities have been terminated." Ex. 2. The FAQs also include a list of terminated awards. Ex. 5.

As a result of NSF's implementation of the Priority Directive, Plaintiff States' institutions have had to stop working on projects focused on critical research in STEM education and training. CO-Schwartz Second Decl. ¶¶ 5, 15-16; HI-Hokoana Decl. ¶¶5, 18; RI-Jenkins Decl. ¶¶7, 57; WI-Mueller Decl. ¶¶5, 17. The loss of funding has impeded data collection and analysis efforts, which will affect the timely publication and dissemination of research findings on critical topics. HI-Bruno Decl. ¶3; NM-Holloway Second Decl. ¶20. WA-Patrick Decl. ¶12. For example, a terminated grant at the University of Delaware was for a project studying associations between health factors and suicidality or post-traumatic stress disorder among Veterans Health Administration patients with the aim of delivering actionable clinical insights to identify high-risk populations. DE-Garcia-Diaz Decl. ¶43. NSF's terminations also mean that new initiatives—such as fostering ongoing collaboration between Indigenous communities and Western scientists to support the health of the Great Lakes ecosystem—will not be implemented. WA-Patrick Decl. ¶14. The loss of these projects constrains innovation and slows down the development of future proposals that could advance national STEM priorities. There is no way to recover lost time or restore research continuity once disrupted. MA-Barton Decl. ¶213.

Postdoctoral scholars, project managers, undergraduate students, faculty and staff have lost or will lose their jobs because of the implementation of the Priority Directive. CO-Schwartz Second Decl. ¶19; OR-Goode Decl. ¶19; MD-Amoussou Decl. ¶20; NV-Gillum Decl. ¶21; WA-Ko Decl. ¶19; WI-Simcox Decl. ¶19. Faculty and staff who depart will take their training and expertise with them, requiring new investment in recruitment and training. WA-Ostendorf Decl. ¶18. The terminations also impact students' ability to continue their education and training, and have forced institutions to eliminate supportive mentorship programs that increase retention, persistence, and graduation rates in STEM. CT-Fowler Second Decl. ¶16; DE-Garcia-Diaz Decl. ¶¶23, 30, 37; HI-Irwin Decl. ¶¶7, 19-22. For example, the City University of New York has been forced to stop a program that trained more than 200 undergraduate students in wastewater-based epidemiology. NY-Wesson Decl. ¶14. Targeting projects that specifically promote participation in STEM by underrepresented groups, including women, minorities, and disabled people, will close pathways aimed at bringing underrepresented groups into STEM, ultimately impacting the nation's ability to innovate and develop its workforce. HI-Irwin ¶24; MD-Amoussou Decl. ¶22; NV-Gillum Decl. ¶24.

Multiple terminated grants also focused on improving STEM instruction for K-12 students in Plaintiff States and across the country through investing in teacher training, providing ongoing professional development for teachers, providing instructional resources, enhancing recruitment of underrepresented populations, and researching strategies to expand access to STEM education. DE-Garcia-Diaz ¶¶28-29; MD-Amoussou Decl. ¶5(a); WA-Anderson ¶¶12, 15; WA-Ko Decl. ¶8. Teachers will no longer have access to this vital training, support, and professional development, and students will be adversely impacted. The termination of one such grant at the University of Oregon will directly impact an estimated 20,000 students who will miss out on computer science

6

learning experiences at a time when technology is increasingly shaping opportunities and outcomes in society.  OR-Goode ¶18.

Funding reductions will hamper Plaintiff States' institutions' ability to deliver innovation, provide world-class education, and advance critical technologies in STEM.  CO-Schwartz Second Decl. ¶16.  This will ultimately limit the capacity of these institutions to drive progress and discover solutions to address some of society's most pressing challenges and will have a long-term negative impact on the STEM workforce pipeline in Plaintiff States and the nation.  WA-Ostendorf Decl. ¶¶17-19.

### III.    NSF's Indirect Cost Directive Upends Decades-Long Practice of Compensating Universities for their Administrative and Facilities Expenditures.

#### A.    An Array of Statutes and Regulations Provide for Calculating and Negotiating Indirect Cost Rates.

NSF grants, like other grants awarded for research by federal agencies, typically provide funds for two types of costs.  The first category is direct costs, which are costs attributed to a specific research project, such as specialized staff, equipment, and materials for the discrete project being funded.  The second category is indirect costs, which are costs necessary for the institution to carry out the research, but attributable to multiple projects.  Examples of indirect costs include building and maintaining buildings, laboratories, and lab equipment, paying the staff who maintain those buildings, heating and cooling costs, and paying administrative staff.  *See* NJ-Porterfield Decl. ¶11; NY-Friedman Decl. ¶26; RI-Jenkins Decl. ¶66; WA-Patrick Decl. ¶21; WA-Ostendorf Decl. ¶¶24-27; WI-Grejner-Brzezinska Decl. ¶9.  Indirect costs are critically important to research institutions because each research project rests on an institutional foundation that can be established and maintained only with adequate funding.

NSF, like other federal agencies, awards direct costs in its grants by providing specific dollar amounts to specific categories, such as senior personnel, graduate students, fringe benefits,

travel, and materials/supplies, all of which support the specific project. NSF, like other federal agencies, also awards a dollar amount of indirect costs in its grants. The amount of indirect costs allocated by NSF is calculated by taking a particular percentage of the modified total direct costs. That percentage is called the indirect cost rate. NSF does not permit indirect costs to be recovered on certain types of direct costs; commonly excluded costs include equipment and capital expenditures, participant support costs, and the portion of each subaward that exceeds $50,000. *See NSF's Indirect Cost Rate Policies*, U.S. National Science Foundation, https://www.nsf.gov/funding/proposal-budget/indirect-costs.

NSF does not choose the indirect cost rate each time it issues a grant; indirect cost rates are negotiated by each Institute of Higher Education ("IHE")[3] across their entire institution. There is a prescribed statutory and regulatory framework for how federal agencies, including NSF, must award indirect costs. Congress has specifically directed federal agencies, including NSF, to "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates." 41 U.S.C. § 4708. NSF has "formally adopted" the regulations promulgated by the Office of Management and Budget ("OMB") that establish uniform administrative requirements for federal grants, including procedures for calculating indirect costs. *See* 2 C.F.R. § 2500.100.

The federal government awards indirect costs only on the basis of an IHE's actual, allowable indirect expenses, shown via documentation. The rate is then calculated based on a specific process prescribed by regulation. Specifically, 2 C.F.R. § 200.414(e) provides that the

---

[3] An IHE is an educational institution in any state that meets statutory criteria, including authorization to provide a program of education beyond secondary education, a public or other nonprofit institution, and properly accredited. *See* 20 U.S.C. § 1001(a); Pub. L. No. 111-358, 124 Stat. 3982 (42 U.S.C.A. § 1862 note).

"[r]equirements for development and submission of indirect cost rate proposals" for IHEs are located in Appendix III to 2 C.F.R. part 200, which sets forth detailed substantive and procedural requirements for calculating indirect costs, including the formal negotiation process (§ C.11), a standard application form (§ C.12), documentation requirements (§ E), and certification by the IHE (§ F).  It can take over two years for a large research university to complete this complicated negotiation process.  NY-Martin Decl. ¶7.  Once set, an IHE's indirect cost rate is re-calculated, audited, and adjusted, if necessary, once the funds have been spent to ensure that the government is paying out only actual documented indirect costs.  2 C.F.R. § 200.501(b); Appx. III § (C)(11)(d).  These procedures have been followed by NSF and other agencies for decades.  *See* 41 U.S.C. § 4708; *see also* Pub. L. 87–638, 76 Stat. 437.

The schedule of "[n]egotiated indirect cost rates must be accepted by all Federal agencies." 2 C.F.R. § 200.414(c)(1).  The regulation provides only two exceptions that allow an agency to deviate from this negotiated rate: (1) "when required by Federal statute or regulation," or (2) "when approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]," which states that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  *Id.* §§ 200.414(c)(1), (c)(3).  Notably, each of these exceptions applies only to "either a class of Federal awards or a single Federal award."  *Id.* § 200.414(c)(1). NSF's Proposal and Award Policies and Procedures Guide—which is cross-referenced in NSF's regulations implementing OMB's uniform guidance, *see* 2 C.F.R. § 2500.100—reiterates the application of this statutory and regulatory framework to NSF, *see* NSF, *Proposal and Award Policies and Procedures Guide* at X-5, II-20, https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf.

Because institutions' indirect cost rates are based on their actual expenses, those rates vary between institutions. Institutions have a negotiated schedule that sets forth the rates for different types of work, including on-campus research and off-campus research. *See, e.g.*, RI-Jenkins Decl. ¶69. Off-campus research can be subject to lower rates. *See, e.g.*, CO-Moseley First Decl. ¶10 (rate of 54% for on-campus organized research and 26% for off-campus research); IL-Garcia-Solis ¶17 (rate of 50.5% for on-campus research and 26% for off-campus research). The vast majority of NSF-funded projects at Plaintiff States' IHEs are on-campus research projects with indirect cost rates of 40-60%. *See, e.g.*, CO-Christensen Decl. ¶10 (56% at University of Colorado at Denver); CO-Schwartz First Decl. ¶ 4 (56.5% at University of Colorado at Boulder); DE-Garcia-Diaz Decl. ¶13 (primarily 60% at the University of Delaware); HI-Syrmos Decl. ¶12 (45.5% at the University of Hawai'i); NV-Gomez Decl. ¶12 (47% at the University of Nevada, Reno); NJ-Pelesko ¶21 (50.5% at the New Jersey Institute of Technology).

### B.    NSF Caps Indirect Costs at 15% Across-the-Board

On May 2, 2025, NSF issued a "Policy Notice" titled "Implementation of Standard 15% Indirect Cost Rate" (the "Indirect Cost Directive"). Ex. 3. It announced that NSF "is updating its policy regarding the reimbursement of indirect costs in federally funded financial assistance," and that "[e]ffective May 5, 2025, NSF will apply a standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable." *Id.* It further stated that "[t]he 15% rate maximum" applies to all "new awards made to IHEs on or after May 5, 2025." *Id.*[4]

---

[4] The Indirect Cost Directive came on the heels of two nearly identical directives, one at the National Institutes of Health ("NIH") and one at the Department of Energy ("DOE"), both of which were swiftly enjoined by courts based on the same patent deficiencies and immediate harm that

The Indirect Cost Directive purported to "serve[] as public notification of the policies, procedures and general decision-making criteria that NSF has used to justify deviation from negotiated rates for all awards in accordance with 2 CFR 200.414(c) for the class of NSF financial assistance awarded to IHEs." *Id.* The entire "rationale" offered by the Directive is the following:

### Rationale

This policy supports NSF's commitment to:

- **Efficiency**: Reducing administrative burdens for awardee institutions.
- **Consistency**: Ensuring consistent treatment of all IHE financial assistance recipients.
- **Effectiveness**: Increasing the proportion of federal funds allocated to direct research costs.

This policy allows NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks. Applying a standard indirect cost rate also improves government efficiency by eliminating the need for individualized indirect cost negotiations.

*Id.*

The Indirect Cost Directive will have immediate negative impacts and stop IHEs from serving and meeting critical missions, including research and education. *See*, *e.g.*, CO-Christensen Decl. ¶¶5-6; HI-Syrmos Decl. ¶¶16-18; IL-Garcia-Solis Decl. ¶21-24; NV-Hatchett Second Decl. ¶¶18-20; NJ-Porterfield Decl. ¶¶14, 17, 18; OR-Tankersley Second Decl. ¶¶17-21, 64-67; RI-Jenkins Decl. ¶¶70-75; WA-Ostendorf Decl. ¶¶23-26; WI-Smith Decl. ¶¶12-15. For example, the Center for High Technology Materials at the University of New Mexico, which performs cutting edge research on novel semiconductor devices and quantum materials will be forced to operate at a reduced schedule, and semiconductor growth chambers may be shut down entirely. NM-Holloway First Decl. ¶12(a). The University of Colorado Boulder anticipated using $4 million

---

warrant an injunction here. *See Massachusetts. v. Nat'l Inst. of Health*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025); *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, 2025 WL 1414135 at *1 (D. Mass. May 15, 2025).

annually in indirect cost recovery to fund construction of a new academic and research facility that will host modern laboratories for chemistry, applied mathematics, and specialized quantum research; the Indirect Cost Directive puts this project at risk. CO-Schwartz First Decl. ¶20. The University of Washington will be unable to expand AI computing because that research requires access to expensive, powerful computers. WA-Ostendof Decl. ¶25. IHEs will also have to lay off employees, many of whom ensure compliance with a broad range of financial, legal, regulatory, and reporting requirements. NY-Friedman Decl. ¶16; IL-Garcia-Solis Decl. ¶24-26; NM-Holloway First Decl. ¶14; RI-Jenkins Decl. ¶73.

## ARGUMENT

Plaintiff States have satisfied each requirement for issuance of a preliminary injunction as to the Priority Directive and the Indirect Cost Directive: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020).

## I.    Plaintiff States Are Likely to Succeed on the Merits of their Claims Challenging the Priority Directive.

Plaintiff States are likely to succeed on the merits of their claims challenging the Priority Directive for several independent reasons. *First,* the Priority Directive violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious and contrary to law. *See* 5 U.S.C. § 706(2)(A). *Second*, the Priority Directive violates constitutional provisions enshrining the separation of powers. And *third*, the Priority Directive is *ultra vires*.

A.      **The Priority Directive Violates the APA.**

1.      **The Priority Directive is Subject to Review Under the APA.**

The Priority Directive is "final agency action" subject to review under the APA, 5 U.S.C. § 704, because it: (1) "mark[ed] the consummation" of agency decision-making, and (2) determined "rights or obligations ... from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up); *see also Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *8 (D.R.I. May 6, 2025); *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025); *Am. Assoc. of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084  (D. Mass. Apr. 29, 2025).  The Priority Directive conclusively declared that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."  Ex. 1.  There is nothing "tentative or interlocutory" about that determination.  *Rhode Island*, 2025 WL 1303868 at *9 (quotation marks omitted).  The Priority Directive also has concrete legal consequences—following its issuance, NSF relied on it to terminate grants and to announce that it will not support certain projects in the future.  NSF itself explicitly acknowledged, moreover, that its terminations based on the Priority Directive are a "final agency decision[.]"  *See, e.g.*, CA-Raman Decl. ¶24; CO-Schwartz Second Decl. Ex. C; *see also* Ex. 2 ("Terminations of awards … are the final agency decision[.]").

2.      **The Priority Directive is Arbitrary and Capricious.**

The APA requires that a court "hold unlawful and set aside agency action" that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  This standard "requires that agency action be reasonable and reasonably explained."  *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  If the agency has

> relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

its action fails arbitrary-and-capricious review. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Priority Directive is arbitrary and capricious for multiple reasons. *First*, Defendants failed to "engage in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up). In setting its new priorities, NSF provided a mere two sentences of apparent explanation:

> These efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups. Research projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities.

Ex. 1. This falls far short of what is required of an agency to demonstrate that its action is "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423; *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*" (emphasis in original) (cleaned up)). The Priority Directive makes no serious effort to explain why the projects referenced fail to "effectuate NSF priorities"— a particularly glaring omission when Congress specifically directed NSF to prioritize the kinds of projects the Directive declares to be contrary to NSF's priorities. The most the Priority Directive offers is a vague reference to "creat[ing] opportunities for all Americans everywhere," with no acknowledgment that Congress has already determined that these projects benefit the country and its residents. Ex. 1; 42 U.S.C. § 1885(a). By neglecting to address any of this—and instead providing the most conclusory of justifications[5]—NSF has failed to "examine the relevant data

---

[5] The Priority Directive does not appear to provide *any* explanation *at all* as to the "environmental justice" and "misinformation/disinformation" terminations undertaken pursuant to it.

and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up); *see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (an agency is required to "articulate[] a satisfactory explanation for [its] decision" (cleaned up)).[6]

*Second*, Defendants failed to demonstrate any awareness that the Priority Directive represents a *change* in position—on top of their obvious failure to justify that change. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "An agency may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Yet that is precisely what Defendants have done here, with zero attempt to explain (or even acknowledge) the Priority Directive's departure from the agency's long-held and statutorily-mandated priorities.

And *third*, the Priority Directive is arbitrary and capricious because Defendants "failed to consider ... important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. There is absolutely no consideration of reliance interests, including the substantial resources Plaintiff States' institutions have invested—by, for example, hiring staff and entering into contracts—in reliance on NSF's longstanding priorities and the statutory framework it has now effectively abandoned. *See*, *e.g.*, NJ-Porterfield Decl. ¶15; CO-Lyons Decl. ¶16. At the very least, Defendants were required to take these interests into account. *See Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the

---

[6] The terminations undertaken pursuant to the Priority Directive provide no better explanation. The boilerplate notices simply repeat that the "termination of certain awards is necessary because they are not in alignment with current NSF Priorities." *See*, *e.g.*, HI-Irwin Decl. Ex. B. There is absolutely no explanation of how the specific project at issue fails to effectuate agency priorities—requiring one to guess at NSF's basis for reaching that conclusion. *See*, *e.g.*, *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action[.]").

disadvantages of agency decisions." (emphasis in original)); *Regents*, 591 U.S. at 33 ("[B]ecause [the agency] was not writing on a blank slate . . . it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." (cleaned up)). Defendants entirely failed to conduct that analysis. Nor is there any indication that Defendants "pa[id] attention to the advantages *and* the disadvantages of [their] decisions," as the APA requires. *Michigan*, 576 U.S. at 753.

### 3.     The Priority Directive Is Contrary to Law.

Plaintiff States are also likely to succeed on their claim that the Priority Directive is contrary to law. *See* 5 U.S.C. § 706(2)(A). That is because the Priority Directive blacklists projects on subjects that Congress has expressly required NSF to support, making it functionally impossible for the agency to comply with its obligations under numerous federal statutes.

As discussed above, the NSF Act of 1950, as amended, requires NSF to not only support— but to pursue—programs designed to broaden participation of women, minorities, and people with disabilities in STEM fields. Section 1862k, titled "Findings; core strategies," specifically directs NSF to pursue congressional goals by applying a core strategy of developing intellectual capital "with particular emphasis on groups … that traditionally have not participated fully in [STEM]." 42 U.S.C. § 1862k(b)(1). Congress required this based on its judgment that "underrepresented populations are the largest untapped STEM talent pools in the United States," and that "the United States should encourage full participation of individuals from underrepresented populations in STEM fields." 42 U.S.C. § 1862s-5(b)(3), (4). The groups whose "increased participation in science and engineering" Congress has directed NSF to prioritize are "women, minorities, and persons with disabilities." 42 U.S.C. § 1885(b). Congress accordingly mandated that the NSF Director "continue to support programs designed to broaden participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(c), and "shall award grants ... to increase the

participation of underrepresented populations in STEM fields, including [women, minorities, and people with disabilities]." 42 U.S.C. § 1862s-5(d)(1). One of the enumerated goals NSF is statutorily directed to "identify and demonstrate project support of" when evaluating projects is "[e]xpanding participation of women and individuals from underrepresented groups in STEM." 42 U.S.C. § 1862p-14(a)(7).

Beyond the generally applicable mandate to support broadening access, the NSF Act is replete with mandates for specific outreach and projects. *See, e.g.*, 42 U.S.C. § 1862n(a)(5) (activities through Mathematics and Science Education Partnership grants shall include elementary and secondary school programs to encourage ongoing interest of girls in STEM and prepare girls to pursue undergraduate and graduate degrees and careers in STEM); *id.* § 1862p-6(a) (consideration must be given to the goal of promoting participation of women, minorities, and persons with disabilities when awarding grants for research experiences for undergraduates). Critical here, 42 U.S.C. § 1862p-4 requires NSF "to support . . . the Louis Stokes Alliances for Minority Participation program."[7] Grants under this program were terminated in Plaintiff States pursuant to the Priority Directive. *See, e.g.,* CA-Raman Decl. ¶20(t); CO-Moseley Second Decl. ¶5(j); CT-Fowler Second Decl. ¶4; HI-Irwin Decl. ¶5; MA-Barton Decl. ¶¶19, 131, 209, 224; MD-Steiner Decl. ¶6(b); NJ-Pelesko Decl. ¶46; OR-Tumer Second Decl. ¶4(iii).

Despite these Congressional mandates, NSF now says that "research projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities" and that investigators should not prioritize the broader impacts goal of

---

[7] Pursuant to this program, a group of IHEs work together to diversify the nation's STEM workforce. Louis Stokes Alliances for Minority Participation, National Science Foundation, https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation.

"[e]xpanding participation of women and individuals from underrepresented groups in STEM." 42 U.S.C. § 1862p-14(a)(7); Ex. 1. The APA does not allow an agency to flout Congress's clear directives in this way. *See, e.g.*, *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (explaining that a court may not accept "the agency's policy judgments ... if they conflict with the policy judgments that undergird the statutory scheme"); *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress"). The Priority Directive and its implementation are plainly irreconcilable with the weight of statutes that mandate Defendants to specifically support projects that seek to increase the participation of women, minorities, and people with disabilities in STEM. Defendants have therefore acted contrary to law, in violation of the APA.

### B.    The Priority Directive Is Unconstitutional and *Ultra Vires*.

The Priority Directive also violates separation-of-powers principles by contravening Congress's direction that NSF spend appropriations while prioritizing equity in STEM. The separation of powers doctrine is a central tenet of our Constitution and is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637-38 (2024). Article I of the Constitution allows only Congress to make law. U.S. Const. art. I, § 1. Thus, only Congress may create and define a federal agency and set its mission and purpose. *See Myers v. United States,* 272 U.S. 52, 129 (1926). The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City and Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (*citing* U.S. Const. art. I, § 9, cl. 7 and U.S. Const. art. I, § 8, cl. 1).

This foundational separation of powers principle is further reflected in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence

of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  And it has been codified in the

Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made

available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b),

and that "[n]o officer or employee of the United States may defer any budget authority" except in

exceedingly narrow circumstances, *id.* § 684(b); *see also In re Aiken Cnty.*, 725 F.3d 255, 261 n.1

(D.C. Cir. 2013) ("[E]ven the President does not have unilateral authority to refuse to spend the

funds").  As a result, "[a]bsent congressional authorization, the Administration may not redistribute

or withhold properly appropriated funds in order to effectuate its own policy goals." *San

Francisco*, 897 F.3d at 1235.  The President has no "unilateral authority to refuse to spend" vast

swaths of duly authorized and appropriated funding.  *See id.* at 1232 (quoting *Aiken Cnty*, 725 F.3d

at 261 n.1).

    As set forth above, Congress has consistently appropriated specific funds to NSF to further

the goals set out in the NSF Act—*i.e.*, to increase the involvement of communities

underrepresented in STEM and grow a diverse STEM workforce—which has, for years, included

billions of dollars of grant awards in furtherance of that purpose.  This NSF funding was duly

authorized and appropriated by Congress, and Defendants may not unilaterally refuse to spend it

by improperly terminating grants or by refusing to fund a class of congressionally mandated

projects in the future.  And because the Priority Directive is not authorized by the Constitution or

by statute, the Executive's authority is at "its lowest ebb." *San Francisco*, 897 F.3d at 1233

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

concurring)).  It accordingly violates separation-of-powers principles and is impermissible.

    For the same reasons, the Executive has failed to "take Care that the Laws be faithfully

executed," U.S. Const. art. II § 3—here, the laws directing NSF to support programs and fund

projects designed to increase STEM participation by women, minorities, and people with disabilities. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. "[T]he President may not decline to follow a statutory mandate … simply because of policy objections." *Aiken Cnty.*, 725 F.3d at 259. And by rejecting congressionally mandated policy to expand STEM participation by women, minorities, and people with disabilities, and terminating projects because they advance those congressionally mandated goals, Defendants have violated the Take Care Clause.

Defendants' actions are also *ultra vires*. As discussed, no constitutional or statutory authority allows NSF to entirely eliminate one of its congressionally articulated objectives. "Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers*, 272 U.S. at 129. Administrative agencies like NSF "are creatures of statute" created by Congress. *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). The Priority Directive—which directly contravenes the statutory mandates Congress provided—accordingly exceeds Executive authority and should be enjoined. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (federal courts have the authority to enjoin "violations of federal law by federal officials").

## II.    Plaintiffs Are Likely to Succeed on the Merits of their Claims Challenging the Indirect Cost Directive.

Plaintiffs are likely to succeed on the merits of their claims challenging the Indirect Cost Directive under the APA because the Directive is (1) arbitrary and capricious, and (2) contrary to

law. 5 U.S.C. § 706(2)(A).[8]  For decades, Congress has consistently rejected exactly the sort of across-the-board rate that the Indirect Cost Directive provides.  And multiple recent decisions have held that virtually identical directives at other federal agencies violate the APA.  *See Massachusetts*, 2025 WL 702163, at *1; *Dep't of Energy*, 2025 WL 1414135, at *1.

### A.    The Indirect Cost Directive Is Subject to Review Under the APA.

Like the Priority Directive, the Indirect Cost Directive is subject to APA review because it represents final agency action.  There is no doubt that the Directive "mark[ed] the consummation" of NSF's decision-making as to indirect cost rates, *see Bennett*, 520 U.S. at 177-78, as the Directive itself states that it "takes precedence over inconsistent policies and procedures set forth in the NSF Proposal & Award Policies & Procedures Guide for all financial assistance issued after the effective date."  Ex. 3.  The Directive also determined "rights or obligations" and "legal consequences will flow[.]" *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  The Directive sets forth the indirect cost rate for all "new awards made to IHEs on or after May 5, 2025." *Id.*  "[T]he decision-making process is complete, the policy is set, and the result of that process has already or will soon directly affect the parties," and so the Indirect Cost Directive is final agency action subject to APA review.  *Dep't of Energy*, 2025 WL 1414135, at *10.

### B.    The Indirect Cost Directive Is Arbitrary and Capricious.

The Indirect Cost Directive—like the Priority Directive—is arbitrary and capricious for numerous reasons.  *First*, the Indirect Cost Directive does not articulate any reasoned, non-

---

[8] Universities and university associations have also sued to the challenge the Indirect Cost Directive.  *See Ass'n of Am. Universities v. Nat'l Sci. Found.*, No. 25-cv-11231 (D. Mass.).  Cross-motions for summary judgment are set for hearing on June 13, 2025.  At the invitation of that court, Defendants have given notice that they are temporarily pausing implementation of the Indirect Cost Directive through the hearing date.  *Id.*, ECF No. 50.

conclusory basis for setting an across-the-board rate cap for the indirect costs of all IHEs—a significant change in agency policy. NSF invoked three "[r]ationale[s]" for the directive, each in a single clause. Ex. 3. As to the first "rationale"—"Efficiency: Reducing administrative burdens for awardee institutions"—there is no explanation (let alone evidence) to indicate what administrative burden will be lessened by the Directive. Nor is any explanation apparent. Notwithstanding the Directive's unsupported assertion that it will "improve[] government efficiency by eliminating the need for individualized indirect cost negotiations," *see id.*, both IHEs and the government will continue to expend resources to negotiate IHE-specific indirect cost rates. IHE's rates are negotiated with either the Department of Health and Human Services or the Department of Defense's Office of Naval Research. 2 C.F.R. part 200, Appendix III, paragraph C.11(a)(1). And the rates negotiated with those agencies will continue to apply to IHEs' grants from other federal agencies. 2 C.F.R. § 200.414(c)(1). Thus, both Plaintiff States and the federal government will continue to expend effort negotiating indirect cost rates.

As to the second "rationale"—"Consistency: Ensuring consistent treatment of all IHE financial assistance recipients"—Defendants provide no explanation as to why treating all IHEs the same, regardless of the institution or the type of research funded, is rational, nor any reason for departing from the existing scheme that sets the indirect cost rate based on an IHE's actual expenses. "Uniformity is not necessarily efficient or appropriate," *Dep't of Energy*, 2025 WL 1414135, at *12; different institutions have varied indirect costs because they conduct different types of research. Specialized technical research often requires expensive specialized facilities, which the Directive fails to take into account. *See, e.g.* WA-Ostendof Decl. ¶25.

And as to the last "rationale"—"Effectiveness: Increasing the proportion of federal funds allocated to direct research costs"—Defendants rely on the faulty and unsupported premise that

decreasing the portion of each award attributable to indirect costs and reducing "administrative overhead," will result in *more* research, not less.  *See* Ex. 3.  This is belied by the extensive evidence in the record showing the catastrophic consequences of cutting the indirect cost rate.  *See* NM-Holloway First Decl. ¶14 (Indirect Cost Directive would have "deeply damaging effects" on UNM's ability to conduct research from day one including across the board staffing reductions of at least 20 employees); NY-Friedman Decl. ¶¶22-25 ("devastating" harm to SUNY if the indirect cost rate is capped, including inability to pay facilities costs, payroll, information technology support, and inability to manage clinical trials, which will slow or end research, wasting the government's prior investments).  This is far from a reasonable response to the agency's stated goals, given the facts before it and its statutory authority.  *See, e.g., Dep't of Commerce*, 588 U.S. at 785; *State Farm*, 463 U.S. at 43; *Massachusetts*, 2025 WL 702163, at *17; *Dep't of Energy*, 2025 WL 1414135, at *12.

*Second*, the Indirect Cost Directive is arbitrary and capricious because *even if* some reasoned basis existed to set an across-the-board rate cap applicable to IHEs, the Directive does not articulate any reason, let alone any evidence, as to why 15%—a tremendous reduction—is the correct rate.  The only sentence of the Directive that even plausibly defends the 15% figure is a reference to "aligning with common federal benchmarks," but Defendants did not identify what benchmarks are being referenced, or how those unnamed benchmarks are "align[ed]" with the Directive.  This is precisely the type of "inscrutable reasoning" that, "given the information available to the agency, [is] facially irrational." *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 173 (1st Cir. 2021).

*Third*, the Indirect Cost Directive is arbitrary and capricious because it fails to provide the "substantial justification" required when reversing agency factual findings. *Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 106 (2015); *Fox Television*, 556 U.S. at 515.  The Indirect Cost Directive constitutes the reversal of not only agency policy with respect to indirect costs, but also factual findings reached between IHEs and the federal government, as reflected in the IHEs' Negotiated Indirect Cost Rate Agreements.  Existing negotiated indirect cost rates are the result of detailed documentary submissions by IHEs and extensive, fact-driven negotiation between IHEs and accounting experts representing the federal government through a years-long process.  *See supra* at 9.  NSF has provided no explanation to support its dramatic change in position. *Massachusetts*, 2025 WL 702163, at *18; *Dep't of Energy*, 2025 WL 1414135, at *13.

And *fourth*, the Indirect Cost Directive is arbitrary and capricious because it fails to recognize the practical consequences, reliance interests, and profound harms to Plaintiff States and their IHEs from an immediate, dramatic, and across-the-board cap, let alone justify why such consequences could possibly be warranted.  It is a basic rule of administrative law that an agency must "pay[] attention to the advantages *and* the disadvantages of agency decisions," *Michigan*, 576 U.S. at 753, and consider reliance interests, *Regents*, 591 U.S. at 30; *Massachusetts*, 2025 WL 702163, at *19; *Dep't of Energy*, 2025 WL 1414135, at *13.  Plaintiffs States' IHEs have negotiated indirect costs rates stretching years into the future, which have been budgeted for and upon which their staffing decisions rely.  *See, e.g.*, CO-Christensen Decl. ¶13; NJ-Pelesko Decl. ¶¶24-25; WA-Ostendorf Decl. ¶35.  The Indirect Cost Directive upends these reliance interests with only three days' notice and with no indication that these interests were at all considered.  Nor did Defendants grapple with Plaintiff States' IHEs' loss of hundreds of millions of dollars currently supporting STEM research, at the cost of future research efforts.  *See Massachusetts*, 2025 WL 702163, at *17.  Because Defendants "should have considered th[ese] matters but did not," their "failure was arbitrary and capricious in violation of the APA."  *Regents*, 591 U.S. at 33.

C.    **The Indirect Cost Directive Is Contrary to Law.**

No federal statute or regulation allows NSF to set a categorical indirect cost rate cap contrary to its decades-long practice. To the contrary, NSF must "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates," 41 U.S.C. § 4708, and must "accept[]" the "[n]egotiated indirect cost rate[]" used by all other federal agencies, unless an exception applies, 2 C.F.R. § 200.414(c)(1). Because the Indirect Cost Directive violates these mandates, it is contrary to law in violation of the APA.

In the Indirect Cost Directive, NSF suggests it need not follow the general prescription in 2 C.F.R. § 200.414(c)(1) that every federal agency, including NSF, use the single, negotiated indirect cost rate due to the exception in 2 C.F.R. § 200.414(c)(3) that specifies the parameters for limited deviations. *See* Ex. 3. But that exception does not apply here for three reasons.

*First*, an agency may invoke the (c)(3) exception only for "a class of Federal awards or a single Federal award." 2 C.F.R. § 200.414(c)(1). But the Indirect Cost Directive claims the exception for *all* NSF awards, to *all* IHEs, in perpetuity. That is, self-evidently, not a "single Federal award," nor a "class of Federal awards"—to allow the "class" of Federal awards to which the exception applies to be all awards to IHEs would render not only the term "class" meaningless, but would also make the entire regulatory scheme meaningless, as the (c)(3) exception would swallow the (c)(1) rule. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force."); *Massachusetts*, 2025 WL 702163, at *11; *Dep't of Energy*, 2025 WL 1414135, at *14 n.4.

*Second*, (c)(3) allows "deviations from negotiated rates," but the Directive is not just a deviation. *See Textron Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003) ("The Supreme Court has

repeatedly emphasized the importance of the plain meaning rule[.]").  By its own terms, the Directive "eliminat[es] the need for individualized indirect cost negotiations" at all.  Ex. 3.

*Third*, the (c)(3) exception only applies once an agency "implement[s], and make[s] publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3).  NSF has not done that here, nor could it.  No one-size-fits-all policy could satisfy the requirements of this regulation.  Under the Indirect Cost Directive, there will be no procedures and no decision-making criteria at all, since every award to every IHE will be treated exactly the same without any individualized consideration.  This squarely violates the regulation, and thus the APA.  *Fox Television*, 556 U.S. at 515 ("An agency may not ... simply disregard rules that are still on the books."); *Nat'l Env'tl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is 'axiomatic' . . . 'that an agency is bound by its own regulations.'"); *Massachusetts*, 2025 WL 702163, at *10; *Dep't of Energy*, 2025 WL 1414135, at *14-15.[9]

Nothing in the underlying statute permits this dramatic action.  Congress's actions in the decades since this statute has been in place have instead consistently rejected exactly the sort of across-the-board rate that the Indirect Cost Directive provides.  *See* Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437 (current version at 41 U.S.C. § 4708).  For example, after the Executive Branch proposed cutting the indirect cost rate to 10% for all NIH grants, Congress enacted an appropriations rider providing that existing regulatory "provisions relat[ed] to indirect costs" must continue to apply and has consistently reenacted the rider.  Pub. L. No. 115-141, § 226, 132 Stat.

---

[9]  The Indirect Cost Directive violates the regulation in yet another way as to the set of grants for which the Notices of Funding Opportunity were posted before May 2, 2025, but are to be awarded after May 5, 2025, as the regulation requires NSF to "include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement."  2 C.F.R. § 200.414(c)(4).

348, 740; *see also* 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.  There is simply no basis for the Indirect Cost Directive.

### III.     Plaintiff States Will Suffer Irreparable Harm Absent Injunctive Relief.

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In addition to sustaining sizeable monetary losses, Plaintiff States' IHEs have had to abruptly stop work on important projects focused on broadening participation in STEM.  *See, e.g.*, CO-Schwartz Second Decl. ¶7(f); HI-Bruno Decl. ¶¶12, 16, 23; MD-Steiner Decl. ¶6(c); NJ-Porterfield Decl. ¶24; WA-Anderson Decl. ¶6; WI-Simcox Decl. ¶7.  Faculty, staff, PhD and undergraduate students have lost or will lose jobs and research opportunities due to canceled projects.  *See, e.g.*, CO-Schwartz Second Decl. ¶19; OR-Goode Decl. ¶19; MD-Amoussou Decl. ¶20; NV-Gillum Decl. ¶21; RI-Jenkins Decl. ¶59; WA-Ko Decl. ¶19; WI-Simcox Decl. ¶19.  Undergraduate students have also lost access to training and mentorship programs.  *See, e.g.*, CT-Fowler Second Decl. ¶16; HI-Irwin Decl. ¶¶ 7, 19-22.

The Indirect Cost Directive will likewise cause imminent harm to Plaintiff States' IHEs because reducing the indirect cost rate to 15% will create budget shortfalls that will require IHEs to lay off staff, scale back or even halt critical research, and stop construction of new infrastructure projects.  *See, e.g.*, CO-Schwartz First Decl. ¶20; DE-Garcia-Diaz Decl. ¶18; HI-Syrmos Decl. ¶18; NM-Holloway First Decl. ¶¶12-14; RI-Jenkins ¶73.  Additionally, the Directive has already caused and will continue to cause immediate confusion, uncertainty, and operational chaos for Plaintiff States' IHEs, which have already budgeted for indirect costs based on longstanding federal practice.  *See, e.g.*, CO-Schwartz First Decl. ¶¶19-20; HI-Syrmos Decl. ¶¶16–17; IL-Garcia-Solis Decl. ¶¶ 21-22; MA-Barton Decl. ¶¶16-18.  Although NSF has agreed to temporarily pause the Directive, *see supra* n. 5, it has not revoked it.  To the contrary, NSF maintains that the 15% rate "will apply" retroactively to any award issued during the stay if it prevails in litigation

against the universities. *Nat'l Sci. Found.*, No. 25-cv-11231 (D. Mass.), ECF No. 50. This rate is financially unsustainable for Plaintiff States and their IHEs.

These types of harms have been recognized as warranting preliminary injunctive relief. *See City & Cnty of S. F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy, constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same). Even recoverable costs, "may constitute irreparable harm … where the loss threatens the very existence" of an organization or program. *Packard Elevator v. ICC*, 782 F. 2d 112, 115 (8th Cir. 1986); *see Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, No. 1:25-cv-00702-JRR, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (agency action affecting existence of programs and livelihoods of individuals within those programs constituted irreparable harm).

## IV. The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.

The equities and the public interest tip sharply in favor of Plaintiff States.[10] As detailed above, Plaintiff States have established an "extremely high likelihood of success on the merits," indicating that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). That is true because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id.*; *see also Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018); *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *30. An injunction here would preserve the status quo, which represents Congress's reasoned judgment that a diverse STEM workforce serves America's competitive interests, and decades of consistent practice across federal agencies as to how indirect

---

[10] These factors merge "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

costs are awarded.  And it would avoid harm to Plaintiff States and their institutions.  *See, e.g.*, *Massachusetts*, 2025 WL 702163, at *32 (recognizing harms including "the degradation of infrastructure," "brain drain," and "delay and potential suspension of future grant applications as institutions are unable to support additional research projects" as tipping equities in favor of the plaintiff states).  Because Plaintiff States have satisfied each preliminary injunction factor, they are entitled to relief.[11]

## **CONCLUSION**

Plaintiff States respectfully request that the Court grant their motion for a preliminary injunction.

---

[11] Some of the grants terminated pursuant to the Priority Directive are part of collaborative projects in which investigators from multiple institutions collaborate on a single, overarching research project, with each institution bearing responsibility for a separate award.  *See, e.g.*, WI-Mueller Decl. ¶ 6.  To afford full relief for the investigators in Plaintiff States who are part of these projects, relief should extend throughout the cooperative agreement.  *See* Proposed Order of Preliminary Injunction.

Dated: May 28, 2025            Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Special Counsel for Federal Initiatives
Colleen K. Faherty
Special Trial Counsel
Jessica Ranucci
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Attorneys for the State of New York*


**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
Caitlyn B. Carpenter*
Deputy Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
caitlyn.b.carpenter@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**ROB BONTA**
Attorney General for the State of California

By*: /s/ José Pablo Galán de la Cruz*
José Pablo Galán de la Cruz*
Deputy Attorney General
Maureen C. Onyeagbako*
Supervising Deputy Attorney General
Cheryl L. Feiner*
Senior Assistant Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3439
Pablo.Galan@doj.ca.gov
Maureen.Onyeagbako@doj.ca.gov
Cheryl.Feiner@doj.ca.gov

*Attorneys for the State of California*


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: /s/ *Lauren Peach*
Shannon Stevenson*
Solicitor General
Lauren Peach*
First Assistant Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Lauren.Peach@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: /s/ Ashley Meskill
Ashley Meskill*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorney for the State of Connecticut*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ *Cara Hendrickson*
Cara Hendrickson*
Assistant Chief Deputy Attorney General
Rebekah Newman*
Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Rebekah.Newman@ilag.gov

*Attorneys for the State of Illinois*

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: /s/ *Vanessa L. Kassab*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: /s/ Virginia A. Williamson
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General for the State of
Massachusetts

/s/ Katherine Dirks
Katherine Dirks*
Chief State Trial Counsel
Jak Kundl*
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

**AARON D. FORD**
Attorney General for the State of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Farng-Yi Foo*
Angela Cai
Executive Assistant Attorney General
Farng-Yi D. Foo*
Anaiis Gonzalez*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Farng-Yi.Foo@law.njoag.gov

*Attorneys for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: /s/ Astrid Carrete
Astrid Carrete*
Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504
(505) 490-4060
acarrete@nmdoj.gov

*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: /s/ *Anuradha Sawkar*
Anuradha Sawkar*
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
anu.sawkar@doj.oregon.gov

*Attorneys for the State of Oregon*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: /s/ *Ellen Range*
Ellen Range*
Assistant Attorney General
Office of the Washington State Attorney
General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

*Attorney for the State of Washington*

*Pro hac vice application forthcoming*

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: /s/ *Leonard Giarrano IV*
Leonard Giarrano IV*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Attorney for the State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: /s/ Aaron J. Bibb
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorney for the State of Wisconsin*

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 8,749 words, calculated using Microsoft Word, which complies with Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
       May 28, 2025

LETITIA JAMES
Attorney General of the State of New York
By: /s Colleen K. Faherty
Colleen K. Faherty
    Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov