UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et. al.*,

                              Plaintiffs,

         *v.*

NATIONAL SCIENCE FOUNDATION; BRIAN
STONE, in his official capacity as Acting Director of the
National Science Foundation,

                              Defendants.

25 Civ. 4452 (JPC)

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2734

Of Counsel:
MÓNICA P. FOLCH
ADAM GITLIN
Assistant United States Attorneys

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .......................................................................................................................2

    I.       NSF's Administration of Grants ...............................................................................3

    II.      NSF's Indirect Research Cost Cap ...........................................................................4

          A.  Direct and Indirect Costs ...................................................................................4

          B.  The May 2025 Policy ........................................................................................6

LEGAL STANDARD................................................................................................................6

ARGUMENT ...........................................................................................................................7

    I.       Plaintiffs Are Unlikely to Succeed on Their Grant-Termination Claims ....................7

          A.  This Court Lacks Jurisdiction Over Plaintiffs' Grant Termination Claims............7

               1.   The Court of Federal Claims Has Exclusive Jurisdiction Over the Grant-Termination Claims ........................................................................7

               2.   Congress Committed Grant Administration to Agency Discretion ................10

          B.  Plaintiffs' Grant-Termination Claims Also Fail on the Merits.............................11

               1.   The Grant Terminations Were Not Arbitrary of Capricious...........................11

               2.   The Grant Terminations Were Consistent with the NSF Act of 1950.............14

          C.  Plaintiffs' "Constitutional" Claims Also Fail ......................................................14

    II.      Plaintiffs Are Unlikely to Succeed on Their Claims Related to NSF's Cap ...............16

          A.  This Court Lacks Jurisdiction Over Plaintiffs' Cap Claims ...................................17

               1.   Plaintiffs' Lack Article III Standing to Challenge the Cap............................17

               2.   Plaintiffs' Cap Claims Are Not Ripe ..........................................................18

               3.   Plaintiffs' APA Cap Claims Are Unreviewable .............................................19

          B.  Plaintiffs' Cap Claims Also Fail on the Merits.....................................................19

        1.   The Cap Is Not Arbitrary or Capricious ...........................................................19

        2.   The Cap Is Consistent with Law ...................................................................21

            a.   The Cap Is Authorized by the Act and 41 U.S.C. § 4708..........................21

            b.   The Cap Is Consistent With 2 C.F.R. § 200.414(c) ...................................22

III.     Plaintiffs Fail to Demonstrate Irreparable Harm .........................................................23

   A.  Plaintiffs Fail to Demonstrate Irreparable Harm Arising from the Grant Terminations .................................................................................................................24

   B.  Plaintiffs Fail to Demonstrate Irreparable Harm Arising from the Cap ................24

IV.     The Balance of the Equities and the Public Interest Weigh in Favor of the Government...........................................................................................................................25

CONCLUSION...............................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,

204 F.3d 475 (3d Cir. 2000) ................................................................................ 24

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,

357 F.3d 62 (D.C. Cir. 2004) ................................................................................ 8

*Am. Petro. Inst. v. U.S. Dep't of Interior*,

81 F.4th 1048 (10th Cir. 2023) ........................................................................... 13

*Arab World, Inc.*,

645 F.3d 32 ......................................................................................................... 25

*Bd. of Regents v. Roth*,

408 U.S. 564 (1972) ............................................................................................ 19

*Boaz Hous. Auth. v. United States*,

994 F.3d 1359 (Fed. Cir. 2021) ............................................................................ 7

*Brooks v. Giuliani*,

84 F.3d 1454 (2d Cir. 1996) ............................................................................... 26

*Calixto v. Walsh*,

No. 19-1853, 2022 WL 4446383 (D.D.C. Sep. 23, 2022) .................................. 13

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,

370 F.3d 151 ....................................................................................................... 25

*Child Trends, Inc. v. Dep't Education*,

No. 25 Civ. 1154 (BAH), 2025 WL 1651148 (D. Md. June 11, 2025) .............. 10

*Clapper v. Amnesty Int'l USA*,

    568 U.S. 398 (2013) ................................................................................................ 18, 19

*Clinton v. Jones*,

    520 U.S. 681 (1997) ...................................................................................................... 16

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,

    247 F.3d 1378 (Fed. Cir. 2001) ..................................................................................... 9

*Dalton v. Specter*,

    511 U.S. 462 (1994) ........................................................................................... 14, 15, 16

*Department of Education v. California*,

    145 S. Ct. 966 (2025) ......................................................................................... 8, 9, 10

*Env't Def. Fund v. EPA*,

    922 F.3d 446 (D.C. Cir. 2019) ..................................................................................... 21

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009) ...................................................................................................... 12

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,

    602 U.S. 367 (2024) ...................................................................................................... 17

*Fox Television*,

    566 U.S. 515 ................................................................................................................. 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

    561 U.S. 477 (2010) ...................................................................................................... 16

*Grand River Enters. Six Nations, Ltd. v. Pryor*,

    481 F.3d 60 (2d Cir. 2007) ............................................................................................ 6

*Heckler v. Chaney,*

    470 U.S. 821 (1985) ...................................................................................................... 11

*Holbrook v. Tenn. Valley Auth.,*

    48 F.4th 282 (4th Cir. 2022) ......................................................................................... 11

*Holley v. United States,*

    124 F.3d 1462 (Fed. Cir. 1997) ..................................................................................... 8

*Hollingsworth v. Perry,*

    570 U.S. 693 (2013) ...................................................................................................... 18

*Kidwell v. Dep't of Army,*

    56 F.3d 279 (D.C. Cir. 1995) ........................................................................................ 8

*Lincoln v. Vigil,*

    508 U.S. 182 (1993) ...................................................................................................... 10

*Lujan,*

    504 U.S. 577 ............................................................................................................ 16, 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*

    567 U.S. 209 (2012) ........................................................................................................ 8

*Megapulse, Inc. v. Lewis,*

    672 F.2d 959 (D.C. Cir. 1982) ....................................................................................... 8

*Milk Train, Inc. v. Veneman,*

    310 F.3d 747 (D.C. Cir. 2002) ..................................................................................... 11

*Morrison v. Olson,*

    487 U.S. 654 (1988) ...................................................................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ...............................................................................................11, 12

*Murthy v. Missouri*,

    603 U.S. 43 (2024) ............................................................................................ 17, 18

*Nat'l Consumer Info. Ctr. v. Gallegos*,

    549 F.2d 822 (D.C. Cir. 1977) ............................................................................... 18

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,

    927 F.3d 1263 (Fed. Cir. 2019) .............................................................................. 13

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,

    538 U.S. 803 (2003) ............................................................................................... 19

*New York v. United States Dep't of Homeland Sec.*,

    969 F.3d 42 (2d Cir. 2020) ..................................................................................... 24

*Perry Cap. LLC v. Mnuchin*,

    864 F.3d 591 (D.C. Cir. 2017) ................................................................................. 8

*Printz v. United States*,

    521 U.S. 898 (1997) ............................................................................................... 16

*Raines v. Byrd*,

    521 U.S. 811 (1997) ............................................................................................... 17

*Roberts v. Progressive Preferred Ins. Co.*,

    No. 23 Civ. 1597 (PAG), 2024 WL 2295482 (N.D. Ohio May 21, 2024) ............... 18

*Rodriguez ex rel. Rodriguez v. DeBuono*,

    175 F.3d 227 (2d Cir. 1999) ................................................................................... 24

*Sampson v. Murray*,

    415 U.S. 61 (1974) ............................................................................................. 25

*Sharp v. Weinberger*,

    798 F.2d 1521 (D.C. Cir. 1986) ........................................................................ 10

*Sierra Club v. EPA*,

    353 F.3d 976 (D.C. Cir. 2004) ..........................................................................11

*Spectrum Leasing Corp. v. United States*,

    764 F.2d 891 (D.C. Cir. 1985) ............................................................................ 9

*Steel Co. v. Citizens for Better Environment*,

    523 U.S. 83 (1998) ............................................................................................... 7

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,

    709 F. Supp. 3d 118 (S.D.N.Y. 2024) ......................................................... 6, 26

*Sustainability Inst. v. Trump*,

    No. 25 Civ. 1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ........................ 10

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,

    282 F.3d 23 (1st Cir. 2002) ............................................................................... 24

*TransUnion*,

    594 U.S. 424 .......................................................................................................18

*Trump v. Hawaii*,

    585 U.S. 667 (2018) ........................................................................................... 21

*Trump v. New York*,

    592 U.S. 125 (2020) ........................................................................................... 19

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,

136 F.3d 641 (9th Cir. 1998) ................................................................. 9

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,

No. 25 Civ. 465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ........................................ 10

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

591 U.S. 1 (2020) ................................................................. 13

*United Aeronautical Corp. v. U.S. Air Force*,

80 F.4th 1017 (9th Cir. 2023) ................................................................. 8

*Up State Fed. Credit Union v. Walker*,

198 F.3d 372 (2d Cir. 1999) ................................................................. 9

*We The Patriots USA, Inc. v. Hochul*,

17 F.4th 266 (2d Cir. 2021) ................................................................. 6

*Webster v. Doe*,

486 U.S. 592 (1988) ................................................................. 11

*Whitmore v. Arkansas*,

495 U.S. 149 (1990) ................................................................. 18

*Winter v. Nat. Res. Def. Council*, Inc.,

555 U.S. 7 (2008) ................................................................. 6

**Regulations**

2 C.F.R. § 200.1 ................................................................. 5, 24

2 C.F.R. § 200.340(a)(4) ................................................................. 3

2 C.F.R. § 200.412 ................................................................. 4

2 C.F.R. § 200.413(a) ................................................................. 4

2 C.F.R. § 200.413(b) ............................................................................................................. 4

2 C.F.R. § 200.414(a) ........................................................................................................... 4, 5

2 C.F.R. § 200.414(c) ......................................................................................................... 22, 23

2 C.F.R. § 200.414(c)(1) .................................................................................................. 5, 22, 23

2 C.F.R. § 200.414(c)(3) ..................................................................................................... 5, 23

2 C.F.R. § 200.414(f) ........................................................................................................... 6, 21

2 C.F.R. § 2500.100 .................................................................................................................. 5

**Statutes**

5 U.S.C. § 701(a)(2) ......................................................................................................... 10, 19

5 U.S.C. § 702 .................................................................................................................... 7, 8

5 U.S.C. § 706(2)(A) ............................................................................................................ 11

28 U.S.C. § 1346(a)(2) ........................................................................................................... 8

28 U.S.C. § 1491(a)(1) ........................................................................................................ 1, 7

41 U.S.C. § 4708 ........................................................................................................... passim

42 U.S.C. § 1870(c) ....................................................................................................... passim

42 U.S.C. § 1873(e) .......................................................................................................... 11, 14

42 U.S.C. §§ 1862(a)(1) .......................................................................................................... 3

## PRELIMINARY STATEMENT

The National Science Foundation ("NSF") is an independent federal agency that supports science and engineering in the United States. Congress established NSF in 1950 to promote the progress of science, advance the national health, prosperity and welfare, and secure the national defense. NSF accomplishes these objectives primarily through grant agreements with America's Institutions of Higher Education ("IHEs") for basic research.

Plaintiffs request a preliminary injunction for two sets of claims: (1) contract-based grant termination claims; and (2) claims relating to NSF's imposition of a 15% cap on indirect costs in future grant awards. *See* Dkt. 6 ("Motion"). The request should be denied.

First, this Court should deny Plaintiffs' Motion for lack of jurisdiction. As to the grant termination claims, the Tucker Act requires that such claims be brought in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1). While Plaintiffs frame these claims as constitutional and statutory challenges and invoke the Administrative Procedure Act, Plaintiffs essentially seek to undo NSF grant terminations and require the United States to specifically perform the agreements. The APA thus does not confer jurisdiction upon this Court to review Plaintiffs' claims or to restore previously awarded grants. Separately, Plaintiffs' claims are prohibited programmatic challenges rather than challenges to identified final agency actions, and grant termination decisions are not subject to APA review because the awarding and termination of grants is committed to agency discretion by law.

With respect to the imposition of a 15% indirect-cost cap (the "Cap"), the Court does not have jurisdiction to decide Plaintiffs' claims because they have not shown that they have standing to assert them. Plaintiffs cannot show that the Cap caused them injury-in-fact because it only applies to newly issued awards and does not require IHEs to amend budgets for existing awards.

1

Similarly, Plaintiffs' claims are not ripe because, in light of the prospective nature of the Cap, Plaintiffs do not cite to any examples of institutions that have "certainly impending" injuries arising from the Cap.

Second, even if Plaintiffs' claims are justiciable, they fail on their merits. The terms and conditions of Plaintiffs' grant agreements provided that a change in agency priorities is a valid basis for the agency to terminate the grants. NSF's grant terminations were based on the agency's new priorities, and complied with applicable statutes. Moreover, the Cap is authorized by NSF's organic statute, is additionally authorized by 41 U.S.C. § 4708, and is reasonable.

And even if the Court determines it has jurisdiction and finds the claims meritorious, the Court should deny Plaintiffs' request for injunctive relief. Plaintiffs have failed to show irreparable harm or that such relief is in the public interest.

## BACKGROUND

The National Science Foundation Act of 1950 (the "Act" or "NSF Act"), Pub. L. No. 81-507, 64 Stat. 149, established NSF as an independent agency "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes." To that end, the Act gave NSF broad grant-making authority. The Act "authorized and directed" NSF to "initiate and support basic scientific research" in a range of scientific and mathematical fields through "contracts or other arrangements (including grants, loans, and other forms of assistance)." *Id.* § 3(a)(2). The Act gave NSF latitude to fund any research NSF "deem[ed] necessary to carry out" its mission. *Id.* § 11(c). And the Act authorized NSF to use "its discretion" to use appropriations in whatever way would "best realize" four objectives: (1) having qualified persons perform the research; (2) "strengthening the research staff of organizations" in the United States; (3) "aiding institutions, agencies, or organizations which, if aided, will advance basic

2

research"; and (4) "encouraging independent basic research by individuals." *Id.* § 14(g). The Act otherwise provided no limitations on how to make or fund grants. The Act's original grant-making authorities continue in effect substantially unchanged today. *See* 42 U.S.C. §§ 1862(a)(1), 1870(c), 1873(e).

In 2024, NSF funded approximately 11,000 grants. Declaration of Brian Stone ("Stone Decl.") ¶ 5. Of these, approximately 9,400 grants were awarded to IHEs. *Id.* NSF is "responsible to Congress and taxpayers for carrying out its mission in a manner that not only facilitates research but does so cost-effectively." *Id.* ¶ 14.

## I.    NSF's Administration of Grants

NSF awards are subject to terms and conditions specified in the award notice, which provide NSF the authority to terminate awards that no longer effectuate program goals or agency priorities. *Id.* ¶ 15. Similarly, after NSF awards a grant, 2 C.F.R. § 200.340(a)(4) permits NSF to terminate that award in part or in its entirety "if [it] no longer effectuates the program goals or agency priorities."

On April 18, 2025, NSF issued a "Statement of U.S. National Science Foundation Priorities." (the "Priority Directive"). The Priority Directive explained that "NSF priorities are grounded in the mission of the agency and modulated by statutory directives and administration priorities," and noted that "NSF's broadening participation activities, including activities undertaken [to broaden participation in science and technology], must aim to create opportunities for all Americans everywhere." *Id.* ¶ 17. It further clarified that such "efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups." *Id.* Research projects with more narrow impact limited to subgroups of people based on protected class or characteristics "do not effectuate NSF priorities." *Id.*

Thereafter, NSF conducted a careful review of awards to determine whether they were aligned with NSF priorities, as articulated in the Priority Directive. Based on the review, NSF terminated a total of 1,665 awards. *Id.* ¶ 20. Each grant termination letter explained that after reviewing the awards "carefully and individually," NSF "determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." *Id.* The termination letters further explained that NSF was "issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities." *Id.*[1]

## II.    NSF's Indirect Research Cost Cap

### A.  Direct and Indirect Costs

NSF grants generally cover two types of expenses: direct costs and indirect costs. *See* 2 C.F.R. § 200.412. "Direct costs" are "identified specifically with" a particular research project or activity—*i.e.*, the specific research that NSF intends to support with the grant. *Id.* § 200.413(a). Direct costs include, for example, the "proportion of employee compensation" expended on the research and the costs of "supplies needed to achieve the award's objectives." *Id.* § 200.413(b).

NSF grants may also cover certain "indirect costs." 2 C.F.R. § 200.414(a). These costs support "more than one" research project or activity and are "not readily assignable" to specific research "without effort disproportionate to the results achieved." *Id.* § 200.1. First, indirect "facilities" costs include "depreciation on buildings, equipment and capital improvements, interest

---

[1] The NSF Grant General Conditions (GC-1) "Termination and Enforcement" term and condition provides that an "award may be suspended or terminated in whole or in part" by NSF "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *See, e.g.*, NSF Grant General Conditions (GC-1) Effective for Awards Made on or After May 20, 2024, *available at* https://nsf-gov-resources.nsf.gov/files/may24-r.pdf

on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* § 200.414(a). Second, indirect "administration" costs include "general administration and general expenses such as the director's office, accounting, personnel and all other types of expenditures not listed" elsewhere. *Id.*

Indirect costs generally are paid based on an "indirect cost rate." The higher the indirect cost rate, the more NSF will reimburse. For example, if a university has an indirect-cost rate of 69 percent for on-campus research, NSF may pay up to $169,000 for a $100,000 grant: $100,000 in direct costs plus $69,000 in indirect costs.

To determine the indirect cost rate that will apply to a particular grant, NSF has adopted the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Guidance"). *See* 2 C.F.R. § 2500.100. As a default, section 200.414(c)(1) of the Guidance generally requires NSF to pay indirect costs based on a rate periodically negotiated with each grantee institution, which is memorialized in a negotiated indirect cost rate agreement ("NICRA"). *Id.* § 200.414(c)(1); *see id.* pt. 200, subpart E & app. III. But the Guidance also provides a path for NSF to depart from those rates. That is, section 200.414(c)(1) also states that a "Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award" in two instances: first, "when required by Federal statute or regulation," and second, "when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." *Id.*

In addition to providing the path to depart from NICRA rates, the Guidance provides for a default "de minimis rate of up to 15 percent" for institutions that have not negotiated rates. *Id.* § 200.414(f). In those circumstances, the grant recipient "is authorized to determine the appropriate rate up to this limit" and need not provide "documentation to justify its use." *Id.*

## B. The May 2025 Policy

Plaintiffs take issue with the Cap instituted prospectively by NSF on May 2, 2025, addressing indirect-cost rates. Dkt. No. 1-3. The Cap applies a standard, predetermined indirect cost rate capped at 15 percent to grant awards issued by NSF after May 5, 2025. *Id.* It applies "to all grants and cooperative agreements awarded to IHEs" after May 5, 2025, "for which indirect costs are allowable." *Id.* It does not apply to existing awards, or to continuing grant increments. *Id.* The Cap's allowance of a standard rate up to 15 percent is equivalent to the default rate that already applies by regulation in the absence of individually negotiated rates.

## <u>LEGAL STANDARD</u>

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

# ARGUMENT

## I.    Plaintiffs Are Unlikely to Succeed on Their Grant-Termination Claims

### A.  This Court Lacks Jurisdiction Over Plaintiffs' Grant-Termination Claims

#### 1.   The Court of Federal Claims Has Exclusive Jurisdiction Over the Grant-Termination Claims

The Court must first assess whether it has subject matter jurisdiction. *See Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States'"). Plaintiffs' challenges to NSF's grant terminations are contract claims over which this Court does not have jurisdiction. In challenging the NSF's grant terminations, Plaintiffs seek an order that (1) prevents NSF from "implementing the Priority Directive" to terminate grants, and (2) "restore[s] the status quo of Plaintiff States' funding." *See* Dkt. 5-1 at ¶¶ 1, 3. Thus, Plaintiffs' relief is premised on contracts (the NSF grants) between the United States and Plaintiff States' IHEs.

That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."[2] 28 U.S.C. § 1491(a)(1). The Tucker Act precludes relief under the APA or otherwise because the APA's waiver of sovereign immunity is limited to claims "seeking relief other than money damages," 5 U.S.C. § 702, and the APA does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Department*

---

[2] The grant awards here are simply "contracts to set the terms of and receive commitments from recipients," *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The bar on district court jurisdiction therefore applies and a "suit in the Claims Court for damages relating to [the] alleged breach" is the only recourse. *Id.*

*of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Moreover, Congress has by statute explicitly precluded district court jurisdiction over such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States [unless it is for less than $10,000].").

Plaintiffs assert constitutional and statutory claims challenging the "Priority Directive." *See generally* Motion 12–20. But that is of no moment. Courts must look to the claims' "substance, not merely [their] form." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). Thus, regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997). Determining whether "a particular action" is "at its essence a contract action," not within the jurisdiction of the district courts, requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). Both prongs point toward a lack of district court jurisdiction here.

First, the source of the rights Plaintiffs assert is the grant agreements themselves. Specifically, Plaintiffs reference NSF's statutory obligations to award grants, and they point to "sizeable monetary losses" Plaintiffs have sustained as a result of the grant terminations. Motion

at 16-17, 27. "Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over constitutional claim because it was contractually based). In other words, "it is likely that no cause of action would exist at all" in the absence of the contracts. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

The relief prong of the test weighs against jurisdiction here. Indeed, the Supreme Court recently explained that the type of relief sought here is in the heartland of the Tucker Act's bar. There, several plaintiffs brought a similar APA challenge to termination of federal grants that no longer aligned with agency priorities. *California*, 145 S. Ct. at 968. After the district court issued a temporary restraining order enjoining the government from terminating those grants and requiring the government to restore plaintiffs to the pre-existing status quo, the Supreme Court stayed that order, explaining that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968–69. According to the Supreme Court, suits seeking relief like that sought by the *California* plaintiffs (like the relief sought here) belong in the Court of Federal Claims. *See id.*

After *California*, the Fourth Circuit recently stayed a district court injunction effectively identical to the one sought here. *Sustainability Inst. v. Trump*, No. 25 Civ. 1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Plaintiffs there brought APA and *ultra vires* constitutional claims seeking to prevent and reverse grant terminations. *Id.* Looking to *California*, the Fourth Circuit concluded that it was likely that the district court lacked jurisdiction to order the relief sought. *Id.* In so concluding, the Fourth Circuit noted that, "[w]hile the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.*; *see also Child Trends, Inc. v. Dep't Education*, No. 25 Civ. 1154 (BAH), 2025 WL 1651148, at *7 (D. Md. June 11, 2025).

At bottom, in seeking an injunction to maintain payments pursuant to a contract with the United States, Plaintiffs "want[] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25 Civ. 465 (TNM), 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025), appeal dismissed, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025). Because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at *7 (quoting *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986)).

### 2. Congress Committed Grant Administration to Agency Discretion

Plaintiffs' claims are separately unreviewable because they challenge funding decisions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Id.* at 193. These principles are not limited to lump-sum appropriations; section 701(a)(2)

bars review when an appropriation confers discretion on the agency. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002).

NSF's actions to terminate existing grants or award future grants are unreviewable. Congress has authorized NSF to issue grants it "deems necessary to carry out" its mission. 42 U.S.C. § 1870(c). To that end, NSF is given "discretion" to "utilize appropriations" in order to "best realize" four congressional objectives. *Id.* § 1873(e). Statutory language that empowers the agency head in such a manner "fairly exudes deference to the" agency head. *See Webster v. Doe*, 486 U.S. 592, 600 (1988). Plaintiffs' references to statutory language discussing the award of grants, *see, e.g.*, Motion at 16, cannot overcome the broad discretion conferred by Congress to invest in particular grantees or projects consistent with the direction provided in relevant statutes.[3]

### B.  Plaintiffs' Grant-Termination Claims Also Fail on the Merits

#### 1.  The Grant Terminations Were Not Arbitrary or Capricious

Even if the grant terminations were reviewable under the APA, which they are not, they satisfy the APA standard. The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted).

---

[3] Plaintiffs cannot overcome the discretion conferred on NSF by Congress under the Act. Where a decision is presumptively non-reviewable, as with funding allocations, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)). Plaintiffs do not cite to any particular sources of law that show that Congress intended through the APA to waive sovereign immunity by curbing NSF's discretion to issue the policy.

As a result, a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks and citation omitted). The terminations clear these hurdles.

In terminating individual grants, NSF issued letters explaining that the agency had "determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities," and that NSF was "issuing this termination to protect the interests of the government." Stone Decl. ¶ 20. In referencing the Priority Directive in the termination letters, NSF made clear that its current priorities were to "create opportunities for all Americans everywhere" and "not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups." *Id.* ¶ 17. Finally, NSF noted that the grants at issue "no longer effectuate the program goals or agency priorities," and as such they were terminated pursuant to "NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement.'" *Id.* ¶ 20. Thus, NSF provided the reasons for its terminations and the authority under which it was terminating those grants. And a change in agency priorities following a change in administration "is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 59 (Rehnquist, J., concurring in part, dissenting in part). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* Although Plaintiffs may disagree with the agency's new priorities, the agency "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . . , that there are good reasons for it, and that the agency believes it to be better." *Fox Television*, 566 U.S. at 515.

Further, Plaintiffs are incorrect that NSF "failed to demonstrate any awareness that the Priority Directive represents a change in position." Motion 15. The reasoning provided in each grant termination noted terminations were necessary because certain grants were "not in alignment with *current* NSF priorities," and explained that the terminated award at issue "*no longer* effectuate the program goals or agency priorities." Stone Decl. ¶ 20. (emphasis added).

Plaintiffs' reliance-interest arguments also fail. Motion 15. First, Plaintiffs have no legally protectible reliance interests in grants that they have not yet been awarded. *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 927 F.3d 1263, 1269 n.4 (Fed. Cir. 2019) (holding amendment to Veterans Affairs' regulations "[did] not defeat veterans' reliance interests" because the amendment "applied only prospectively"). And with respect to now-terminated grants, NSF necessarily understood and considered that it was terminating funding on which the grantee relied to conduct research when it terminated the grant for that research. Plaintiffs may disagree with the agency's weighing of Plaintiffs' interests against the agency's responsibilities and priorities, but Plaintiffs cannot substitute their judgment for the agency's. *See Am. Petro. Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1066 (10th Cir. 2023) ("Though an agency must adequately consider any 'legitimate reliance' on an existing policy, such reliance is not 'necessarily dispositive' to the agency's decision"; "an agency may conclude, for instance, that reliance interests were 'entitled to no or diminished weight' or outweighed by 'other interests and policy concerns") (quoting U*.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020)); *Calixto v. Walsh*, No. 19-1853, 2022 WL 4446383, at *16 (D.D.C. Sep. 23, 2022) ("Even if the agency considers the reliance interests to be serious, it may nonetheless determine that other interests and policy concerns outweigh any reliance interests."). Where NSF decided to terminate

13

a grant that was funding research, Plaintiffs' or their members' reliance on that research funding cannot compel NSF to maintain the grant.

### 2. The Grant Terminations Were Consistent with the NSF Act of 1950

Plaintiffs argue that the termination of grants is contrary to the NSF Act. Motion at 16. While the Act requires NSF to award grants to eligible entities to increase the participation of underrepresented populations in science and technology, it allows the agency significant discretion in doing so. *See* 42 U.S.C. § 1870(c); *id.* § 1873(e). Plaintiffs have not alleged that NSF has failed to support *any* programs within the ambit of the statute. Plaintiffs focus on the termination of their grants, but, NSF has awarded and maintains thousands of other grants. In fact, NSF is continuing to fund grants supporting the participation of women, minorities, and people with disabilities in science and engineering. Stone Decl. ¶ 21. More broadly, NSF is continuing to fund grants that generally encourage participation in science, mathematics, and engineering, which will necessarily have the effect of encouraging the participation of the populations addressed in the statutes. *Id.* The statutes permit NSF discretion to decide which grants among these categories to approve and renew to effectuate those goals. That is what NSF has done.

### C. Plaintiffs' "Constitutional" Claims Also Fail

Plaintiffs' constitutional claims alleging violations of the Separation of Powers and the Take Care Clause, *see* Compl. ¶¶ 106–31, lack merit. As a threshold matter, Plaintiffs' asserted constitutional claims are actually statutory claims framed using constitutional language—as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory

authority is *ipso facto* in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5. Here, Plaintiffs' claims focus entirely on their contentions that Defendants have not acted consistent with statutory obligations. Motion at 25–27. Under *Dalton*, such claims cannot succeed.

Plaintiffs' claim under the Take Care Clause, *see* Dkt. 1 ¶¶ 119–125 (Count IV), also fails on its own merits. The Government is not aware of a case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. In reality, the claim comprises a broad programmatic attack against Defendants in an attempt to circumvent the limitations of the APA. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against either of the Defendants. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing the Defendant agency, but rather, are based on Plaintiffs' subjective views about how to best implement and administer that agency.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922

(1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws.

## II.    Plaintiffs Are Unlikely to Succeed on Their Claims Related to NSF's Cap

Plaintiffs are unlikely to succeed on their claims related to NSF's Cap because the Court does not have jurisdiction to decide Plaintiffs' claims. Plaintiffs have not shown injury-in-fact or that their claims are ripe for review. The Court lacks jurisdiction for the additional reason that NSF's grant-related decisions are committed to discretion by law under the APA. In addition, Plaintiffs' claims are also unlikely to succeed on the merits. The Cap is authorized by NSF's organic statute, is additionally authorized by 41 U.S.C. § 4708, and is reasonable.

### A.  This Court Lacks Jurisdiction Over Plaintiffs' Cap Claims

The Court lacks subject matter jurisdiction over Plaintiffs claims because they have not established injury-in-fact, Plaintiffs' claims are not ripe for review, and they are unreviewable pursuant to the APA.

#### 1.  Plaintiffs Lack Article III Standing to Challenge the Cap

The Court should deny Plaintiffs' request for a preliminary injunction regarding the new Cap relating to indirect costs because they lack Article III standing to bring their challenge. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

Because "standing is not dispensed in gross," "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation and internal marks omitted). The "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Further, to establish injury-in-fact, Plaintiffs must allege harm that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "*certainly impending*"; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and alterations omitted). And it must be "concrete—that is, real, and not abstract." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted); *see also Murthy*, 603 U.S. at 43, 58 ("because the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury" (internal quotation marks omitted)). Plaintiffs have failed to meet that burden here.

Specifically, Plaintiffs have not established injury-in-fact. No Plaintiff has alleged that NSF has altered the terms of an existing grant by applying the 15 percent indirect cost rate. Plaintiffs cannot make such an allegation because NSF's policy applies "only to *new awards* made to IHEs on or after May 5, 2025"—not to *existing* awards. Stone Decl. ¶ 23. Second, no Plaintiff has alleged that it has received a new grant award at the 15 percent indirect cost rate. Thus, the only "injury" a Plaintiff can identify would stem from potentially being offered a grant award with a lower indirect cost rate, or having to submit (or decide not to submit) grant proposals using the new indirect cost rate. But an opportunity to accept or reject federal funding for research on any terms

17

offered by NSF is not an injury. Rather, claims concerning "hypothetical, future grants—that Plaintiffs may or may not be eligible for" are "nothing more than a generalized grievance about Defendants' programs." *Roberts v. Progressive Preferred Ins. Co.*, No. 23 Civ. 1597 (PAG), 2024 WL 2295482, at *8 (N.D. Ohio May 21, 2024). "The Supreme Court has 'repeatedly held that such a "generalized grievance," no matter how sincere, is insufficient to confer standing.'" *Id.* (citing *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)); *see also, e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("possible future injury" does not suffice for standing); *Clapper*, 568 U.S. at 409 (conjectural future injuries or alleged fear of such injuries do not establish standing); *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822, 828 (D.C. Cir. 1977) (year-to-year grants "cannot create more than a 'unilateral expectation' . . . which is not entitled to constitutional protection" (citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).

### 2.  Plaintiffs' Cap Claims Are Not Ripe

Article III further requires that the Court only adjudicate claims that are ripe for review. Ripeness requires that an alleged injury be "certainly impending"; a claim is not ripe if it is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation and internal quotation marks omitted). A court lacks jurisdiction over un-ripe claims that do not satisfy the Constitution's case or controversy requirements. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

Plaintiffs do not cite to any examples of IHEs that have "certainly impending" injuries arising from the Cap. Instead, Plaintiffs cite to several existing contracts between NSF and educational institutions, *see* Compl. ¶¶ 82–85, which, because the Cap is forward-looking, are not

affected by the Cap. Nor have Plaintiffs alleged that any particular institution has applied for, or has been denied, funding under NSF's new policy. Absent any indication that injuries to Plaintiffs are "certainly impending," Plaintiffs' alleged potential future injuries are not ripe for review. *See Clapper*, 568 U.S. at 409 ("[T]hreatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.").

### 3. Plaintiffs' APA Cap Claims Are Unreviewable

For the same reasons discussed *supra* at I.A.2, NSF's Cap decision is a funding determination that is "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2).

### B. Plaintiffs' Cap Claims Also Fail on the Merits

Even if the Court were to find that the Cap is reviewable under the APA, Plaintiffs are not likely to succeed on their APA claims because the Government acted reasonably and followed proper procedures in instituting the Cap. In addition, the Cap is lawful: it is authorized by NSF's organic statute, and it is additionally authorized by 41 U.S.C. § 4708.

### 1. The Cap Is Not Arbitrary or Capricious

Even if the Court were to find that the Cap is reviewable under the APA, Plaintiffs are not likely to succeed on their APA claims because the Government acted reasonably and followed proper procedures in instituting it. The Cap acknowledges it is an "updat[e]" and "change" to NSF's preexisting policy. Dkt. 1-3, at 2. It sets out the reasons for the change: to increase "efficiency" by "[r]educing administrative burdens for awardee institutions" and "eliminating the need for individualized indirect cost negotiations," "consistency" by "[e]nsuring consistent treatment of all IHE financial assistance recipients," and "effectiveness" by "[i]ncreasing the proportion of federal funds allocated to direct research costs." *Id.* at 3. The Cap explains the change will "allow[] NSF and its awardees to focus more on scientific progress and less on administrative

overhead by aligning with common federal benchmarks." *Id.* That is, NSF "is responsible to Congress and taxpayers for carrying out its mission in a manner that not only facilitates research but does so cost-effectively"; "[i]ndirect costs, by definition, constitute Federal expenditures that do not directly support researchers." *Id.* ¶ 14.

Plaintiffs argue that the Cap does not articulate any reasoned, non-conclusory basis for setting an across-the-board rate cap for indirect costs. Motion 21-22. However, as Plaintiffs concede, the justifications for the Cap are in its plain text: "efficiency," "consistency," and "effectiveness." Dkt. 1-3 at 3. Plaintiffs take issue with the substance of these justifications, but they are mere disagreements with NSF's decision, which are insufficient to satisfy the arbitrary and capricious standard. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018).

Plaintiffs also argue that the Cap ignores reliance interests. Not so. The Cap considers reliance interests—first, because it applies only to "funding opportunities issued after May 5, 2025," and not "to existing awards" Dkt. 1-3 at 3. The Cap explained that institutions therefore "are not required to amend budgets for awards issued before this effective date, nor will they be required to return previously reimbursed indirect costs." *Id.* (emphasis in original). NSF also considered the IHEs' reliance interest on "continuing grant awards" by excepting those grants from the Cap, as well. *Id.* To the extent Plaintiffs argue that they have reliance interests arising from grant awards that have not yet been made, and then rely on receiving reimbursement for indirect costs at their previous rates (or some unspecified rates that exceed the Cap), those speculative interests are not protected by law.[4]

---

[4] At bottom, to the extent that Plaintiffs have any reliance interest in the receipt of future grants (which they do not), the Cap reflects the policy judgment that it is preferable to "[i]ncreas[e] the proportion of federal funds allocated to direct research costs" even at the cost of disrupting those private reliance interests. Dkt. 1-3, at 3.

Lastly, Plaintiffs argue that the Cap is arbitrary and capricious because it does not explain why 15 percent is the correct rate, and it fails to provide the "substantial justification" to reverse agency factual findings. Motion at 22-23. Yet the Cap does explain the basis for the 15% rate, namely that it "allows NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks." Dkt. 1-3, at 3. And 15% was a pre-existing, publicly known number as it was the default "de minimis rate" for institutions that have not negotiated rates.  2 C.F.R. § 200.414(f).  In any event, even where regulatory obligations are involved, agencies need not address every potential issue "in one fell swoop." *Env't Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019) (citation omitted). "It is not for [the court] to second-guess" what the agency chooses to prioritize. *Id.* (citation and internal quotation marks omitted).

### 2.  The Cap Is Consistent with Law

#### a.  The Cap Is Authorized by the Act and 41 U.S.C. § 4708

The Cap is a proper exercise of NSF's statutory authority over grants. The Act provides NSF broad authority to issue grants funding research NSF "deems necessary to carry out" its mission of promoting science, health, prosperity, and welfare, and securing national defense. 42 U.S.C. § 1870(c). And the Act provides NSF "discretion" to use appropriations in whatever way will "best realize" four objectives geared toward strengthening and encouraging research capacity within the United States. *Id.* § 1873(e). NSF thus has broad authority to set the terms of its grants, including by requiring predetermined indirect cost rates that do not exceed 15 percent.

In addition, 41 U.S.C. § 4708 provides a second source of authority for using standardized indirect cost rates where, as here, grants are issued to IHEs. Section 4708 provides that a "cost-type research and development" grant issued to an IHE "may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to . . . reimbursable

direct costs incurred." 41 U.S.C. § 4708. That is what the Cap does: grants issued to IHEs moving forward will provide for the payment of reimbursable indirect costs at predetermined fixed-percentage rates up to 15 percent. The statute provides no guidance regarding which predetermined fixed-percentage rates may be used, compelling the conclusion that any predetermined rates, including 15 percent, are authorized.

### b.  The Cap Is Consistent With 2 C.F.R. § 200.414(c)

The Cap is consistent with, and was promulgated pursuant to, the agency's Guidance on indirect costs. That Guidance provides that agencies generally will adhere to "negotiated rate[s]" for indirect costs. 2 C.F.R. § 200.414(c)(1). But it also provides an express path for NSF to depart from that approach. *See* 2 C.F.R. § 200.414(c)(1). As relevant here, "[a] Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award . . . when approved by the awarding Federal agency [*i.e.*, NSF] in accordance with paragraph (c)(3) of this section." 2 C.F.R. § 200.414(c)(1). Paragraph (c)(3), in turn, requires only that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3). Aside from those procedural requirements, the Guidance imposes no substantive constraint on the ability of NSF to depart from negotiated rates.

Here, NSF followed that path. The Cap specifies that it is deviating from negotiated indirect-cost rates for the class of awards issued to IHEs. Dkt. 1-3. It publicly sets out "the policies, procedures and general decision-making criteria" that NSF will follow. *Id.* And it sets forth a "documented justification" for adopting that updated policy—including that the updated policy would "[r]educ[e] administrative burdens for awardee institutions"; "[e]nsur[e] consistent treatment of all IHE financial assistance recipients"; "[i]ncreas[e] the proportion of federal funds

allocated to direct research costs"; and "improv[e] government efficiency by eliminating the need for individualized indirect cost negotiations." *Id.* at 3.[5]

Plaintiffs argue that the Cap's use of the section 200.414(c) exception for "*all* NSF awards, to all IHEs, in perpetuity" renders the word "class" meaningless in the Guidance. Motion at 25. But the Guidance expressly states that an "awarding agency" may deviate from negotiated rates for "a single Federal award" or, at its option, for "a class of Federal awards." 2 C.F.R. § 200.414(c)(1). That phrasing encompasses the grants addressed by the Cap. A "[c]lass of Federal [a]wards," as defined in the Guidance, includes "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. Here, the Cap applies to a "group of Federal awards" for a "specific type of recipient"—specifically, to NSF research grants made to IHEs. And nothing in the Guidance limits the size of the group of awards that may be adjusted. But even accepting Plaintiffs' theory that a "class" must be a subset of NSF awards, that is true here: the Cap applies only to research grants made to IHEs.

## III. Plaintiffs Fail to Demonstrate Irreparable Harm

As to the second preliminary injunction requirement, Plaintiffs have not shown irreparable harm absent the requested injunction. "Irreparable harm is injury that is neither remote nor speculative," *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020), but rather is "actual and imminent," *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Plaintiffs cannot meet that burden.

---

[5] For these reasons, Plaintiffs' argument that the Cap did not comply with the requirement in paragraph (c)(3) that NSF implements, and makes publicly available, the policies and general decision-making criteria that its programs will follow is unpersuasive. Motion at 26.

### A. Plaintiffs Fail to Demonstrate Irreparable Harm Arising from the Grant Terminations

In considering whether they have met their "exceedingly high burden," the Court should not consider Plaintiffs in the collective. Instead, each Plaintiff must on its own make a clear showing of irreparable harm. *See, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485–86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm . . . , the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy the prong of the preliminary injunction test.").

Plaintiffs' circumstances vary significantly, and no relief may be ordered as to any plaintiff who does not meet the burden. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002). Here, variation exists on both a plaintiff-by-plaintiff and grant-by-grant basis. And Plaintiffs' primary claimed injury resulting from the grant terminations is the delayed payment of money—a standard part of litigation and quintessential example of what generally does not count as irreparable injury. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]emporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.").

### B. Plaintiffs Fail to Demonstrate Irreparable Harm Arising from the Cap

Plaintiffs' primary claimed injury—the alleged direct consequence of the Cap—is that they will receive lower indirect cost reimbursements from NSF than they would have under negotiated indirect cost rates. But the Cap provides that the 15 percent rate cap applies "only to new awards made to IHEs on or after May 5, 2025." Dkt. 1-3 at 3. The Cap "does not apply retroactively to existing awards" and, contrary to the concerns articulated by Plaintiffs, IHEs "are not required to amend budgets for awards issued before this effective date, nor will they be required to return previously reimbursed indirect costs." *Id.* Award supplements and continuing grant increments

under awards existing prior to May 5, 2025, are not subject to the 15 percent indirect cost rate cap. Grants that have yet to be issued by NSF or theoretically awarded to any Plaintiff cannot be the basis of irreparable harm, otherwise the element of irreparable harm would lose all meaning. That is not the law—rather, irreparable harm must be proved. *See Arab World, Inc.*, 645 F.3d at 32.

Likewise, Plaintiffs' alleged harms are speculative because they concern proposals that are still under review by NSF, proposals being prepared by Plaintiffs, and funding opportunities that NSF has yet to issue. Such alleged harms are nothing more than "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store" and cannot justify injunctive relief. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162.

## IV.    The Balance of the Equities and the Public Interest Weigh in Favor of the Government

The equities and public interest also weigh strongly against issuing a preliminary injunction. "Under the last injunction factor, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Students for Fair Admissions*, 709 F. Supp. 3d at 137–38 (internal quotation marks and brackets omitted). Plaintiffs assert that "there is generally no public interest in the perpetuation of unlawful agency action," Motion at 28, but for the reasons discussed above, Plaintiffs will be unable to show that the Government has perpetuated unlawful agency action. Rather, Plaintiffs are seeking to prevent the executive branch from lawfully effectuating policy decisions with respect to funding. Plaintiffs' further argument that an injunction would "preserve the status quo," *id.*, similarly is unpersuasive; there is no public interest in forcing federal agencies to make certain discretionary funding decisions, particularly where the requested injunction would restrain the Government from promoting lawful and important priorities. *See Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2d Cir.

1996) ("Injunctive relief should be narrowly tailored to address specific harms and not impose

unnecessary burdens on lawful activity." (internal quotation marks omitted)).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary

Injunction.

Dated: New York, New York
          June 16, 2025

                                                Respectfully submitted,

                                                JAY CLAYTON
                                                United States Attorney for the
                                                Southern District of New York
                                                *Attorney for Defendants*

By:     */s/ Adam Gitlin*
                                                  MÓNICA P. FOLCH
                                                ADAM GITLIN
                                                Assistant United States Attorneys
                                                86 Chambers Street, 3rd Floor
                                                New York, New York 10007
                                                Tel: (212) 637-2695/2734

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that excluding the caption, table of authorities, signature block, and this certification, this memorandum contains 8117 words calculated using Microsoft Word, which complies with Local Civil Rule 7.1(c) and Rule 2(B) of the Court's Individual Rules and Practices in Civil Cases.

*/s/ Adam Gitlin*
Assistant United States Attorney
