Anna St. John
Neville S. Hedley (*application for pro hac vice forthcoming*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Phone: (917) 327-2392
Email: anna.stjohn@hlli.org
Phone: 312-342-6008
Email: ned.hedley@hlli.org

*Attorneys for Proposed Intervenor
National Association of Scholars*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation, <br><br> Defendants. | Case No. 25-cv-4452-JPC |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE BY THE NATIONAL ASSOCIATION OF SCHOLARS**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................................. i
**TABLE OF AUTHORITIES** ......................................................................................................... ii
**INTRODUCTION**......................................................................................................................... 1
**BACKGROUND** ........................................................................................................................... 3
I.  The National Science Foundation as a source for STEM researching funding. .................. 3
II. The Plaintiffs' complaint. ..................................................................................................... 3
III. NAS as proposed intervenor. ............................................................................................... 5
**ARGUMENT**................................................................................................................................. 5
I.  Proposed Intervenor is entitled to intervene as of right. ...................................................... 5
    A.  NAS's motion to intervene is timely. ......................................................................... 6
    B.  NAS has a cognizable interest in the litigation. ......................................................... 7
    C.  If successful, Plaintiffs' action will impair NAS's interest. ....................................... 9
    D.  The Defendants may not adequately represent NAS's interests. ............................. 10
II. Alternatively, the Court should permit NAS to intervene permissively............................ 11
**CONCLUSION** ........................................................................................................................... 12

## TABLE OF AUTHORITIES

Cases

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ................................................................................................................2

*Do No Harm v. Pfizer, Inc.*,
    126 F.4th 109 (2d Cir. 2025) ...................................................................................................7

*Brennan v. N.Y. City Bd. of Educ.*,
    260 F.3d 123 (2d Cir. 2001) ................................................................................................7, 8

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
    250 F.3d 171 (2d Cir. 2001) ....................................................................................................9

*Do No Harm v. Pfizer, Inc.*,
    126 F.4th 109 (2d Cir. 2025) ...................................................................................................8

*Floyd v. City of N.Y.*,
    770 F.3d 1051 (2d Cir. 2014) ................................................................................................11

*Granite State Ins. Co. v. KM Tactical, LLC*,
    2025 WL 1502019, 2025 U.S. Dist. LEXIS 100017 (S.D.N.Y. May 27, 2025) ...............11

*Green v. Biden*,
    2024 WL 4932751, 2024 U.S. Dist. LEXIS 217562 (E.D.N.Y. Dec. 2, 2024) .................11

*Herdman v. Town of Angelica*,
    163 F.R.D. 180 (W.D.N.Y. 1995) ....................................................................................6, 10

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ................................................................................................................8

*Kleisler v. U.S. Forest Serv.*,
    157 F.3d 964 (3d Cir. 1998) ..................................................................................................10

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ................................................................................................................7

*New York v. HHS*,
    2019 WL 3531960, 2019 U.S. Dist. LEXIS 129498 (S.D.N.Y. Aug. 2, 2019) ...................8

*New York v. Scalia*,
    2020 WL 3498755, 2020 U.S. Dist. LEXIS 115415 (S.D.N.Y. June 29, 2020) ............... 11

*In re New York City Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) ....................................................................................... 6, 7, 9, 11

*N.Y. State Vegetable Growers Association, Inc. v. Hochul*,
    2024 WL 656007, 2024 U.S. Dist. LEXIS 27605 (W.D.N.Y. Feb. 16, 2024) .................... 6

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) .................................................................................................. 2, 4, 8, 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    600 U.S. 181 (2023) ................................................................................................ 2, 4, 8, 10

*United States v. Hooker Chems. & Plastics Corp.*,
    749 F.2d 9685 (2d Cir. 1984) ............................................................................................ 10

*United States v. N.Y.C. Hous. Auth.*,
    326 F.R.D. 411 (S.D.N.Y. 2018) ....................................................................................... 11

*United States v. Pitney Bowes, Inc.*,
    25 F.3d 66 (2d Cir. 1994) ..................................................................................................... 6

Rules and Statutes

42 U.S.C. 1862(a)(1) ........................................................................................................................ 3

42 U.S.C. § 1862k(a)(6)(A) ............................................................................................................. 3

42 U.S.C. § 1885 .......................................................................................................................... 3, 8

42 U.S.C. § 1885a ............................................................................................................................ 8

42 U.S.C. § 1885b ............................................................................................................................ 8

U.S. Const. amend. V ........................................................................................................... 2, 4, 8, 10

Fed. R. Civ. P. 24(a) ............................................................................................................... 7, 9, 11

Fed. R. Civ. P. 24(a)(2) .................................................................................................................... 5

Case 1:25-cv-04452-JPC   Document 63   Filed 06/20/25   Page 5 of 18

Fed. R. Civ. P. 24(b) ...........................................................................................................11


Other Authorities

*D.E.I. Division. Extremism. Ideology. How the Biden-Harris NSF Politicized Science*,
    U.S. Senate Committee on Commerce, Science & Transportation, Oct. 9, 2024................3

Devins, Neal & Prakash, Saikrishna B.,
    *The Indefensible Duty to Defend*,
    112 Columbia L. Rev. 507 (2012) ...................................................................................10

Goad, Mason D. & Chartwell, Bruce R.,
    *Ideological Intensification: A Quantitative Study of Diversity, Equity, and*
    *Inclusion in STEM Subjects at American Universities*,
    National Assoc. of Scholars (Nov. 28, 2022) ......................................................................5

**INTRODUCTION**

The National Association of Scholars ("NAS") seeks to intervene in this case to protect it and its members' interest in ensuring that federal research grants funded by the National Science Foundation are evaluated and awarded based on scientific merit, and not based on racial or gender preferences, as advocated by the Plaintiffs in their complaint.[1] Plaintiffs seek to enjoin the National Science Foundation's recently issued statement of priorities ("Priority Directive," attached as Exhibit 1), which prioritizes research grants for artificial intelligence, quantum information science, biotechnology, nuclear energy, and translational science. Instead of allocating scarce federal research dollars according to preferences of "underrepresented" groups, the Priority Directive FAQs emphasized "that all outreach, recruitment, or participatory activities in NSF projects [must be] open and available to all Americans." Exhibit 1 at 7.

NAS is a tax-exempt non-profit organization that seeks to reform higher education and adamantly opposes the pernicious intrusion of Diversity, Equity, and Inclusion ("DEI") ideology within academia, particularly in the Science, Technology, Engineering, and Mathematics ("STEM") disciplines. NAS has members in STEM disciplines who regularly seek and have obtained federal research grants, including from the National Science Foundation. Those members should not be disadvantaged at competing for federal grants just because they don't fall within one of Plaintiffs' preferred identities. NAS opposes DEI within academia, especially within higher education and advanced scientific research because it emphasizes group identity, rather than prioritizing scientific merit, sound academic inquiry, and equal opportunity. Racial and gender preferences, such as those Plaintiffs advocate, are a hallmark of DEI ideology.

Plaintiffs' complaint seeks to resurrect National Science Foundation grant funding based on DEI principles, and prevent implementation of the National Science Foundation's updated guidance on scientific research priorities. Plaintiffs argue that the Priority Directive is contrary to

---

[1] Plaintiffs have indicated that they intend to oppose the Proposed Intervenor's motion. Federal Defendants have not provided their position on this motion.

law because Congress sought to increase participation by underrepresented groups in STEM disciplines, and thereby mandated that the National Science Foundation utilize racial and gender preferences to achieve this goal. *See* ECF 6 at 16-20. To the extent those statutes dictate racial and gender preferences for allocating scarce scientific research funding—a position explicitly advocated by the Plaintiffs (ECF 1 ¶¶ 36-42; ECF 6 at 18)—they are contrary to the Equal Protection guarantees incorporated into the Fifth Amendment of the U.S. Constitution. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). In *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (*SFFA v. Harvard*), the Supreme Court held that diversity in admission to selective colleges and universities was not a compelling government interest, and therefore admissions preferences based on race violated the Equal Protection Clause. 600 U.S. 181, 214-217 (2023); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 58-59 (2017) (government must show "exceedingly persuasive justification" for statutory gender preference). Thus, the Plaintiffs' complaint and statutory interpretation are inconsistent with the Constitution's Equal Protection guarantee because the pursuit of "diversity" or "equity" in STEM research are not compelling governmental interests. Accordingly, NAS and its members that compete for scarce National Science Foundation research funding have an interest in ensuring that gender and racial preferences play no role in the awards process, and that such funding is allocated solely based on scientific merit and other lawful considerations in alignment with the National Science Foundation's Priority Directive.

      NAS moves to intervene pursuant to Rule 24 to protect that interest. NAS's motion is timely, as the case was filed a mere three weeks ago, briefing on the only substantive motion filed to date is ongoing, and NAS has proposed an expedited schedule for filing an opposition to Plaintiffs' motion for preliminary injunction to ensure there is virtually no delay in any hearing or ruling on the motion. NAS has a cognizable interest in ensuring that National Research Funds are not required to rely on race- and sex-based discrimination in violation of the Equal Protection Clause. That interest will be impaired if the Plaintiffs are successful in this case. Meanwhile, the Federal Defendants have defended their actions as consistent with the very statutes that Plaintiffs

claim *mandate* such discrimination.

## BACKGROUND

**I.      The National Science Foundation as a source for STEM researching funding.**

Congress established the National Science Foundation in 1950 "to initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. 1862(a)(1). Congress appropriates funds for the National Science Foundation to allocate to research promising ideas "across all fields of science and engineering." Exhibit 1 at 1*;* 42 U.S.C. § 1862k(a)(6)(A). Congress has indicated that the pursuit of scientific and engineering research is an equal opportunity endeavor. *See* 42 U.S.C. § 1885. But the National Science Foundation under the Biden administration deviated from the principles of equal opportunity. A report by the Senate Committee on Commerce, Science, and Transportation published in late 2024 showed that a significant percentage of National Science Foundation research grants were directed to projects focused not on scientific advancement or merit, but that promoted Diversity, Equity, and Inclusion ideology, and/or incorporated racial or gender preferences. *See generally D.E.I. Division. Extremism. Ideology. How the Biden-Harris NSF Politicized Science,* U.S. Senate Committee on Commerce, Science & Transportation (Oct. 9, 2024) (documenting allocation of NSF research funding based on DEI and social justice ideology and/or racial and gender preferences) (attached as Exhibit 2).

On April 18, 2025, the new leadership at the National Science Foundation issued the Priority Directive which re-oriented the Foundation's research funding decisions to the original mission of pursuing basic scientific research focused on intellectual merit that had a broad, positive impact on the country. Exhibit 1. The Priority Directive emphasized that "[t]he principles of merit, competition, equal opportunity, and excellence are the bedrock of the NSF mission." *Id.*

**II.     The Plaintiffs' complaint.**

Plaintiffs are sixteen states that brought the present action against the National Science

Foundation. ECF 1 at ¶ 9. Plaintiffs allege that the Priority Directive violated the Administrative Procedure Act because it is arbitrary and capricious (Count 1) and is contrary to law (Count 2). Plaintiffs also allege that the Priority Directive violates Separation of Powers under the U.S. Constitution (Counts 3 & 4) and is *ultra vires* because the National Science Foundation exceeded its congressionally granted authority (Count 5). The thrust of Plaintiffs' complaint is that Congress mandated "NSF to undertake activities for the specific purpose of increasing STEM participation by women, minorities, and people with disabilities." ECF 1 ¶ 37. Plaintiffs concede that the National Science Foundation has fulfilled this directive because the number of women in STEM occupations has doubled and minorities in those occupations went from 15% to 35%. ECF 1 ¶ 43.[2]

Plaintiffs nevertheless insist that Congress has mandated that the National Science Foundation continue to "diversify" the STEM workforce and prioritize "equity"—not equality—when making research grant funding decisions. ECF 6 at 2, 18. Plaintiffs contend that Congress has mandated statutory racial and gender preferences with the goal of increasing participation in STEM fields by underrepresented populations. ECF 1 ¶¶ 37-42. But Plaintiffs' position is at odds with the Supreme Court's holding in *SFFA v. Harvard*, which soundly rejected on Equal Protection grounds the notion that diversity in higher education is a compelling government interest justifying racial preferences. 600 U.S. at 216-18. Similarly, the Supreme Court has held that statutory gender preferences are extremely suspect. *Morales-Santana*, 582 U.S. at 58-59.

To the extent that Plaintiffs contend that Congress has mandated by statute gender and racial preferences with respect to research funding decisions to achieve some vague standard of "equity" in STEM for underrepresented populations, that position is no long tenable, and should be rejected.

---

[2] Plaintiffs also challenge the National Science Foundation's Indirect Cost Directive, which limits indirect costs to 15% for future grants awarded to institutions of higher education. ECF 1 ¶ 7. Plaintiffs allege that the Indirect Cost Directive also violates the Administrative Procedures Act. Counts VI & VII. NAS does not take a position on these allegations other than to assert that the more money directed to actual, meritorious scientific research, rather than administrative and overhead costs, the better.

**III.     NAS as proposed intervenor.**

The National Association of Scholars is a non-profit 501(c)(3) membership organization that seeks to uphold the traditional standards of higher education by prioritizing merit and achievement, fostering intellectual freedom, searching for the truth, and promoting virtuous citizenship. To further these goals, NAS defends the academic freedom of members and students through advocacy and investigates and publishes reports related to issues of academic freedom and integrity. NAS has been an outspoken critic of DEI ideology and initiatives within higher education. NAS believes that DEI is contrary to the traditional role of higher education. NAS has conducted investigations and published reports and advocacy opposing DEI within higher education, including in STEM disciplines. *See, e.g.*, Mason D. Goad & Bruce R. Chartwell, *Ideological Intensification: A Quantitative Study of Diversity, Equity, and Inclusion in STEM Subjects at American Universities*, National Assoc. of Scholars (Nov. 28, 2022), www.nas.org/reports/ideological-intesification. Included in its opposition to DEI in higher education, NAS has been a vocal opponent of racial and gender preferences within higher education and filed amicus briefs in support of the plaintiffs in *SFFA v. Harvard*. *See* Declaration of Peter Wood ¶¶ 11-16 (attached as Exhibit 3).

NAS members in STEM disciplines have sought and been awarded research grants from multiple federal agencies including the National Science Foundation, and NAS members intend to continue to seek federal government funding for basic scientific research, including from the National Science Foundation. Wood Decl. ¶ 17. NAS and its members believe that STEM research funding should be awarded based on intellectual and scientific merit and contribution to the betterment of the Nation. Similar to the Priority Directive, NAS is committed to "[t]he principles of merit, competition, equal opportunity, and excellence" within STEM disciplines, and believes that research funding should be allocated based on those principles. Wood Decl. ¶¶ 12, 14.

## ARGUMENT

**I.     Proposed Intervenor is entitled to intervene as of right.**

Rule 24(a)(2) of the Federal Rules of Civil Procedure permits a party to intervene as a

matter of right. The proposed intervenor must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *In re New York City Policing During Summer 2020 Demonstrations ("NYC Policing")*, 27 F.4th 792, 799 (2d Cir. 2022). NAS satisfies all four prongs.

### A. NAS's motion to intervene is timely.

NAS's motion is timely. In evaluating timeliness, courts weigh "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994). This case is still in its infancy. Plaintiffs filed their complaint only three weeks ago. *See Herdman v. Town of Angelica*, 163 F.R.D. 180, 185 (W.D.N.Y. 1995) (motion was timely when filed just 10 weeks after the complaint). Plaintiffs filed a motion for preliminary injunction in conjunction with their complaint, and briefing for that motion is ongoing. Defendants have not yet responded to Plaintiffs' complaint and no other substantive motions have been filed. If NAS's motion to intervene is granted, the Court has stated an intention to set a briefing schedule for NAS's opposition to the preliminary injunction motion that would be limited to the issues raised. *See* ECF 60. NAS requested, and would expect, an expedited briefing schedule that would have minimal if any impact on the timing of any hearing or decision on the motion. This timing compares favorably to the three-month delay in the motion to intervene in *N.Y. State Vegetable Growers Association, Inc. v. Hochul*. There, the court granted intervention even though the proposed intervenor "could have filed the motion sooner," but still filed "before the preliminary injunction hearing, before Defendants responded to the complaint, and before any discovery or further motion practice" and did "not seek to adjourn the preliminary injunction hearing." 2024 WL 656007, 2024 U.S. Dist. LEXIS 27605, at *6-*7 (W.D.N.Y. Feb. 16, 2024). Accordingly, NAS's intervention and the associated few days of delay in the briefing schedule will not prejudice

existing parties. Meanwhile, however, NAS will be severely prejudiced if it is not permitted to intervene. There is a high likelihood that the ruling on the preliminary injunction motion will form the basis for an ultimate resolution of the entire case either on appeal or on motion for summary judgment. This may be the only, or at least primary, point in the litigation for NAS to protect its interests. Finally, there are no unusual circumstances that undermine a finding of timeliness here.

### B. NAS has a cognizable interest in the litigation.

Rule 24(a) requires that an intervenor demonstrate a cognizable interest. This has been interpreted as an interest that is "direct, substantial, and legally protectable" that could "be impaired" without intervention. *NYC Policing*, 27 F.4th at 799. A proposed intervenor need not show a "property or other legally protectable interest." *Brennan v. N.Y. City Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001). NAS has an interest in ensuring that National Science Foundation research grants are awarded based on scientific merit, rather than on unlawful racial or gender preferences contrary to the Constitution's guarantee of Equal Protection. NAS's mission is to uphold high ethical and intellectual standards in higher education and to foster intellectual freedom, the search for truth, and promote virtuous citizenship. Wood Decl. ¶ 9. That includes pursuing scientific inquiry and research that is grounded in scientific merit. In addition, NAS has members that have in the past applied for and received research funding from the federal government, including from the National Science Foundation, and who intend to apply for such research funding in the future. Wood Decl. ¶ 17. NAS and its members, particularly those in STEM disciplines who pursue scientific research, are committed to competing for federal research funding based on a level playing field and do not wish to be helped or hindered by unconstitutional preferences based on group identity. The Priority Directive directly states that the allocation of National Science Foundation research funding "should not preference some groups at the expense of others or directly/indirectly exclude individuals or groups." Exhibit 1 at 1.[3] The Priority Directive thus

---

[3] NAS need not "independently demonstrate Article III standing" to the extent it seeks the same relief as the Federal Defendants, which presumably is dismissal of the complaint or summary judgment confirming the validity of the Priority Directive. *See Little Sisters of the Poor Saints*

aligns with and furthers NAS's mission and goals.

Plaintiffs seek relief that would compromise NAS's interests. Plaintiffs seek to impose racial and gender preferences for National Science Foundation research funding based on their interpretation of 42 U.S.C. § § 1885(a) & (b), 1885a, and 1885b; ECF 1 ¶¶ 37-42; ECF 6 at 14, 16-18. While NAS seeks to have grants determined according to equal opportunity and scientific merit, Plaintiffs' litigation goal is to "prioritize[e] equity in STEM" when allocating scarce federal scientific research dollars. ECF 6 at 18. Plaintiffs' position is contrary to the Equal Protection guarantee incorporated into the Due Process Clause of the Fifth Amendment, and is contrary to the Supreme Court's holdings in *SFFA v. Harvard* and *Morales-Santana*. This is a cognizable interest sufficient for intervention. *See Brennan*, 260 F.3d at 130-31 (intervenor had interest in restoring circumstances without discrimination, while litigation party sought imposition of gender and race preferences).

The Priority Directive will benefit NAS and its members within STEM disciplines, who aim to compete for National Science Foundation funding based on merit, without consideration of gender or racial preferences or related DEI interests. This qualifies as "a cognizable interest in this action." *New York v. HHS*, 2019 WL 3531960, 2019 U.S. Dist. LEXIS 129498 at *17 (S.D.N.Y.

---

*Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 675 n.6 (2020). Nonetheless, to the extent the relief sought by NAS is broader or different than the Federal Defendants, it can satisfy the test for associational standing.

To establish associational standing, NAS "must show: (1) 'its members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977)). Here, NAS has several members in STEM disciplines who regularly apply for and have received federal research funding, including from NSF. Wood Decl. ¶ 17. Those members would be at a disadvantage when applying for NSF grants if they don't fall into a gender or racial preference that Plaintiffs assert is mandated by statute. *Id.* ¶ 18; *see, e.g.*, ECF 1 ¶¶ 53, 55, 95; ECF 6 at 17-20. Moreover, the interests NAS seeks to protect coincide with NAS's mission and goals and resolution of the case is not dependent upon the participation of an individual NAS member.

Aug. 2, 2019) (holding that intervening religious medical association and member had cognizable interest defending HHS religious exemption regulation).

### C. If successful, Plaintiffs' action will impair NAS's interest.

A proposed intervenor as of right must be "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2); *NYC Policing*, 27 F.4th at 799. NAS satisfies this prong, as well. As noted above in Section I.B., if Plaintiffs are successful in their action, NAS members in STEM disciplines that are not eligible for the gender or racial preferences demanded by Plaintiffs, or who disagree with them as a matter of principle and do not wish to be helped in fact or in perception by such preferences, will be at a disadvantage when seeking National Science Foundation research funding. When an applicant establishes that it has a cognizable interest in the outcome of the litigation, courts frequently find that the applicant also demonstrates that its interests will be impaired if there is an adverse decision on the same grounds. *See, e.g., Brennan*, 260 F.3d at 132.

Plaintiffs seek to have the Priority Directive enjoined and for the National Science Foundation to make research funding decisions based on gender and racial preferences, with a goal to impose "equity" in STEM disciplines, infused with DEI ideology. If Plaintiffs are successful, the National Science Foundation could revert to allocating funds according to DEI ideology, social justice ideas, and racial or gender preferences. *See* Exhibit 2 at 1-3.

This litigation offers NAS an opportunity to not only defend the Priority Directive in alignment with its mission and goals, but also prevent the National Science Foundation from reverting to funding polices that are contrary to NAS's core values and the interests of its members. NAS's interest in ensuring that the Foundation's funding decisions are based on equality rather than equity, and scientific merit rather than racial or gender preferences, make it the "mirror image" of the position advocated by the Plaintiffs and the policies that existed before NSF issued the Priority Directive. *See NYC Policing*, 27 F.4th at 792 (competing policy determinations gives rise to interest that justifies intervention).

**D. The Defendants may not adequately represent NAS's interests.**

Finally, NAS must show that the representation of their interests may not be adequately represented by the Federal Defendants. *NYC Policing*, 27 F.4th at 803. Although the Second Circuit has "demanded a more rigorous showing of inadequacy," where the applicant and an existing party share "the same ultimate objective," *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001), NAS meets any more rigorous standard that might apply.[4]

First, NAS's objective is not identical to that of the Federal Defendants. NAS believes that Plaintiffs' interpretation that the relevant statutes mandate racial and gender preferences is contrary to the Constitution's Equal Protection guarantee, particularly in light of the Supreme Court's holdings in *SFFA v. Harvard* and *Morales-Santana*. But the Department of Justice may feel compelled to defend the constitutionality of the statutes if there is a plausible argument to be made to uphold the statutes. *See* Neal Devins & Saikrishna B. Prakash, *The Indefensible Duty to Defend*, 112 Columbia L. Rev. 507, 517-521 (2012) (highlighting the sometimes contradictory DOJ guidance regarding the duty to defend federal statutes). Consequently, the Federal Defendants may not press the Equal Protection arguments with the same vigor as NAS. Indeed, they may not even raise the argument that the Plaintiffs' interpretation of the underlying statutes is unlawful and it would be unlawful for the National Science Foundation to make funding decisions pursuant to that interpretation. We have seen evidence of this already in Defendants' opposition to the Plaintiffs' motion for preliminary injunction. There, the Defendants focused little of their argument on Plaintiffs' argument that the Priority Directive was contrary to statutory law mandating the use of racial and gender preferences. And without addressing the unconstitutionality of mandatory discrimination in funding decisions, the Defendants argued that their actions pursuant to the Priority Directive were consistent with those laws. *See* ECF 53 at 14.

---

[4] The Second Circuit has also required an elevated showing of inadequacy from parties moving to intervene alongside the government when the government sue to enforce a law in *parens patriae*. *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 985 (2d Cir. 1984). That is not applicable in scenarios, like this one, where the government is defending the validity of a government action. *See Herdman*, 163 F.R.D. at 190.

Moreover, there is no guarantee that the Priority Directive issued by the National Science Foundation will remain unchanged. This administration or a new administration could resurrect policies for allocating research funding pursuant to unlawful race- and sex-based criteria, similar to those documented in Exhibit 2 as recently as last year. Because the Defendants do not appear to be arguing that the Plaintiffs' interpretation of the statues is unconstitutional, reversion to these practices is all the more likely. It is thus far from hypothetical or even unlikely that NAS and the Federal Defendants could find their positions diverging during the course of the litigation. *See Kleisler v. U.S. Forest Serv.*, 157 F.3d 964, 973-74 (3d Cir. 1998) (it is "not realistic to assume that the [government's] programs will remain static or unaffected by unanticipated policy shifts").

Thus, NAS cannot be assured that the Federal Defendants will adequately represent NAS and its members' interests in the litigation, thereby satisfying the fourth prong. *NYC Policing*, 27 F.4th at 804.

**II.     Alternatively, the Court should permit NAS to intervene permissively.**

If the Court determines that the NAS is not entitled to intervene as of right under Rule 24(a), the Court should alternatively grant permissive intervention under Rule 24(b). Courts evaluating whether to permit permissive intervention look to whether (1) the motion is timely, and (2) whether the claims or defenses share a common question of law or fact with the main action. *See Floyd v. City of N.Y.*, 770 F.3d 1051, 1057 (2d Cir. 2014) (per curiam) (citing Rule 24(b)). Moreover, "district courts routinely grant permissive intervention to applicants even in cases where the court has found that the existing party adequately represents the proposed intervenor's interest." *Green v. Biden*, 2024 WL 4932751, 2024 U.S. Dist. LEXIS 217562, at *24-*25 (E.D.N.Y. Dec. 2, 2024) (collecting cases).

NAS satisfies the test for permissive intervention. As noted above, NAS's motion to intervene is timely. NAS's participation in this litigation will helpfully "provide this Court with a fuller picture" of the issues at stake in the case because it will bring the perspective of STEM researchers who compete for scarce National Science Foundation research funding. *United States*

*v. N.Y.C. Hous. Auth.*, 326 F.R.D. 411, 419 (S.D.N.Y. 2018). Intervention by NAS will not delay the resolution of the litigation or cause undue prejudice to the existing parties because NAS's defense of the Priority Directive shares common questions of law and fact with the underlying action. *See New York v. Scalia*, 2020 WL 3498755, 2020 U.S. Dist. LEXIS 115415, at *15-*16 (S.D.N.Y. June 29, 2020) (allowing intervention did not create "an 'appreciable burden' because the Court would have received" proposed intervenor's arguments as *amicus* anyway); *Green*, 2024 U.S. Dist. LEXIS 217562 at *26. Allowing NAS to intervene could also alleviate potentially inconsistent rulings, thereby promoting judicial efficiency, because if the Plaintiffs were to prevail, NAS, one its members in a STEM discipline, or another unrelated entity might be inclined to challenge in another venue the statutes that promote racial and gender preferences for the National Science Foundation's research grants. *See Granite State Ins. Co. v. KM Tactical, LLC*, 2025 WL 1502019, 2025 U.S. Dist. LEXIS 100017, at *21 (S.D.N.Y. May 27, 2025) (noting that intervention would foster judicial economy and prevent inconsistent rulings).

Given NAS's demonstrated interest in ensuring that National Science Foundation research funding is awarded based on scientific merit and alignment with its research priorities, the lack of prejudice to existing parties, and the very early stage of the case, the Court should at minimum allow permissive intervention.

## CONCLUSION

For the foregoing reasons, NAS respectfully asks the Court to grant NAS's motion to intervene as of right or, in the alternative, to intervene permissively.

Dated: June 20, 2025         /s/ *Anna St. John*
Anna St. John
Neville S. Hedley (*pro hac vice application forthcoming*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K St. NW, Suite 300
Washington, DC 20006
Phone: (917) 327-2392
Email: anna.stjohn@hlli.org

*Attorneys for National Association of Scholars*

**Certification**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 4,291 words, calculated using Microsoft Word, which complies with Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: June 20, 2025

/s/ *Anna St. John*
Anna St. John

**Certificate of Service**

The undersigned certifies she electronically filed the foregoing Memorandum of Law and associated exhibits via the CM/ECF system for the Southern District of New York, thus sending the documents to the Clerk of the Court and also effecting service on all attorneys registered for electronic filing.

Dated: June 20, 2025

/s/ *Anna St. John*
Anna St. John