UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                          :

STATE OF NEW YORK, STATE OF HAWAII, STATE  :
OF CALIFORNIA, STATE OF COLORADO, STATE    :
OF CONNECTICUT, STATE OF DELAWARE, STATE  :
OF ILLINOIS, STATE OF MARYLAND,                :
COMMONWEALTH OF MASSACHUSETTS, STATE   :
OF NEVADA, STATE OF NEW JERSEY, STATE OF   :
NEW MEXICO, STATE OF OREGON, STATE OF    :
RHODE ISLAND, STATE OF WASHINGTON, and   :
STATE OF WISCONSIN,                       :
                                                 :

                          Plaintiffs,         :
                                               :

             -v-                     :          25 Civ. 4452 (JPC)
                                               :

NATIONAL SCIENCE FOUNDATION and BRIAN   :      OPINION AND ORDER
STONE, *in his official capacity as Acting Director of the* :
*National Science Foundation*,            :
                                               :

                       Defendants.      :
                                               :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Sixteen states bring this action against the National Science Foundation ("NSF") and its

Acting Director, Brian Stone, challenging NSF's "Statement of U.S. National Science Foundation

Priorities" (the "Priority Directive").  Issued on April 18, 2025, the Priority Directive announced,

among other things, that NSF's efforts to advance scientific research will not give preference to

certain groups at the expense of others.  Along with their Complaint, Plaintiffs have moved for a

preliminary injunction that would enjoin Defendants from implementing the Priority Directive,

including by terminating or interrupting previously awarded grants, and would restore hundreds

of millions of dollars in funding for terminated grants awarded to Institutions of Higher Education

("IHEs") in the Plaintiff states.  NSF terminated these awards upon determining that they were not

aligned with the Priority Directive.  After receiving briefing on Plaintiffs' preliminary injunction motion from the parties and an *amicus curiae*, the Court held a hearing on the motion on July 9, 2025.[1]

Plaintiffs' first two causes of action plead claims under the Administrative Procedure Act ("APA").  Through these causes of action, Plaintiffs ultimately advance two kinds of claims.  First, Plaintiffs challenge NSF's already-completed grant terminations and ask the Court to order those grants—and thus the funding for Plaintiffs' IHEs—restored.  The Court concludes that it likely lacks subject matter jurisdiction over this type of retrospective claim because Plaintiffs, in essence, seek monetary relief from the federal government in an amount exceeding $10,000 and the Court of Federal Claims has exclusive jurisdiction over that kind of claim.  Second, Plaintiffs' causes of action under the APA also assert a claim to vacate the Priority Directive and prospectively enjoin its implementation.  While in isolation such a claim would tend to lay comfortably within this Court's jurisdiction under the APA, at this preliminary stage Plaintiffs have not carried their burden of persuasion of showing that splitting their claims with the Court of Federal Claims would be permissible.  The Court also concludes that subject matter jurisdiction is likely lacking over Plaintiffs' three nonstatutory review causes of action because alternative procedures exist for the review of those claims and because Plaintiffs have not established that NSF plainly acted contrary to a clear and mandatory statutory prohibition or otherwise disregarded a clear statutory command.  Thus, and for reasons that follow, Plaintiffs' motion for a preliminary injunction is denied.

---

[1]  Plaintiffs' motion also seeks to enjoin NSF from implementing *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034 (the "Indirect Cost Directive"). *See* Dkt. 6 ("Motion") at 20-27.  At the July 9, 2025 hearing, the Court denied the motion for a preliminary injunction as to the Indirect Cost Directive in light of a decision of the United States District Court for the District of Massachusetts which vacated that policy.  Transcript of Hearing, July 9, 2025 ("Hearing Tr.") at 74:14-81:12; *see* Dkts. 77, 78, *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, No. 25 Civ. 11231 (IT), Dkts. 77, 78 (D. Mass. June 20, 2025).

## I. Background[2]

### A.    The National Science Foundation

The National Science Foundation Act of 1950 ("NSF Act"), Pub. L. No. 81-507, 64 Stat. 149 (1950) (codified as amended at 42 U.S.C. §§ 1861, *et seq.*), created NSF.  Among other functions, NSF is charged with "initiat[ing] and support[ing] basic scientific research and programs to strengthen scientific research potential and science education programs," and "award[ing] . . . scholarships and graduate fellowships for study and research in the sciences or in engineering."  42 U.S.C. § 1862(a)(1)-(2).

Congress has found that "it is in the national interest to promote the full use of human resources in science and engineering and to insure the full development and use of the scientific and engineering talents and skills of men and women, equally, of all ethnic, racial, and economic backgrounds, including persons with disabilities."  42 U.S.C. § 1885(a).  To that end, Congress declared that "it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds, including persons with disabilities, to acquire skills in science, engineering, and mathematics, to have equal opportunity in education, training, and employment in scientific and engineering fields, and thereby to promote scientific and engineering literacy and the full use of the human resources of the Nation in science and engineering."  *Id.* § 1885(b).  Congress has also identified "that the highest quality science and engineering over the long-term requires substantial support, from currently available research and educational funds,

---

[2] When resolving a motion for a preliminary injunction, "a court may consider the entire record including affidavits and other hearsay evidence."  *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (internal quotation marks omitted).  The Court accordingly considers the declarations and attached exhibits the parties submitted in connection with the motion.  *See* Dkt. 7 ("Ranucci Decl."); Dkt. 37 ("Ranucci Supp. Decl."); Dkt. 54 ("Stone Decl."); Dkt. 66 ("Faherty Decl.").

for increased participation in science and engineering by women, minorities, and persons with disabilities." *Id.*

NSF is required by statute to use a core strategy of "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." *Id.* § 1862k(b)(1). Among other similar statutory directives and authorizations, *see* Dkt. 1 ("Compl.") ¶¶ 32-33, 36-41 (collecting examples); Motion at 16-17 (same), NSF must "award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in [science, technology, engineering, and mathematics ('STEM')] fields." 42 U.S.C. § 1862s-5(d)(1). NSF also must "continue to support" various programs directed at increasing minority participation in STEM. *Id.* § 1862p-4.

To accomplish Congress's goals, "NSF awards grants to various entities, including Institutions of Higher Education (IHEs), to support research activities." Stone Decl. ¶ 5. In determining whether to award a grant, NSF "uses two statutory criteria to ensure that every award has the potential to advance new knowledge (Intellectual Merit) with maximum impact on the Nation and its people (Broader Impacts)." *Id.* ¶ 6; *see* 42 U.S.C. § 1862s(b) ("The Foundation shall maintain the intellectual merit and broader impacts criteria, among other specific criteria as appropriate, as the basis for evaluating grant proposals in the merit review process."). Congress has directed NSF to "identify and demonstrate project support" of seven goals when applying the broader impacts review criterion, including "[e]xpanding participation of women and individuals from underrepresented groups in STEM." 42 U.S.C. § 1862p-14(a), (a)(7).[3]

---

[3] The other six goals for the broader impacts review criterion are:

(1) Increasing the economic competitiveness of the United States.

NSF's grant review process usually takes six months for technical review and an additional month for final administrative review prior to an award being made. Stone Decl. ¶ 8. During this time, NSF also negotiates the proposed budget with the grant recipient. *Id.* NSF's grant awards are subject to the terms and conditions specified in the award notice. *Id.* ¶ 15. Before October 1, 2024, grants awarded to IHEs were subject to NSF's Research Terms and Conditions ("RTCs") and NSF Agency Specific Requirements. *Id.* Since October 1, 2024, NSF Grant General Conditions ("GC-1") apply to all new NSF grants to IHEs and pre-existing grants subject to funding amendments. *Id.* Both the RTCs and the GC-1 authorize NSF to terminate awards that no longer effectuate program goals or are not in alignment with agency priorities. *Id.*

NSF funded approximately 11,000 grants in Fiscal Year 2024, approximately 9,400 of which were awarded to IHEs. *Id.* ¶ 5. "For Fiscal Year 2025, Congress appropriated approximately $7.18 billion to NSF for research and related activities to carry out the [NSF Act] and other statutory obligations, and $1.172 billion to NSF for STEM education to carry out the NSF Act and other statutory obligations." Compl. ¶ 45 (citing Pub. L. No. 119-4, § 1102(a)(2), 139 Stat. 9, 10-11 (2025); Pub. L. No. 118-42, 138 Stat. 25, 161-62 (2024)).

---

(2) Advancing of the health and welfare of the American public.

(3) Supporting the national defense of the United States.

(4) Enhancing partnerships between academia and industry in the United States.

(5) Developing an American STEM workforce that is globally competitive through improved pre-kindergarten through grade 12 STEM education and teacher development, and improved undergraduate STEM education and instruction.

(6) Improving public scientific literacy and engagement with science and technology in the United States.

42 U.S.C. § 1862p-14(a)(1)-(a)(6).

**B.    The Priority Directive and NSF's 2025 Grant Terminations**

On April 18, 2025, NSF, through its then-Director Sethuraman Panchanathan, announced

the Priority Directive.  *See* Stone Decl. ¶ 17.  The Priority Directive reads:

> The U.S. National Science Foundation (NSF) was established in 1950 to promote the progress of science, advance the national health, prosperity and welfare, and secure the national defense.  It does this by investing in the most promising ideas and people across all fields of science and engineering (S&E).  NSF priorities are grounded in the mission of the agency and modulated by statutory directives and administration priorities.
>
> NSF uses two statutory criteria to ensure that every award has the potential to advance new knowledge (Intellectual Merit) with maximum impact on the Nation and its people (Broader Impacts).  NSF investments unleash groundbreaking discoveries, translational solutions and expand participation in STEM.  These efforts strengthen our domestic workforce to fuel economic prosperity, national security, and global S&E competitiveness.
>
> The principles of merit, competition, equal opportunity, and excellence are the bedrock of the NSF mission.  NSF continues to review all projects using Intellectual Merit and Broader Impacts criteria.
>
> NSF's broadening participation activities, including activities undertaken in fulfillment of the Broader Impacts criterion, and research on broadening participation, must aim to create opportunities for all Americans everywhere.
>
> These efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups.  Research projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities.
>
> NSF will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates, with the core goal of creating opportunities for all Americans.
>
> NSF will continue to support basic and use-inspired research in S&E fields that focus on protected characteristics when doing so is intrinsic to the research question and is aligned with Agency priorities.

Ranucci Decl., Exh. 1 ("Priority Directive") at 1-2.

"The [Priority Directive], along with Frequently Asked Questions (FAQs), was published

on NSF's public facing website (NSF.gov)."  Stone Decl. ¶ 18; *see* Ranucci Decl., Exh. 2 (Priority

Directive FAQs).  NSF also "formed an internal panel to review grant awards and determine if they aligned with NSF priorities.  Based on the review, NSF began terminating awards beginning April 18th and conducted several rounds of terminations on a rolling basis."  Stone Decl. ¶ 19. "Awards were identified through keywords searches and analytics and were terminated, generally on Fridays for approximately four weeks."  *Id.*

By May 28, 2025, NSF had terminated 1,665 grants.  *Id.* ¶ 20.  When a grant was terminated, NSF provided the grant recipient with a letter explaining the reason for termination. *Id.*  The relevant portion of one termination letter is depicted below:

The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorites.

Effective immediately, the following are terminated:

| NSF Award Id |
| --- |
| 2128746 |
| 2417884 |

NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

Ranucci Decl., Exh. 49 at 13.

The other termination letters provided to the Court are nearly identical, with the only variation being the identification number of the award being terminated.  *Compare, e.g.*, Ranucci Decl., Exh. 49 at 13, *with id.*, Exh. 20 at 82, *with id.*, Exh. 38 at 102-03; *see* Stone Decl. ¶ 20 (attesting that consistent language was used in the termination letters).  Notwithstanding these grant terminations, Acting Director Stone declares that "[c]onsistent with the NSF Act of 1950, NSF continues to support increased participation in science and technology by U.S. populations, including women and minorities.  NSF is continuing grants that broadly encourage increased

participation in science and technology, which necessarily have the effect of supporting participation of particular groups, including women and minorities." Stone Decl. ¶ 21.

## C. Procedural History

The State of New York, State of Hawaii, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, State of Maryland, Commonwealth of Massachusetts, State of Nevada, State of New Jersey, State of New Mexico, State of Oregon, State of Rhode Island, State of Washington, and State of Wisconsin filed this action on May 28, 2025. Dkt. 1. Plaintiffs allege that "[o]n the same day that the Priority Directive was posted, and in explicit reliance on the Priority Directive, NSF began terminating awards it claimed were not aligned with its changed priorities," including "numerous awards for projects conducted" at IHEs in the Plaintiff states. Compl. ¶ 48; *see id.* ¶¶ 49-51, 55 (providing examples of terminated grants); *see also* Ranucci Decl., Exhs. 6, 8-11, 15, 18-23, 25-27, 29-34, 37-39, 42, 46-49, 52-60, 63-66, 68 (declarations from researchers describing the terminated projects); Ranucci Supp. Decl., Exhs. 69-74 (same).[4] Plaintiffs claim that, as of May 27, 2025, NSF's FAQs had a list of 1,752 awards that were terminated pursuant to the Priority Directive. Compl. ¶ 48.

Plaintiffs' Complaint asserts seven causes of action, with five targeting the Priority Directive and subsequent grant terminations. Counts I and II allege that the Priority Directive violates the APA on theories that it is arbitrary and capricious and contrary to law, respectively. Compl. ¶¶ 90-97 (Count I), 98-105 (Count II); *see* 5 U.S.C. § 706(2). These Counts seek "an order and judgment, and [] a preliminary and permanent injunction, holding unlawful and vacating the Priority Directive and enjoining any act to implement the Priority Directive." Compl. ¶¶ 97, 105.

---

[4] The other declarations included in the record are primarily focused on the effects of the Indirect Cost Directive.

Counts III, IV, and V allege that the Priority Directive violates constitutional separation of powers and the Take Care Clause and is *ultra vires*. *Id.* ¶¶ 106-118 (Count III), 119-125 (Count IV), 126-131 (Count V).[5]  These Counts also seek "injunctive relief barring Defendants from implementing the Priority Directive," *id.* ¶¶ 117, 124, 130, as well as declarations that the Priority Directive is unconstitutional or *ultra vires* based on these theories, *id.* ¶¶ 118, 125, 131.[6]

Along with their Complaint, Plaintiffs have moved to preliminarily enjoin implementation of the Priority Directive.  Dkt. 5; Motion; Rannuci Decl.; Rannuci Supp. Decl.; *see also* Dkt. 5-1 ("Proposed Order").  Plaintiffs seek the following injunctive relief with respect to the Priority Directive, as reflected in the Proposed Order attached to their Notice of Motion:

> 1.  Defendants are and until further order of this Court shall remain enjoined from enforcing or implementing the Priority Directive with respect to Plaintiff States and institutions of higher education within Plaintiff States, as well as investigators participating in cooperative grant agreements with investigators at institutions of higher education within Plaintiff States, including any implementation thereof by means of termination or interruption of funding;
>
> * * *
>
> 3.  Defendants are ordered to restore the status quo of Plaintiff States' funding preceding the Priority Directive . . . .

---

[5] Counts VI and VII concern the Indirect Cost Directive.  Compl. ¶¶ 132-141 (Count VI), 142-152 (Count VII); *see supra* n.1.

[6] Plaintiffs seek similar relief with respect to the Priority Directive in their Prayer for Relief. Compl. at 33 (seeking an order holding the Priority Directive unlawful and vacating it pursuant to the APA; a declaratory judgment finding the Priority Directive and its implementation invalid, arbitrary and capricious, contrary to law, *ultra vires*, and violative of the U.S. Constitution; and preliminary and injunctive relief barring implementation of the Priority Directive as to the Plaintiff states and their IHEs).

Proposed Order ¶¶ 1, 3.[7]  Defendants opposed the motion on June 16, 2025.  Dkt. 53 ("Opposition"); Stone Decl.  Plaintiffs replied on June 23, 2025.  Dkt. 65 ("Reply"); Faherty Decl. While the Court denied the application of the National Association of Scholars to intervene in this case, *see New York v. Nat'l Sci. Found.*, No. 25 Civ. 4452 (JPC), 2025 WL 1793858, at *2-6 (S.D.N.Y. June 30, 2025), it allowed that entity to file a brief addressing Plaintiffs' motion as *amicus curiae*, *id.* at *6, and that brief was filed on July 7, 2025, Dkt. 82 ("Amicus Br.").  The Court held a hearing on Plaintiffs' motion on July 9, 2025.  On July 10, 2025, Plaintiffs filed a letter to the Court addressing certain issues raised at the hearing.  Dkt. 84 ("July 10 Letter"). Plaintiffs also filed a notice of supplemental authority on July 22, 2025.  Dkt. 87.

## II.  Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (internal quotation marks omitted).  "In general, a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (citation modified); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[8]  "When the government is a party to the suit, [the] inquiries into the public interest and

---

[7] Paragraph 2 of the Proposed Order concerns only the Indirect Cost Directive, while Paragraphs 4, 5, and 6 concern notice of the order, a status report requirement, and the effective date of the order, respectively.  Proposed Order ¶¶ 2, 4-6.

[8] Some cases in the Second Circuit use a different "serious questions" standard, which "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the

the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (per curiam).

"Courts refer to preliminary injunctions as prohibitory or mandatory. Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 36 (2d Cir. 2018). "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits." *Id.* at 37 (internal quotation marks omitted). "The 'status quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (internal quotation marks omitted).

The parties' briefing does not address whether the injunction sought is better characterized as mandatory or prohibitory.[9] Plaintiffs' desired relief as to the Priority Directive comes in two main forms. First, Plaintiffs ask the Court to enjoin Defendants "from enforcing or implementing the Priority Directive with respect to Plaintiff States and institutions of higher education within Plaintiff States, as well as investigators participating in cooperative grant agreements with investigators at institutions of higher education within Plaintiff States, including any implementation thereof by means of termination or interruption of funding." Proposed Order ¶ 1.

---

underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Neither party asks the Court to apply the serious questions standard in this case, instead agreeing that Plaintiffs must show they are likely to succeed on the merits for preliminary relief to issue. *See* Motion at 12; Opposition at 6.

[9] When asked at the July 9 hearing, Plaintiffs' counsel stated that Plaintiffs seek a mandatory injunction. *See* Hearing Tr. at 6:10-13. In their July 10 letter, Plaintiffs clarified that their request is for a prohibitory injunction. *See* July 10 Letter at 1.

Second, Plaintiffs ask the Court to order Defendants "to restore the status quo of Plaintiff States' funding preceding the Priority Directive." *Id.* ¶ 3.

While these requests for relief have implications for the merits of Plaintiffs' claims, *see infra* III.A.2, III.B.2, they do not elevate the applicable standard to that for a mandatory injunction. The distinction between a mandatory and prohibitory injunction does not necessarily turn on whether the desired relief is affirmative or constraining. *See Mastrio*, 768 F.3d at 120-21 (explaining that "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action"). This is because "[t]he 'status quo' in preliminary-injunction parlance is really a 'status quo ante.' . . . This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *N. Am. Soccer League*, 883 F.3d at 37 n.5. Here, even though the relief Plaintiffs seek includes the restoration of funding, the complained-of wrongdoing is the termination of NSF grants awarded to IHEs in the Plaintiff states as a consequence of the agency's implementation of the Priority Directive. The "last actual, peaceable uncontested status which preceded the pending controversy," *Mastrio*, 768 F.3d at 120, is accordingly the status that existed prior to those terminations. Plaintiffs must therefore satisfy the comparatively less stringent—though still exacting—standard for a prohibitory injunction.

## III.  Discussion

Defendants contend that Plaintiffs cannot show a likelihood of success on the merits of their causes of action implicating the Priority Directive, arguing that the Court lacks jurisdiction over those claims and that the claims also fail on the merits. *See* Opposition at 7-16. Because the

Court concludes that, at this preliminary stage, Plaintiffs have not shown that the Court likely has subject matter jurisdiction over those causes of action, the motion is denied.[10]

## A.    Plaintiffs Are Unlikely To Succeed on Their APA Claims

### 1.  The Administrative Procedure Act and the Tucker Act

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022).  "Via the APA, the Congress has provided a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Id.* at 1105-06 (quoting 5 U.S.C. § 702).

Section 702 of the APA "permits a party to bring an equitable claim challenging arbitrary and capricious action of an administrative agency in federal district court and waives the government's sovereign immunity with respect to such claims in that forum." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) (per curiam).  But Section 702 does not allow a court to grant equitable relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702; *see Crowley Gov't Servs.*, 38 F.4th at 1106; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that this provision "prevents plaintiffs from exploiting the APA's waiver [of sovereign immunity] to evade limitations on suit contained in other statutes").

---

[10] As the Court concludes that Plaintiffs have not shown a likelihood of success on the merits, it does not address the remaining factors for preliminary relief.  *See Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 231-32 (2d Cir. 2021) (holding a district court need not "address the remaining preliminary injunction factors" where the movant has failed to show a likelihood of success on the merits).

One such statute is the Tucker Act, which provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Under the Tucker Act, the Court of Federal Claims is generally said to have "exclusive jurisdiction" over claims exceeding $10,000 founded upon express or implied contract with the United States. *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015).[11]

"The Tucker Act impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." *Up State Fed. Credit Union*, 198 F.3d at 375 (citation modified). Therefore, if a plaintiff's "claim 'arises out of a contract [with the United States]'" and exceeds $10,000, "the Court of Claims has exclusive jurisdiction over the action" and relief in any other court is "impliedly forbid[den]" by the Tucker Act. *Id.*; *see Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1448 (D.C. Cir. 1985) ("[T]he fact that a plaintiff's substantive claim is cognizable under the Tucker Act may, at least in some circumstances, bar the plaintiff from obtaining, under the APA, either the relief that would be available under the Tucker Act or alternative forms of relief.").

While the interaction between the APA and the Tucker Act may be easy enough to articulate in the abstract, the realities of litigation make this jurisdictional boundary difficult to traverse. Courts must be mindful of efforts by attorneys to "bypass Tucker Act jurisdiction by converting complaints which 'at their essence' seek money damages from the government into

---

[11] The so-called Little Tucker Act confers district courts with jurisdiction, concurrent with the Court of Federal Claims, over contract claims against the United States not exceeding $10,000. 28 U.S.C. § 1346(a)(2); *see Adeleke v. United States*, 355 F.3d 144, 152 (2d Cir. 2004).

complaints requesting injunctive relief or declaratory actions." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *accord U.S. Conf. of Cath. Bishops v. U.S. Dep't of State* ("*Cath. Bishops*"), 770 F. Supp. 3d 155, 162 (D.D.C. 2025) ("[C]ourts are to be wary of plaintiffs artfully pleading their way around the jurisdictional strictures of the Tucker Act."). "Because this forum shopping circumvents" the Tucker Act's primary purpose in "ensur[ing] that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, courts utilize the test established by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), to determine if a claim "so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims," *id.* at 968. The Second Circuit is among several circuits that have applied the *Megapulse* inquiry. *See Up State Fed. Credit Union*, 198 F.3d at 375-77; *see also id.* at 375 ("The District of Columbia Circuit has developed a useful analysis for distinguishing contract claims from challenges to agency action." (citing, *inter alia*, *Megapulse*, 975 F.2d 959)).

Under *Megapulse*, "an action against the United States which is *at its essence* a contract claim lies within the Tucker Act," and "a district court has no power to grant injunctive relief in such a case." 672 F.2d at 967 (emphasis added). "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs.*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In conducting this two-pronged inquiry, a court "look[s] to the complaint's substance, not merely its form." *Kidwell*, 56 F.3d at 284.

Prong one, the source of the rights upon which a plaintiff bases its claims, asks courts to "make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *Megapulse*, 672 F.2d at 969-70. "[T]he mere fact that a court

may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Id.* at 968. Instead, courts "consider whether, among other factors, the plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights exist prior to and apart from rights created under the contract, and whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to which the government is a party." *Crowley Gov't Servs.*, 38 F.4th at 1107 (citation modified).

Prong two, the type of relief sought, "boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Id.* "[A] claim is subject to the Tucker Act and its jurisdictional consequences if, in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Kidwell*, 56 F.3d at 284. "A plaintiff does not 'in essence' seek monetary relief, however, merely because he or she hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Id.* Among other factors, courts look to whether the requested relief is "specific to actions that sound in contract" and if relief would be "determined by reference to the terms of the contract." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017).

### 2. Jurisdiction Likely Is Lacking as to Counts I and II as Currently Framed by Plaintiffs

#### i. *Megapulse* Prong One: The Source of the Rights

The Court starts with the "source of the rights" upon which Plaintiffs' claims are based. *Megapulse*, 672 F.2d at 968. The prong one analysis requires the Court to first "properly characterize [Plaintiffs'] asserted right before . . . proceed[ing] to identify its source." *Crowley Gov't Servs.*, 38 F.4th at 1108.

16

There are two possible ways of characterizing Plaintiffs' asserted right in this case. Plaintiffs could be asserting their right to the money promised to their IHEs by NSF in the pertinent grant awards, which recently have been terminated. Alternatively, Plaintiffs may be asserting a right to be free from government action violative of statutory and constitutional limits.[12] *Cf. Crowley Gov't Servs.*, 38 F.4th at 1108 (deciding whether the asserted right in question was the "right to be free from government action beyond its congressional authority" or "alleged rights to certain monies" (citation modified)). As each characterization points to a different source for that right—the grant agreements or the statutory and constitutional framework for challenging agency action—this initial step is fundamental to the *Megapulse* prong one analysis, and thus to the issue of whether Plaintiffs are likely to establish this Court's jurisdiction.

While so far as the Court can tell, no judicial decision has set forth clear guidance for characterizing a plaintiff's asserted right for purposes of prong one of the *Megapulse* analysis, courts have examined a few indicia.

To start, courts of course look to the complaint. This entails examining the claims asserted, how those claims are styled, and the legal theory upon which the claims are based. *Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) (Scalia, J.) (looking to the appellant's "claims and prayers" to determine if the action fell under the APA or the Tucker Act); *Crowley Gov't Servs.*, 38 F.4th at 1108 (finding that the "asserted right is clear enough on the face of the complaint"); *Megapulse*, 672 F.2d at 969 (observing that the plaintiff "does not claim a breach of contract"); *Twin Metals Minn. LLC v. United States*, No. 22 Civ. 2506 (CRC), 2023 WL 5748624, at *5 (D.D.C. Sept. 6, 2023) (looking to the rights identified in two claims of the plaintiff's

---

[12] Although this Section addresses Plaintiffs' APA claims in Counts I and II, aspects of their other claims provide additional indicia helpful in characterizing their asserted right.

complaint to characterize the asserted right).  The relief a plaintiff seeks in the complaint similarly can indicate the asserted right.  *See Crowley Gov't Servs.*, 38 F.4th at 1108 (citing a disclaimer in the plaintiff's complaint to "monetary relief . . . or any other contractual remedy" as relevant to the characterization of the asserted right); *Sharp*, 798 F.2d at 1523 (examining the "prayer for relief"); *Megapulse*, 672 F.2d at 969 (observing that the plaintiff "limited its request for relief," that the plaintiff sought "no monetary damages against the United States," and that the remedy in the case was "not properly characterized as one for specific performance").[13]

The D.C. Circuit has noted a general "rule that where the jurisdiction of the court turns on whether the complaint seeks monetary relief, the court must generally limit itself to the four corners of the complaint."  *Tootle v. Sec'y of Navy*, 446 F.3d 167, 174 (D.C. Cir. 2006).  "The bright-line rule, however, turns out to be rather dim, for the [D.C. Circuit] has recognized that not all complaints asking for equitable relief will be taken at face value."  *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 6 (D.D.C. 2004); *see Kidwell*, 56 F.3d at 284; *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 361-62 (5th Cir. 1987) (collecting cases establishing that "[i]t is clear, both in this circuit and elsewhere, that a plaintiff cannot avoid Tucker Act jurisdiction simply by characterizing an action as equitable in nature").  After all, as explained at *supra* III.A.1, a purpose of the *Megapulse* inquiry is to weed out "disguised" contract actions.  *Megapulse*, 672 F.2d at 968; *see Kidwell*, 56 F.3d at 284.[14]

---

[13] In this sense, the characterization of the asserted right blends somewhat with the analysis under *Megapulse* prong two, insofar as the "type of relief sought," 672 F.2d at 968, provides an indication of what right the plaintiff hopes to vindicate.

[14] Since the *Megapulse* analysis endeavors to identify disguised contract actions, Plaintiffs' contention that "[a]ccepting Defendants' position could allow agencies to pursue unlawful policies with effective impunity," Reply at 3, is unpersuasive.  Agency action can be challenged through the APA under this analysis, so long as the "essence" of the plaintiff's case is not contractual.  *See, e.g.*, *Crowley Gov't Servs.*, 38 F.4th at 1113 (holding that the plaintiff could challenge the agency's action in the district court through the APA); *Megapulse*, 672 F.2d at 971 (same).

As the Second Circuit has said, "where the prime objective of the plaintiff is to obtain money from the Government, the jurisdiction of the Court of Claims under § 1491(a)(1) could not be avoided by framing a complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining of money damages." *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983). "[T]he substance of the pleadings must prevail over their form. Courts consistently endeavor to 'pierce' the pleadings so that artful pleading does not undercut the jurisdiction of the Claims Court . . . . It is clear . . . that a plaintiff cannot avoid Tucker Act jurisdiction simply by characterizing an action as equitable in nature." *Amoco Prod. Co.*, 815 F.2d at 361. "[D]istrict courts will not have jurisdiction where a plaintiff casts his complaint as seeking equitable relief merely as a pretext in an attempt to avoid the Court of Federal Claims' exclusive jurisdiction." *Bublitz*, 309 F. Supp. 2d at 7; *see Amoco Prod. Co.*, 815 F.2d at 361-62 (characterizing the inquiry as determining the plaintiff's "primary objective" or "ultimate aim" and collecting cases describing this inquiry in varied language).

Thus, when analyzing an action under *Megapulse*, a court need not accept a plaintiff's proffered characterization of its asserted right in its complaint; rather, a court must conduct its own searching inquiry into the "essence" of the plaintiff's claims. *See, e.g.*, *Megapulse*, 672 F.2d at 968; *Kidwell*, 56 F.3d at 284; *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (rejecting the appellant's contention "that the source of its right to relief in this case is [a statute] and not the contract"). In assessing indicia beyond the complaint, courts consider how a plaintiff characterizes its asserted right in briefing. *See Crowley Gov't Servs.*, 38 F.4th at 1108 (citing the appellant's contention "that it has the right 'to be free from government action beyond [its] congressional authority'" in its briefing on appeal as an indication of the right asserted).

Courts have also examined the factual background of a given case, including the origins of the lawsuit. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025) (per curiam) ("By the district court's own telling, the dispute here arose when [the federal agency] terminated these agreements."), *reh'g en banc denied*, 2025 WL 1521355 (D.C. Cir. May 28, 2025). The specific factual predicate underlying a plaintiff's claims and whether those facts implicate breach of contract also may be telling of a plaintiff's asserted right. *See Am. Libr. Ass'n v. Sonderling*, No. 25 Civ. 1050 (RJL), 2025 WL 1615771, at *7 (D.D.C. June 6, 2025) (looking to the "heart of [the plaintiffs'] allegations" and the "main mechanism through which defendants allegedly violated [statutory] mandates" when determining the source of the plaintiffs' rights); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, --- F. Supp. 3d ----, No. 25 Civ. 1363 (DLB), 2025 WL 1585051, at *23 (D. Md. June 5, 2025) (looking to the factual allegations of the complaint under *Megapulse* prong one). As particularly applicable here, when assessing a request for preliminary relief, arguments and evidence offered to establish irreparable harm and injury, as well as the injunctive relief sought, provide a further glimpse into the asserted right. *See Am. Libr. Ass'n*, 2025 WL 1615771, at *8 (citing the declarations filed in support of a motion for a preliminary injunction to determine that "[g]rant terminations are also the heart and soul of plaintiffs' standing and irreparable harm arguments" and the "plaintiffs' standing and irreparable injury largely do not exist prior to and apart from rights created under their grant agreements"); *see also Martin Luther King, Jr. Cnty. v. Turner*, --- F. Supp. 3d ----, No. 25 Civ. 814 (BJR), 2025 WL 1582368, at *9 (W.D. Wash. June 3, 2025) (in context of a motion for a preliminary injunction, looking to "the relief Plaintiffs seek" in the underlying complaint). In sum, courts consider the totality of a plaintiff's pleadings, briefing, arguments, and evidence as indicators of the asserted

right to ensure that a plaintiff's request for equitable relief is not merely a pretext for its "prime objective" of securing monetary relief.  *B.K. Instrument*, 715 F.2d at 727.

Many federal judges have presided over litigation involving grant terminations in the past few months.  *See generally, e.g.*, *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25 Civ. 1643 (APM), 2025 WL 1865160, at *7 (D.D.C. July 7, 2025); *Am. Libr. Ass'n*, 2025 WL 1615771, at *2; *Cath. Bishops*, 770 F. Supp. 3d at 158-60.  This case, however, implicates not only grant terminations, but also NSF's Priority Directive, which was announced shortly before the relevant grant terminations occurred.  Plaintiffs both challenge the Priority Directive under the APA and also ask for injunctive relief involving the terminated grants.  *See* Proposed Order ¶¶ 1, 3.  Determining the right asserted in this case is a fair bit trickier than in some other grant termination cases because, at heart, Plaintiffs have asserted two rights in this action.

### a.  Plaintiffs Have Asserted a Right To Payment of the Grant Money, Whose Source Is Contractual

To begin the *Megapulse* prong one analysis, the Court concludes that the general rule limiting jurisdictional review "to the four corners of the complaint," *Tootle*, 446 F.3d at 174, does not operate in this case.  To be sure, the Complaint explicitly pleads claims for violations of the APA in Counts I and II, and does not plead any claims styled as breach of contract.  *See* Compl. ¶¶ 90-131.  And by demanding an injunction that would preclude Defendants from implementing the Priority Directive, Counts I and II also seek relief that typically is available in APA cases.  *See* Compl. ¶¶ 97, 105 ("Plaintiff States are entitled to an order and judgment . . . enjoining any act to implement the Priority Directive."); *id.* ¶¶ 117, 124, 130 ("Plaintiff States are entitled to preliminary and permanent injunctive relief barring Defendants from implementing the Priority Directive.").  Similarly, the Complaint's Prayer for Relief requests "preliminary and permanent

injunctive relief barring implementation of the Priority Directive as to Plaintiff States and their institutions." *Id.* at 33.

But what does it mean to "bar[] implementation of the Priority Directive"?  When asked this question at the July 9 hearing, Plaintiffs' counsel confirmed that Plaintiffs are requesting restoration of "the status quo" prior to the Priority Directive and are "seeking to have the terminated grants reinstated."  Hearing Tr. 20:7-25; *accord id.* at 50:4-8 (Plaintiffs' counsel reiterating that the relief sought is "not just an injunction that would mandate action going forward, but also restoring the grants that were terminated").  Plaintiffs' counsel acknowledged that, in seeking an injunction that would "restore NSF to the status quo prior to this arbitrary and capricious decision [*i.e.*, to implement the Priority Directive]," a result may be that "monetary disbursements renew as a result of going back to April 17 [*i.e.*, the day before the Priority Directive was announced]."  *Id.* at 20:10-19.  And in their July 10 Letter confirming the nature of the injunctive relief sought, Plaintiffs explained that the "last uncontested status" included "Plaintiff States' previously issued grants [being] in effect" and "Plaintiffs seek to maintain this status quo during the pendency of this litigation."  July 10 Letter at 1.

So, by Plaintiffs' own account, in this action they seek the reinstatement of the terminated grants and monetary disbursements.  This raises the question of whether Plaintiffs have "cast[ their] complaint as seeking equitable relief merely as a pretext in an attempt to avoid the Court of Federal Claims' exclusive jurisdiction."  *Bublitz*, 309 F. Supp. 2d at 7.  The Court cannot rely on the Complaint alone to answer that question.  As mentioned, "[t]hat [Plaintiffs'] complaint nowhere mentions breach of contract . . . cannot alone suffice to establish jurisdiction in the District Court."  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985); *see Kidwell*, 56 F.3d at 284 ("The plain language of a complaint . . . does not necessarily settle the

question of Tucker Act jurisdiction."); *Ingersoll-Rand Co.*, 780 F.2d at 78 ("That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations.  Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action."); *see also Great-West Life & Annuity Ins. Co. v. Knudson* ("*Great-West*"), 534 U.S. 204, 211 n.1 (2002) ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction.").  The Court must therefore "examine other factors to determine whether the action sounds genuinely in contract or is based on truly independent legal grounds." *Ingersoll-Rand Co.*, 780 F.2d at 78 (citation modified).[15]

Looking to the other indicia in this case, the Court concludes that Plaintiffs have primarily asserted a right to payment of the funds promised in the grant awards.  While the Complaint pleads classic APA violations in Counts I and II, the application for a preliminary injunction is predominantly focused on breach-of-contract remedies in the form of reversing the grant terminations and reinstating the awards.  Indeed, Plaintiffs expressly seek preliminary relief that would direct payment by the government of that grant money.  Proposed Order ¶ 3 ("Defendants are ordered to restore the status quo of Plaintiff States' funding preceding the Priority Directive . . . .").  As discussed further at *infra* III.A.2.ii.a, this is a request for specific performance

---

[15] Plaintiffs' citation to *Community Legal Services in East Palo Alto v. United States Department of Health and Human Services*, 137 F.4th 932, 938 (9th Cir. 2025), does not advance the ball.  *See* Reply at 1–3.  The statement in *Community Legal Services* that "[i]f rights and remedies are statutorily or constitutionally based, then district courts have jurisdiction; if rights and remedies are contractually based then only the Court of Federal Claims does," 137 F.4th at 938 (internal quotation marks and emphasis omitted), simply framed the question that *Megapulse*'s two prongs are designed to answer: whether the rights and remedies in a given case are based on contract or some other source.  This quotation is recycled from *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023), where the Ninth Circuit made the statement to summarize the legal impact of the answer a court derives after applying *Megapulse*.  To accept Plaintiffs' reading of *Community Legal Services*—that the styling of the claims as statutory or constitutional is dispositive—would end-run around the very analysis courts conduct under *Megapulse*.

23

of the grant agreements. Such a request for relief reflects an asserted contract right, since Plaintiffs are "seek[ing] in district court an order compelling [NSF] to perform or fulfill any obligations to [IHEs] created by the contract[s]." *Crowley Gov't Servs.*, 38 F.4th at 1108.

Similarly, Plaintiffs' moving brief in support of a preliminary injunction reveals their focus on the termination of the grant awards. *See* Motion at 3-7. For example, Plaintiffs argue that the "implementation of the Priority Directive" has led IHEs "to stop working on projects focused on critical research in STEM education and training." *Id.* at 5; *see also id.* ("NSF's terminations also mean that new initiatives . . . will not be implemented."); *id.* at 6 ("Postdoctoral scholars, project managers, undergraduate students, faculty and staff have lost or will lose their jobs because of the implementation of the Priority Directive."); *id.* ("The terminations also impact students' ability to continue their education and training, and have forced institutions to eliminate supportive mentorship programs that increase retention, persistence, and graduation rates in STEM."); *id.* ("Multiple terminated grants also focused on improving STEM instruction for K-12 students in Plaintiff States . . . ."); *id.* at 7 ("Funding reductions will hamper Plaintiff States' institutions' ability to deliver innovation, provide world-class education, and advance critical technologies in STEM."). As Plaintiffs' moving brief reinforces, the "implementation" of the Priority Directive that they are challenging is focused on the grant terminations.[16]

This case's background similarly reveals that "the dispute here arose when [NSF] terminated these agreements." *Widakuswara*, 2025 WL 1288817, at *4. Plaintiffs brought this lawsuit after NSF had terminated grant awards "on a rolling basis" for several weeks. *See* Stone

---

[16] Perhaps tellingly, it is only in Plaintiffs' reply brief responding to Defendants' jurisdictional arguments invoking the Tucker Act that Plaintiffs insist they are seeking to challenge agency action arising under statute and the Constitution, not any grant agreement. *See* Reply at 1-2.

Decl. ¶ 19.  Plaintiffs have made clear that it was those terminations that caused their injuries and led them to commence this action.  At the July 9 hearing, Plaintiffs' counsel acknowledged that the termination of grant awards affecting IHEs in the Plaintiff states "dr[ove] the need for [Plaintiffs] to come to this court."  Hearing Tr. at 19:21-24.  Plaintiffs' counsel explained that, once those terminations occurred, "[t]he injury became far more pronounced" as the Plaintiff states' IHEs "fully felt the impact of the change in priority."  *Id.* at 19:17-18; *see also* Compl. ¶¶ 48-51, 55 (discussing the effects of grant terminations in some of the Plaintiff states following the Priority Directive).  That these terminations of grant awards were the "main mechanism through which defendants allegedly violated [their statutory] mandates" further weighs in favor of characterizing Plaintiffs' asserted right as a right to the grant money.  *Am. Libr. Ass'n*, 2025 WL 1615771, at *7.

This conclusion is strengthened by Plaintiffs' efforts to show irreparable harm.  *See id.* at *8.  Plaintiffs argue that the Priority Directive will cause them irreparable harm through the effect of the grant terminations, emphasizing the "sizeable monetary losses" that IHEs in the Plaintiff states have sustained.  Motion at 27; *see id.* ("IHEs have had to abruptly stop work on important projects focused on broadening participation in STEM."); *id.* ("Faculty, staff, PhD and undergraduate students have lost or will lose jobs and research opportunities due to canceled projects.  Undergraduate students have also lost access to training and mentorship programs." (citations omitted)).

Similarly, of the numerous declarations Plaintiffs submitted with their motion, not one discusses prospective harm, irreparable or otherwise, expected to arise from the Priority Directive itself.  These declarations do not explain, for instance, how the Priority Directive will affect the way researchers write grant applications in the future, the kinds of research IHEs will have to

anticipate pursuing to comply with the Priority Directive, or other similar effects. Instead, Plaintiffs' evidence of irreparable harm is wholly limited to the impact of the terminated grants at the declarants' IHEs. *See* Ranucci Decl., Exh. 6 ¶¶ 25-28 (explaining harm resulting from "[r]educed or cancelled funding" and NSF's "terminations" at California State University); *id.*, Exh. 8 ¶¶ 17-18 ("As a result of this termination, [University of Colorado] Denver has been negatively impacted and will have to terminate personnel and immediately stop the project."); *id.*, Exh. 18 ¶¶ 18-20 (outlining "the immediate and ongoing harm of th[e] termination" of a grant at the University of Connecticut); *id.*, Exh. 19 ¶¶ 23-24, 30-31, 37-38, 44-45, 51-52, 58-59 (setting forth the harm of grant terminations at IHEs in Delaware); *id.*, Exh. 21 ¶¶ 19-22 (explaining the harm of the termination of a grant award held by Kapiʻolani Community College in Honolulu, Hawaii); *id.*, Exh. 26 ¶¶ 15-20 (describing the harm caused by "[t]he termination of funding for the three grants awarded by NSF" at Chicago State University); *id.*, Exh. 29 ¶¶ 34-35, 50-51, 66-68, 83-85, 99-101, 117-118, 145-147, 162-164, 179-181, 196-198, 213, 239-240, 255-256, 270-272 (identifying the harm from grant terminations at IHEs in Massachusetts); *id.*, Exh. 31 ¶¶ 12-14 (explaining the "significant[] impact" caused by the loss of grants at the University of Maryland, Baltimore County); *id.*, Exh. 33 ¶¶ 39-51 (explaining the harm "[t]he termination of awards . . . by NSF will have" on the Computer Science graduate program at Kean University in New Jersey, as well as subawards made through the terminated Garden State Louis Stokes Alliance for Minority Participation program); *id.*, Exh. 34 ¶¶ 19-22 (outlining the harm resulting from "[t]he termination of awards . . . by NSF" at the University of New Mexico); *id.*, Exh. 39 ¶¶ 17-20 ("The termination of the five awards by NSF will terminate the projects. . . . As a result, the impact on the University of Nevada, Las Vegas is a diminished ability to serve our students and faculty."); *id.*, Exh. 42 ¶¶ 48-50 (explaining the harm resulting from "[t]he termination of these awards by NSF" in The

State University of New York system, such as research that will "be abandoned due to lack of funding"); *id.*, Exh. 46 ¶¶ 17-21 (identifying the harm resulting from "premature[]" termination of six awards at Portland State University); *id.*, Exh. 52 ¶¶ 57-60 ("[S]killed STEM workforce in Rhode Island will be impacted and a pipeline of early career talent disrupted as the terminated awards supported graduate students, postdoctoral associates and faculty."); *id.*, Exh. 54 ¶¶ 16-19 (describing the harm of grant terminations at the University of Washington); *id.*, Exh. 63 ¶¶ 18-21 (identifying the harm caused by the termination of a grant award at the University of Wisconsin-Madison); *see also id.*, Exh. 9 ¶¶ 13-16; *id.*, Exh. 10 ¶¶ 16-19; *id.*, Exh. 11 ¶¶ 15-19; *id.*, Exh. 15 ¶¶ 15-17; *id.*, Exh. 20 ¶¶ 17-20; *id.*, Exh. 22 ¶¶ 40-54; *id.*, Exh. 23 ¶¶ 17-23; *id.*, Exh. 27 ¶¶ 16-20; *id.*, Exh. 30 ¶¶ 14-21; *id.*, Exh. 37 ¶¶ 18-21; *id.*, Exh. 38 ¶¶ 17-21; *id.*, Exh. 47 ¶¶ 23-32; *id.*, Exh. 48 ¶¶ 17-20; *id.*, Exh. 49 ¶¶ 17-20; *id.*, Exh. 53 ¶¶ 9-17; *id.*, Exh. 54 ¶¶ 16-19; *id.*, Exh. 55 ¶¶ 17-20; *id.*, Exh. 56 ¶¶ 18-21; *id.*, Exh. 57 ¶¶ 24-25; *id.*, Exh. 58 ¶¶ 17-20; *id.*, Exh. 59 ¶¶ 17-20; *id.*, Exh. 60 ¶¶ 17-21; *id.*, Exh. 64 ¶¶ 17-21; *id.*, Exh. 65 ¶¶ 17-21; *id.*, Exh. 66 ¶¶ 17-20; *id.*, Exh. 68 ¶¶ 13-15; Ranucci Supp. Decl., Exh. 69 ¶¶ 15-17; *id.*, Exh. 71 ¶¶ 17-21; *id.*, Exh. 72 ¶¶ 37-40; *id.*, Exh. 73 ¶¶ 5-9; *id.*, Exh. 74 ¶¶ 16-19.

The weight of these indicia points to an asserted right to the money offered in the terminated grant awards.[17]  The next step in the prong one analysis is to "identify the source of [Plaintiffs'] asserted right" in the money offered in those terminated awards.  *Crowley Gov't Servs.*, 38 F.4th at 1108.  The sources of that right are the grant agreements.

---

[17] This conclusion is further bolstered by allegations in the Complaint that largely concern NSF's grant terminations, *see* Compl. ¶¶ 6, 48-55, and specifically articulate the harm from the Priority Directive in terms of the effects from the grant terminations, *id.* ¶ 55 ("As a result of the implementation of the Priority Directive, institutions (including in Plaintiff States) have already stopped work on projects . . . .  The loss of these projects constrains innovation and slows down the development of future proposals that could advance national STEM priorities and benefit Plaintiff States.").

Plaintiffs do not dispute Defendants' characterization of the grant awards as "simply 'contracts to set the terms of and receive commitments from recipients.'"  Opposition at 7 n.2 (quoting *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021)).  NSF's grants are issued pursuant to a process by which Congress appropriates money for NSF to carry out its statutory obligations.  Compl. ¶ 45.  While Congress has instructed NSF to prioritize certain kinds of policies and programs, *see supra* I.A, Congress has not mandated that a particular grant agreement be issued to any individual recipient.  Rather, NSF conducts a competitive grant review process to select, from thousands of applications, which projects will receive the appropriated funds in the form of grant awards.  Stone Decl. ¶ 5.  Each grant award is executed through a grant agreement, in which NSF commits funds to the selected grant recipient, and in return the recipient agrees to the terms and conditions included in either the RTCs or the GC-1.  *Id.* ¶ 15.  "These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes."  *Widakuswara*, 2025 WL 1288817, at *3; *see Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025) (holding that the Tucker Act's waiver of sovereign immunity likely applied because "the grants here were awarded by federal executive agencies to specific grantees from a generalized fund" and "[w]hile the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds").

Thus, the source of Plaintiffs' asserted right is a contract.  As "[t]he core dispute between plaintiffs and defendants arose when defendants terminated those contracts . . . it appears that plaintiffs' claims may indeed be contract claims under the Tucker Act."  *Am. Libr. Ass'n*, 2025 WL 1615771, at *9; *see Spectrum Leasing Corp.*, 764 F.2d at 894 (holding that claims were

contractual because the "right to the [desired] payments arose only upon creation and satisfaction of its contract with the government; in no sense did it exist independently of that contract"). Since Plaintiffs are "seek[ing] to enforce a[] duty imposed upon the government by the relevant contracts to which the government is a party," *Crowley Gov't Servs.*, 38 F.4th at 1107 (citation modified), *Megapulse* prong one indicates that the Tucker Act's waiver of sovereign immunity should apply to this asserted right.[18]

---

[18] Plaintiffs rely on a decision from the D.C. Circuit in *Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985). *See* Reply at 2. In that case, the U.S. Department of Health and Human Services, upon determining that the State of Maryland had misspent federal grant money received pursuant to Title XX of the Social Security Act, offset the amount of the misspent funds through reducing Maryland's Title XX funding. *See Md. Dep't of Hum. Res.*, 763 F.2d at 1443-45. Maryland sued, asking the district court "for a declaratory judgment and for injunctive relief enjoining defendants from reducing funds otherwise due . . . or imposing any sanctions on such funds for alleged Title XX violations." *Id.* at 1446 (citation modified).

In concluding that the action did not fall within the Tucker Act, the D.C. Circuit held that Maryland's claims did not "arise out of an 'express or implied contract' as that phrase is used in the Tucker Act." *Id.* at 1449. That holding rested on two premises. The D.C. Circuit first relied on the Supreme Court's statement in *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 669 (1985), a case which concerned Title I of the Elementary and Secondary Education Act of 1965, that "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Md. Dep't of Hum. Res.*, 763 F.2d at 1449 (quoting *Bennett*, 470 U.S. at 669). From this proposition of law, the D.C. Circuit observed that "Maryland's claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Id.* From these two premises, the D.C. Circuit concluded "that Maryland's claims are not contract claims for Tucker Act purposes." *Id.*

Although Plaintiffs are not alone in applying *Maryland Department of Human Resources* in this fashion, *see Southern Educ. Found. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1453047, at *7 (D.D.C. May 21, 2025), this Court does not accept Plaintiffs' reading of the D.C. Circuit's analysis. Such an approach would inappropriately conflate the statutory nature of the grant-in-aid programs at issue in *Maryland Department of Human Resources* and *Bennett* with the distinct contractual nature of other grant programs in which the federal government participates, like the one at issue in this case. *See San Juan City Coll. v. United States*, 391 F.3d 1357, 1361-62 (Fed. Cir. 2004) (explaining why the use of *Bennett*'s logic is inappropriate when considering federal grant programs which use "formal written agreement[s]").

### b. Plaintiffs Also Have Asserted a Right To Be Free of Unlawful Agency Action, Whose Source Is Statutory

While the bulk of Plaintiffs' focus in this action has been on the terminated grants, they also have made allegations and representations that are more consistent with asserting a statutory right under the APA. Count I, for example, alleges that "[t]he Priority Directive is arbitrary and capricious because it does not provide a reasoned explanation or any 'good reasons for' the change in priorities." Compl. ¶ 94 (quoting *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009)); *see also id.* ¶¶ 95-96. Likewise, Count II of the Complaint alleges that "[t]he Priority Directive is contrary to law and beyond statutory authority because it defies Congress's statutory directives to NSF to not only support, but pursue the very priorities the Directive rejects." *Id.* ¶ 101; *see also id.* ¶ 102. Plaintiffs' counsel similarly represented at the July 9 hearing that their desired relief would entail NSF "restor[ing] the congressionally mandated process." Hearing Tr. at 20:17-18. Plaintiffs' counsel also emphasized their interest in procedural regularity. *See id.* at 18:10-14 ("We are talking about the process, and I really think that that is an important aspect of plaintiffs' claim, because [C]ongress has directed a process by which NSF will conduct merit-based peer review of the priorities.").

Plaintiffs additionally have articulated, albeit in a rather limited fashion, that they have an interest in predictability with regard to the grant application process itself. For example, Plaintiffs' counsel argued at the hearing that "there has to be a predictable ability," contending that "these institutes of higher education are not going to stop striving for NSF funding. They need clarity from this court to explain to them how they can satisfy those broad[er] impact criteri[a]. By way of example, how they can satisfy the goals of NSF and meet what NSF is prioritizing[?] So this is a long-term future-forward clarifying request that we have here, not as to these particular grants." Hearing Tr. at 15:12-20. While the overwhelming majority of the declarations from IHEs

30

submitted by Plaintiffs do not indicate an intent to pursue future NSF grants and are limited to explaining the harm from the terminated grant, *see, e.g.*, Ranucci Decl., Exh. 22 (declaration of the Provost at the University of Hawai'i at Mānoa) at 1-13; *id.*, Exh. 57 (declaration of the Provost and Vice President of Academic Affairs of Eastern Washington University) at 1-7, at least a handful do express such an intent, albeit in general terms or in the course of discussing the effect of the Indirect Cost Directive, *see id.*, Exh. 52 (declaration of the Vice President for Research and Economic Development at the University of Rhode Island ("URI")) ¶ 63 ("URI intends to apply to NSF for new funding awards, and renewals and continuations of existing funding awards, in the next year and in future years to come."); *id.*, Exh. 62 (declaration of the Interim Vice Provost for Research and Graduate School Dean of the University of Wisconsin-Milwaukee) ¶ 8 ("University of Wisconsin-Milwaukee intends to apply to NSF for new funding awards, and renewals and continuations of existing funding awards, in the next year and in future years to come.").

These representations are targeted at a set of interests distinct from the grant terminations: Plaintiffs' interests in procedural regularity and predictability in how NSF will administer its grant award program. The remedies tied to these interests would similarly be distinct from the retrospective monetary relief sought in the contractual right asserted, *see supra* III.A.2.i.a—indeed, ordering the restoration of funds for the terminated grants and directing NSF to pay those obligations on a going-forward basis would not remediate the procedural regularity and predictability concerns, which are primarily prospective in nature. In this regard, Plaintiffs seek classic forms of relief available under the APA: vacatur of the Priority Directive and enjoining its prospective implementation against Plaintiffs' IHEs. *See* Compl. ¶¶ 97, 105; Proposed Order ¶ 1 ("Defendants are and until further order of this Court shall remain enjoined from enforcing or implementing the Priority Directive with respect to Plaintiff States and institutions of higher

education within Plaintiff States . . . including any implementation thereof by means of termination or interruption of funding[.]").[19]

These indicia are all consistent with a right deriving from the APA's promise of procedural regularity, indicating that the source of this asserted right is statutory. A claim based on such an asserted right would fall into the "category of cases identified in *Megapulse* in which contract issues may arise but the action itself is not founded on a contract." *Crowley Gov't Servs.*, 38 F.4th at 1109.

*     *     *

In the end, while Plaintiffs have primarily asserted a right sounding in contract, *see supra* II.A.2.i.a, they simultaneously have asserted a separate right which has a source in statute. The Court will address how this dual-assertion issue affects the "essence" of Plaintiffs' claims at *infra* III.A.3. For now, the analysis turns to the second *Megapulse* prong.

### ii.    *Megapulse* Prong Two:  The Type of Relief Sought

The Court next examines "the type of relief sought." *Megapulse*, 672 F.2d at 968. This prong "boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley Gov't Servs.*, 38 F.4th at 1107 (citation modified).

As alluded at *supra* II.A.2.i, the relief Plaintiffs seek in this action falls into two primary categories, as reflected by the Proposed Order attached to their preliminary injunction motion and

---

[19] The Court understands the final language in this request, which directs Defendants to cease implementing the Priority Directive "by means of termination or interruption of funding," Proposed Order ¶ 1, to entail prospective relief, *i.e.*, an order directing Defendants not to terminate other grants using the Priority Directive as a basis. To the extent Plaintiffs ask the Court to order the payment of either the sums past due or the future streams of payments due on grants already terminated, the Court likely would not have jurisdiction to entertain that request for relief. *See infra* III.A.2.ii.a; *see also Dep't of Educ. v. California* ("*California*"), 604 U.S. ----, 145 S. Ct. 966, 968 (2025) (characterizing relief ordering the United States "to continue paying obligations as they accrue" as falling within the scope of the Tucker Act).

by their representations at the July 9 hearing.  First, Plaintiffs primarily seek relief that is retrospective in nature: they ask the Court to order Defendants "to restore the status quo of Plaintiff States' funding preceding the Priority Directive."  Proposed Order ¶ 3.  Second, Plaintiffs also seek relief that is prospective in nature: they request an order vacating the Priority Directive and enjoining NSF's reliance on that policy to terminate additional grants.  *See* Proposed Order ¶ 1; Compl. ¶¶ 97, 105.[20]  The Court will address each category of relief, in turn.

### a.  The Retrospective Relief Sought Is Contractual in Nature

Starting with Plaintiffs' request that the Court "restore the status quo of Plaintiff States' funding preceding the Priority Directive," Proposed Order ¶ 3, the Court concludes that this kind of relief is contractual.  "The practical effect of such relief would be to order specific performance of the[] grant agreements" to which IHEs in the Plaintiff states are parties.  *Am. Libr. Ass'n*, 2025 WL 1615771, at *9; *see also Cath. Bishops*, 770 F. Supp. 3d at 163 ("Stripped of its equitable flair, the requested relief seeks one thing: [the movant] wants the Court to order the Government to stop withholding the money due under the [relevant agreements].").  Plaintiffs' desired relief in the form of "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation," relies on a remedy that "was not typically

---

[20] In a similar action, the First Circuit recently dealt with another form of relief, which falls somewhere in between these two categories: declaratory relief that the grant terminations were unlawful and arbitrary and capricious.  *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, --- F.4th ----, 2025 WL 2017106, at *3 (1st Cir. July 18, 2025) (reviewing a district court order which provided that resulting grant terminations pursuant to a policy of the National Institutes of Health were "unlawful" and that those terminations are "of no effect, void, illegal, set aside and vacated").  This Court need not pass on the "close[] question," *id.* at *6, of whether this kind of relief is permissible, as Plaintiffs' APA claims have not sought declaratory relief as to the past grant terminations, *see* Compl. ¶ 97 ("Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, *holding unlawful and vacating the Priority Directive* and enjoining any act to implement the Priority Directive." (emphasis added)); *id.* ¶ 105 (same), nor have Plaintiffs asked the Court to enter such relief at this preliminary stage, *see generally* Proposed Order.

available in equity." *Great-West*, 534 U.S. at 210-11; *accord Cath. Bishops*, 770 F. Supp. 3d at

163 ("[A]n injunction is the wrong vehicle to recoup withheld funds.").[21]  Specific performance is

a "classic contractual remedy." *Spectrum Leasing Corp.*, 764 F.2d at 894.  Accordingly, a request

for such relief against the United States "must be resolved by the Claims Court."  *Ingersoll-Rand*

*Co.*, 780 F.2d at 80; *see also Presidential Gardens Assocs. v. U.S. ex rel. Sec. of Hous. & Urban*

*Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Actions seeking specific performance of a contract,

brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be

brought against the United States.").

Plaintiffs argue that "[e]ven if a favorable ruling might result in a chain of events leading

to the disbursement of funds, that does not transform the analysis," relying on *Bowen v.*

*Massachusetts*, 487 U.S. 879 (1988).  Reply at 2.[22]  But the Supreme Court in *Great-West Life &*

*Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), distinguished *Bowen* from the situation

presented in Plaintiffs' first category of relief.  *See Great-West*, 534 U.S. at 212 ("Furthermore,

*Bowen*, unlike petitioners' claim, did not deal with specific performance of a *contractual*

obligation to pay *past* due sums.").  Accordingly, "*Bowen* has no bearing on the unavailability of

---

[21]  The Supreme Court in *Great-West* acknowledged that specific performance was sometimes available in equity "to enforce an agreement to lend money when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions."  534 U.S. at 211 (internal quotation marks omitted).  Plaintiffs' desired relief is not analogous to any of these scenarios.

[22]  *Bowen* held "that the provision of the Administrative Procedure Act that precludes actions seeking 'money damages' against federal agencies, 5 U.S.C. § 702, does not bar a State from seeking specific relief to obtain money to which it claims entitlement under the federal Medicaid statute."  *Great-West*, 534 U.S. at 212 (citation omitted).  In the course of its analysis, the Supreme Court in *Bowen* remarked that its "cases have long recognized the distinction between an action at law for damages . . . and an equitable action for specific relief," reasoning that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  487 U.S. at 893.

an injunction to enforce a contractual obligation to pay money past due." *Id.* While *Bowen* provides that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" 487 U.S. at 893, here "there is more than a 'possibility' that injunctive relief would result in the disbursement of funds; it is the explicit relief sought by plaintiffs," *Am. Libr. Ass'n*, 2025 WL 1615771, at *9 n.7 (quoting, in turn, *Bowen*, 487 U.S. at 910).

The extension of *Bowen* to this case is particularly dubious following the Supreme Court's recent decision in *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966 (2025) (per curiam). There, the Supreme Court considered a request to stay a district court's temporary restraining order which "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 968. The Supreme Court granted the stay application, reasoning that the district court likely lacks subject matter jurisdiction over the case under the Tucker Act. *Id.* In reaching that decision, the Supreme Court cited *Bowen* to state that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). But the Supreme Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here," and that instead the Tucker Act's waiver of sovereign immunity applies. *Id.* (citing *Great-West*, 534 U.S. at 212).

Plaintiffs discount *California* because, citing Justice Elena Kagan's dissent, "[t]hat non-precedential stay order was issued 'with barebones briefing, no argument, and scarce time for reflection.'" Reply at 2-3 (quoting *California*, 145 S. Ct. at 969 (Kagan, J., dissenting)). Of course,

"[a] dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).  As the Supreme Court recently reminded, "[a]lthough [its] interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ----, --- S. Ct. ----, 2025 WL 2056889 (July 23, 2025).  In any event, while Plaintiffs are correct that *California* "did not overrule *Bowen*," Reply at 3, the Supreme Court's decision in *California* does "raise serious doubts" about whether this request for relief is properly brought in a federal district court, *Am. Libr. Ass'n*, 2025 WL 1615771, at *7.

Plaintiffs also point out that "just a few weeks before *California*, the Supreme Court declined the federal government's invitation to apply the Tucker Act to a case involving a freeze on the payment of certain foreign-aid funds," which they claim "demonstrat[es] that *California* should not be read as expansively as Defendants wish."  Reply at 3 (citing *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 604 U.S. ----, 145 S. Ct. 753 (2025)).  The decision in *AIDS Vaccine Advocacy Coalition*, though, concerned a challenge to a temporary restraining order, and the Supreme Court's denial of the government's application to vacate that order was informed by the expiration of the "deadline in the challenged order" by the time the full Court had reviewed the application and "the ongoing preliminary injunction proceedings" in the district court.  145 S. Ct. at 753.  The district court there ultimately held that "Plaintiffs' proposed relief is overbroad insofar as it would specifically order Defendants to continue to contract with them."  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 154 (D.D.C. 2025); *see Cath. Bishops*, 770 F. Supp. 3d at 164-65 (applying the district court's subsequent decision in *AIDS Vaccine Advocacy*

*Coalition* to hold that the "relief the [movant] seeks in its preliminary injunction—reinstatement of contracts terminated by the Government—is beyond the power of this Court").

"[L]ower courts' interpretation of the breadth and applicability of" *California* to actions like this "have varied widely." *Am. Libr. Ass'n*, 2025 WL 1615771, at *7 n.4.  In the D.C. Circuit, some decisions have agreed with Defendants' stance that the Tucker Act likely applies to actions challenging grant terminations.  *See, e.g.*, *Widakuswara*, 2025 WL 1288817, at *3-5.  The D.C. Circuit recently granted *en banc* review of two such decisions and in that order indicated that its initial view was likely closer to Plaintiffs', over a dissent from Judge Gregory G. Katsas.  *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (per curiam).  A panel of the Fourth Circuit recently sided with Defendants, over the dissent of Judge Toby J. Heytens.  *See Sustainability Inst.*, 2025 WL 1587100.  In the Ninth Circuit, ten judges dissented from a denial of rehearing *en banc* in part because those judges believed *California*'s "analysis should have controlled" since the lawsuit "fundamentally" sought to enforce a contractual obligation to pay money, even if the relief was styled as an injunction.  *See Cmty. L. Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 135 F.4th 852, 855 (9th Cir. 2025) (Bumatay, J., and VanDyke, J., dissenting).

The Court is persuaded that the kind of preliminary relief sought by Plaintiffs in this first category of relief is akin to that in *California*, and therefore *Bowen* is likely distinguishable.  Notably, the district court's order on appeal in *California* directed the government to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination."  *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 80 (D. Mass. 2025).  The Supreme Court, though, characterized this relief as "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying

obligations as they accrue." *California*, 145 S. Ct. at 968.  Therefore, the Supreme Court held the Tucker Act's waiver of sovereign immunity likely applies, which would grant the Court of Federal Claims jurisdiction over the matter, and so the government is likely to prevail in showing that the district court lacks jurisdiction. *Id.*  That the relief the district court had ordered in *California* is remarkably similar to what Plaintiffs seek in this first category of relief, *see* Proposed Order ¶ 3 (ordering Defendants "to restore the status quo of Plaintiff States' funding preceding the Priority Directive"), lends additional support to this Court's conclusion that *Bowen* likely does not call for a different outcome.

At the July 9 hearing, Plaintiffs pointed the Court to the Second Circuit's recent decision in *State of New York v. United States Department of Education*, No. 25-1424, Dkt. 40 (2d Cir. June 20, 2025).  There, a Second Circuit panel considered an appeal from a preliminary injunction order which prevented the Department of Education from modifying the period during which a group of plaintiff states could liquidate COVID-19-era grant funding. *Id.* at 2.  The Second Circuit rejected the government's Tucker Act arguments, finding the case to be closer to *Bowen* than *California*. *Id.* at 2-3.  Noting that the matter "is not free from doubt," the majority explained that "[w]hereas *California* concerned the outright termination of education-related grants, the States in this case challenge the Government's rescission of its prior regulatory action setting timelines for liquidating grants that the Government has not cancelled." *Id.* at 3 (citation omitted).  The Second Circuit also emphasized that the plaintiffs' claims "pertain[ed] to the Government's exercise of its *regulatory* authority . . . not a *contractual* duty to pay money to the States." *Id.*

This reasoning is inapposite to the instant case.  Here, Plaintiffs challenge the termination of grants resulting from implementation of the Priority Directive, not an alteration to a regulatory timeline.  Moreover, the source of Plaintiffs' rights is Defendants' contractual duty to pay money

through the grant agreements, *see supra* III.A.2.i.a, rather than any exercise of regulatory authority. The Second Circuit's decision in *State of New York* thus does not alter the Court's conclusion that this matter is more like *California* than *Bowen*.

Similarly, the Court is unpersuaded that the First Circuit's recent decision in *American Public Health Association v. National Institutes of Health*, --- F.4th ----, 2025 WL 2017106 (1st Cir. July 18, 2025), indicates that this category of relief is distinct from that at issue in *California*. The First Circuit considered an application to stay a district court's order which declared that a National Institutes of Health policy prohibiting the agency from funding certain scientific research grants was arbitrary and capricious under the APA, held the policy void, and declared the resulting grant terminations unlawful and void. *Id.* at *1-4. The First Circuit distinguished *California* because "(1) the district court's orders . . . did not award 'past due sums,' but rather provided declaratory relief that is unavailable in the Court of Federal Claims; and (2) neither the plaintiffs' claims nor the court's orders depend on the terms or conditions of any contract." *Id.* at *6.

The district court decision on review in *American Public Health Association* did not contain the problematic relief Plaintiffs seek here, which would entail the Court ordering the government to pay out past-due grant obligations. *Compare id.* at *7 ("In this case, . . . the district court did not 'enforce a contractual obligation to pay money.'  Rather, the court simply declared that the Department unlawfully terminated certain grants." (quoting *California*, 145 S. Ct. at 968)), *with* Proposed Order ¶ 3.  Ordering Defendants to "restore the status quo of Plaintiff States' funding preceding the Priority Directive," Proposed Order ¶ 3, would also require examining the terms of the individual terminated grant agreements to determine what amount of money in arrears would need to be paid.  The First Circuit's decision provides no guidance on whether and how a district court should evaluate such a request for relief.

Plaintiffs further argue that "Defendants nowhere explain how th[e] Court [of Federal Claims] could possibly grant Plaintiffs' requested relief."  Reply at 2.  This argument, though, hinges on the Court's acceptance of Plaintiffs' styling of their relief in equitable terms.  *See id.* ("Plaintiffs do not seek monetary damages; instead . . . they seek to vacate the Priority Directive, and declaratory and injunctive relief as to the Directive and its implementation.").  As explained, Plaintiffs' requested retrospective remedy—specific performance—is contractual in nature and therefore squarely within the ambit of the Court of Federal Claims.  *See Ingersoll-Rand Co.*, 780 F.2d at 80 ("[W]e have indicated that a complaint involving a request for specific performance must be resolved by the Claims Court."); *Cath. Bishops*, 770 F. Supp. 3d at 165 n.6 ("Regardless of the precise remedial powers of the Claims Court, the [D.C.] Circuit signaled that government contractors seeking specific performance must go there, even if the contractor will be limited to a damages remedy.").

### b.  The Prospective Relief Sought Is Statutory in Nature

As discussed, in addition to seeking retrospective relief as to the terminated grants, Plaintiffs plead in their Complaint for vacatur and prospective injunctive relief against the Priority Directive's implementation.  In connection with the instant motion, Plaintiffs ask the Court to enjoin Defendants "from enforcing or implementing the Priority Directive with respect to Plaintiff States and institutions of higher education within Plaintiff States . . . including any implementation thereof by means of termination or interruption of funding."  Proposed Order ¶ 1.[23]

---

[23] To the extent Plaintiffs seek equitable relief for parties not before the Court (*i.e.* other investigators in cooperative grant agreements and potentially private IHEs within the Plaintiff states which Plaintiffs may not have standing to sue on behalf of), the Court may be unable to grant that relief following the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. ----, 145 S. Ct. 2540, 2554 (June 27, 2025).  The Court need not reach this issue in light of its ultimate conclusion that Plaintiffs are not entitled to preliminary equitable relief.

"[T]he Administrative Procedure Act . . . embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,'" and Supreme Court caselaw instructs that the APA's "generous review provisions must be given a hospitable interpretation." *Abbott Laby's v. Gardner*, 387 U.S. 136, 140-41 (1967) (internal quotation marks omitted) (quoting 5 U.S.C. § 702). In this second category of relief, Plaintiffs have requested remedies that are at the heart of the APA's judicial review scheme. These remedies are "precisely the relief that is afforded—indeed, *required*—by and routinely granted under the APA." *Aids Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 135; *see, e.g.*, *N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal remedy when we are faced with unsustainable agency action." (internal quotation marks omitted)); *accord* 5 U.S.C. § 706(2).

It is unclear whether Defendants take umbrage with these principles; the thrust of their briefing challenges the Court's ability to order NSF to pay money to individual grant holders. *See* Opposition at 9-10. As discussed at *supra* III.A.2.ii.a, the Court agrees such relief is jurisdictionally problematic. But that reasoning would not deprive this Court of jurisdiction to vacate an allegedly illegal agency policy, to enjoin an agency from terminating additional grants using that policy as the basis, or to bar the agency from relying on that policy when making decisions to award grants in the future. Such requests for relief could not be left to the Court of Federal Claims since "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief." *Bowen*, 487 U.S. at 905. It "seems highly unlikely that Congress intended to designate an Article I court as the primary forum for judicial review of agency action that may involve questions of policy that can arise" when a litigant requests these forms of relief. *Id.* at 908 n.46. The Court agrees with Plaintiffs that a contrary view of the Court's jurisdiction

risks providing agencies leeway to engage in unlawful actions without a mechanism for judicial review.  *See* Reply at 3.  Accordingly, the prospective relief Plaintiffs have sought is not contractual in nature.

*    *    *

So the second *Megapulse* prong points in two different directions.  Defendants are correct that Plaintiffs have primarily sought contractual relief in this action, yet Plaintiffs also have requested statutory relief.  Like *Megapulse* prong one, *Megapulse* prong two renders a mixed result.  The question then becomes how to characterize the "essence" of this action?

### 3.    The Court Might Split Jurisdiction With the Claims Court, But Plaintiffs Have Not Shown Such a Procedure Is Permissible at This Preliminary Stage

There may be a mechanism to resolve this conflict.  But, perhaps unsatisfyingly, its employment at this stage in the litigation appears premature given the showing Plaintiffs have made thus far.

As explained at *supra* III.A.2.i, the *Megapulse* analysis is concerned with the prospect of "disguised" contract actions, *Megapulse*, 672 F.2d at 968, that is, a situation in which "a plaintiff casts his complaint as seeking equitable relief merely as a pretext in an attempt to avoid the Court of Federal Claims' exclusive jurisdiction," *Bublitz*, 309 F. Supp. 2d at 7.  Adjudicating such a complaint would be improper, as it would hollow out the jurisdiction of the Court of Federal Claims.  *See Kidwell*, 56 F.3d at 284.

Motivated by this concern, some Courts of Appeals have adopted a "rule that where the same facts giving rise to nonmonetary claims may also give rise to a subsequent suit in the Claims Court for monetary damages, a district court may not exercise jurisdiction over the nonmonetary claims."  *Hahn v. United States*, 757 F.2d 581, 588 (3d Cir. 1985).  "These cases express a concern that the preclusive effect of a district court determination of the nonmonetary claims would

42

interfere with the Claims Court's exercise of its exclusive jurisdiction over the monetary claims." *Id.* at 588-89. Other Courts of Appeals have disagreed, taking the position that "district court jurisdiction over a suit for nonmonetary relief is not foreclosed by the fact that it may later be the basis for an award of damages against the United States." *Id.* at 589.

This divide matters when a court is faced with the question of whether "a plaintiff seeking retrospective monetary relief of over $10,000 . . . may also bring an equitable claim in district court." *Vietnam Veterans of Am. v. Sec'y of Navy*, 843 F.2d 528, 535 (D.C. Cir. 1988). When faced with such a situation—*i.e.*, where a "plaintiff brought both [equitable and monetary] claims in district court"—some courts have held that "the court of appeals [could] transfer[] only the monetary claim to the Claims Court, retaining the equitable one." *Id.* Others have found such a procedure improper, on the basis that the litigation in the district court would have a collateral effect on the action in the Court of Federal Claims. *See id.*; *Hahn*, 757 F.2d at 588-89.

So if a litigant has asserted both contract claims for monetary relief in excess of $10,000 from the federal government and claims for other non-monetary forms of relief, the district court plainly lacks jurisdiction to order the monetary relief sought—that jurisdiction lies in the Court of Federal Claims. *See Hahn*, 757 F.2d at 590. Whether a district court could exercise jurisdiction over the remaining non-monetary forms of relief would depend on which side of the circuit split the court sits. If permitted in the court's circuit, the court would proceed to determine whether any remaining claims for nonmonetary relief may properly "serve as a basis to permit splitting a cause of action between the Claims Court and the district court." *Francis E. Heydt Co. v. United States*, 948 F.2d 672, 676 (10th Cir. 1991). "Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief," courts "respect the

plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." *Kidwell*, 56 F.3d at 284 (internal quotation marks omitted). "In such cases, even if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." *Id.*; *see Crowley Gov't Servs.*, 38 F.4th at 1107-08 (identifying that such a plaintiff "does *not* 'in essence' seek monetary relief" under *Megapulse*).

Here, Plaintiffs have brought claims for both monetary and non-monetary relief. Plaintiffs therefore must establish that it is appropriate for the Court to split Plaintiffs' causes of action with the Court of Federal Claims. If so, Plaintiffs' claims would not be "in essence" contractual and the Court could properly assume jurisdiction over the permissible forms of non-monetary prospective relief.

Unfortunately, Plaintiffs have not endeavored to establish the Court's jurisdiction over their APA claims in this manner. To do so would require Plaintiffs to make several additional showings, none of which are briefed in connection with the instant motion. To start, Plaintiffs would need to demonstrate that splitting a cause of action in this manner is permissible in the Second Circuit, whose precedents do not appear to clearly address this issue.[24] Depending on the kind of non-monetary equitable relief Plaintiffs seek, *see supra* n.20, there may be an issue of whether such a claim would have a "preclusive effect" on any claim for monetary relief in the Court of Federal Claims. *See Hahn*, 757 F.2d at 589. If so, another determination to be made would be whether the specific equitable claim would "effectively dispose[] of all issues" before the Court of Federal Claims and thus "substantially infringe[] on the Court of Claims' exclusive

---

[24] The Third Circuit in *Hahn* cited two decisions from the Second Circuit, *Chu v. Schweiker*, 690 F.2d 330 (2d Cir. 1982), and *Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1976), but neither squarely addressed this issue. *Hahn*, 757 F.2d at 588 n.6, 589.

jurisdiction" over the nonmonetary claim in an impermissible manner. *Keller v. Merit Sys. Prot. Bd.*, 679 F.2d 220, 223 (11th Cir. 1982).

Perhaps Plaintiffs may be able to scale each of these barriers. At that stage, the Court would need to assess whether vacatur of the Priority Directive and any prospective injunctive relief Plaintiffs seek have "considerable value independent of any future potential for monetary recovery." *Kidwell*, 56 F.3d at 284 (internal quotation marks omitted); *see Crowley Gov't Servs.*, 38 F.4th at 1107-08; *Havens v. Mabus*, 759 F.3d 91, 97 n.11 (D.C. Cir. 2014); *Smalls v. United States*, 471 F.3d 186, 190 (D.C. Cir. 2006); *see also Am. Libr. Ass'n*, 2025 WL 1615771, at *10 (engaging in this claim-splitting analysis in a grant termination case); *Vera Inst. of Just.*, 2025 WL 1865160, at *13 (same). *But see Porwancher v. Nat'l Endowment for the Humans.*, No. 25 Civ. 1180 (CJN), 2025 WL 2097740, at *2-4 (D.D.C. July 25, 2025) (exercising jurisdiction over only some of a plaintiff's claims without addressing whether those claims have considerable independent value).

As the Court's analysis at *supra* III.A.2.i.b and III.A.2.ii.b indicates, Plaintiffs may be able to establish that this prospective relief has value independent of the monetary relief they concurrently seek, although that determination may depend on the specific kind of prospective relief Plaintiffs pursue. *See Am. Libr. Ass'n*, 2025 WL 1615771, at *10 (concluding that this line of the *Megapulse* analysis is not applicable where "[t]he value of th[e requested] relief is intertwined with the value of reinstating grants"). Plaintiffs may also have to establish that the remaining relief "is not negligible in comparison with the potential monetary recovery." *Kidwell*, 56 F.3d at 284 (internal quotation marks omitted). Given the scale of the potential monetary recovery here, Plaintiffs may need to show that the "value of remedying [any additional] harm" would not be "ancillary to the value of reinstating grants." *Am. Libr. Ass'n*, 2025 WL 1615771, at

*10.  Plaintiffs allege that, as of May 27, 2025, the Priority Directive's FAQs listed "1,752 awards terminated pursuant to the Priority Directive, including numerous awards for projects conducted with Plaintiff States."  Compl. ¶ 48; *see also* Motion at 24 (observing that Plaintiffs' IHE's have lost "hundreds of millions of dollars currently supporting STEM research").  Plaintiffs may have an argument to make on this front too, but so far they have primarily articulated the benefit of these non-monetary forms of relief in terms of the value of reinstating the terminated grants.  *See Vera Inst. of Just.*, 2025 WL 1865160, at *7 (holding that non-monetary relief sought does not satisfy this test where "the value of the non-monetary relief was the avoidance of future grant terminations" because the relief sought "merely ensures that the monetary relief will continue").

If the causes of action are split in this manner, with the Court exercising jurisdiction only over Plaintiffs' APA claims in a circumscribed fashion, addressing the merits of the APA challenges would follow.  Because in this situation the Court would be evaluating the claims as directed towards the Priority Directive itself, the logical first issue—which is also not fully briefed by the parties in connection with the instant motion—is whether the Priority Directive constitutes "final agency action" reviewable under the APA.  5 U.S.C. § 704.  At the July 9 hearing, Defendants' counsel contended that the "final agency action [is] the grant terminations in this case," because "ultimately, it was the grant terminations that were issued in accordance with the [P]riority [D]irective."  Hearing Tr. at 39:12-19; *see also* Opposition at 1 (arguing that "Plaintiffs' claims are prohibited programmatic challenges rather than challenges to identified final agency actions").  Plaintiffs, in contrast, argued in their briefing that the Priority Directive is "final agency action" reviewable under the APA, because "following its issuance, NSF relied on it to terminate grants and to announce that it will not support certain projects in the future."  Motion at 13.  But Plaintiffs' representations at the July 9 hearing appeared to blend this contention with the view

that the termination letters were the final agency action.  Hearing Tr. at 24:15-18 (contending that "this is a final agency action" because "[t]here was no right of appeal with regards to this decision to cancel funds and to make these terminations"); *see also id.* at 7:18-20 ("[T]he notices, the blanket notices, stated that the relevant termination is a 'final agency decision and not subject to appeal.'"); *id.* at 24:24-25:4 (arguing that "NSF relied on the [P]riority [D]irective to terminate grants" and "NSF announced in both the [termination] letters and the FAQ that these terminations are final agency decisions that are not subject to appeal").  *But see id.* at 24:19-22 ("The [P]riority [D]irective is, thus, a consummation of the agency decision-making, which determines rights of obligations or obligations from which the legal consequences flow, and there are legal consequences that stemmed from NSF's decision.").  It is unclear from these statements whether Plaintiffs' view is that the Priority Directive itself, the termination letters, or both constitute final agency action subject to APA review.  That determination will be necessary to resolving whether Plaintiffs' APA claims, as pleaded, are likely to succeed.  Yet, on this front the Court has little from the parties.[25]

---

[25] Even if these outstanding questions were resolved in Plaintiffs' favor at this stage in the litigation, Plaintiffs would not be entitled to preliminary relief due to their showing as to the remaining claims.  Assuming *arguendo* that Plaintiffs establish a likelihood of success in that scenario, it would be on the merits of claims challenging the Priority Directive prospectively.  Yet, Plaintiffs have not shown irreparable harm in relation to this class of prospective claims.  Rather, Plaintiffs' showing of irreparable harm is couched in terms of the effects of the already-completed grant terminations that the retrospective claims—over which this Court likely lacks jurisdiction— would remediate.  *See* Motion at 27 (arguing that Plaintiffs will suffer irreparable harm because their "IHEs have had to abruptly stop work on important projects focused on broadening participation in STEM"); Reply at 10 (contending irreparable harm exists because "loss of funds constitutes irreparable harm in these circumstances" and "in addition to the loss of grants, their IHEs faced stopping work on their important research projects, laying off staff, and cutting training and mentorship programs" (emphasis omitted)); *see also supra* III.A.2.i.a (collecting citations to Plaintiffs' evidence of irreparable harm, which are limited to the impact of the terminated grants).  "[I]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied."  *Uppal v. N.Y. State Dep't of Health*, 756 F. App'x 95, 96 (2d Cir. 2019)

\*     \*     \*

Plaintiffs' requests to reverse the grant terminations and reinstate the awards—the focus of the instant motion—and their APA claims have traversed both sides of the jurisdictional boundary laying between this Court and the Court of Federal Claims.  When pressed by Defendants on the jurisdictionally problematic aspects of this case, Plaintiffs have engaged in a bit of a motte-and-bailey, pointing to the prospective equitable relief they seek in their APA claims to defend this Court's jurisdiction, even though that relief plainly has not been their primary focus thus far in this action.  Defendants, meanwhile, neglect to acknowledge that there does appear to be a core APA challenge laying within Plaintiffs' claims.

In the end, this lack of clarity cuts against Plaintiffs with respect to the instant motion.  While Defendants seem likely to conquer the bailey, neither side has established who will hold the motte.  It is Plaintiffs' burden to make a showing that they are likely to succeed on the merits for preliminary relief to issue.  *See, e.g.*, *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011).  Thus far, the parties have primarily focused on Plaintiffs' requests that the Court reinstate the grants and afford them retrospective relief, with Plaintiffs' seemingly more permissible prospective claims and the legal issues attached thereto playing second fiddle.  Perhaps the tenor of that discussion will change.  Plaintiffs might advance strong arguments supportive of the Court's jurisdiction in connection with any future motion to dismiss or bolster their Complaint's jurisdictional basis through amendment.  But with so many issues outstanding, the Court concludes that Plaintiffs have failed to carry their burden of demonstrating this Court likely has subject matter

---

(summary order) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).

jurisdiction over their APA claims.  As a result, Plaintiffs have not shown a likelihood of success on the merits with respect to Counts I and II.

## B.    Plaintiffs Are Unlikely To Succeed on Their Remaining Claims

Plaintiffs contend that Defendants' "Tucker Act argument cannot possibly affect Plaintiffs' constitutional claims," which are pleaded in Counts III, IV, and V, because "the Tucker Act argument is based on *the APA's* waiver of sovereign immunity."  Reply at 3.  While Plaintiffs do not elaborate on this point, the Court will first take a moment to explain the presumed basis for this argument, before turning to why Plaintiffs are unlikely to succeed on these Counts.[26]

As explained at *supra* III.A.1, Defendants' jurisdictional argument as to Counts I and II rests on the interaction between the waivers of sovereign immunity present in the APA and the Tucker Act.[27]  Courts interpret the Tucker Act to generally provide exclusive jurisdiction to the Court of Federal Claims over contract claims against the United States seeking more than $10,000 in damages.  *See Crowley Gov't Servs.*, 38 F.4th at 1106.  But the jurisdiction of the Court of Federal Claims "is not based on any language in the Tucker Act granting such exclusive

---

[26] Some recent cases have nonetheless addressed constitutional claims, at least in part, under a *Megapulse* analysis.  *See, e.g.*, *Vera Inst. of Just.*, 2025 WL 1865160, at *7; *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer*, No. 25 Civ. 1128 (BAH), 2025 WL 1795090, at *28 (D.D.C. June 30, 2025); *Harris Cnty., Tx. v. Kennedy*, --- F. Supp. 3d ----, No. 25 Civ. 1275 (CRC), 2025 WL 1707665, at *4-6 (D.D.C. June 17, 2025).  As will be explained next, the Court does not believe this approach to be correct.  But in the event any of Plaintiffs' other claims would fall under the scope of the *Megapulse* test, Plaintiffs have not carried their burden of showing that the Court likely has subject matter jurisdiction over the claims for the reasons discussed at *supra* III.A.2.

[27] Recall that "[t]he United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity."  *Crowley Gov't Servs.*, 38 F.4th at 1105.  Since "sovereign immunity is jurisdictional in nature, questions of sovereign immunity implicate a court's subject matter jurisdiction," *Arjent LLC v. U.S. Secs. & Exch. Comm'n*, 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014) (internal quotation marks omitted), and therefore the existence of a sovereign immunity waiver informs whether there is a jurisdictional bar to a given action against the federal government.

jurisdiction to the Claims Court.  Rather, that court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court."  *Bowen*, 487 U.S. at 910 n.48.  "The proper inquiry, then, is whether the statute or statutes relied upon by the plaintiff manifest a congressional intent to consent to suits for money claims against the United States in the district courts notwithstanding the limitations found in the Tucker Act."  *Van Drasek v. Lehman*, 762 F.2d 1065, 1071 n.10 (D.C. Cir. 1985); *see Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) ("Typically, a 'waiver of the Federal Government's sovereign immunity' is demonstrable through clear statutory text." (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996))).

With respect to the APA, that statute's waiver of sovereign immunity does not allow a district court to grant monetary relief in contract actions because Section 702 provides that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act's waiver of sovereign immunity "impliedly forbids" contract claims "from being brought in district court under the waiver in the APA."  *Perry Cap.*, 864 F.3d at 618-19 (internal quotation marks omitted).  Accordingly, Congress did not grant another court authority to hear a claim for monetary relief via the APA's waiver of sovereign immunity.  This means that a district court cannot entertain a contract claim brought under the auspices of the APA's waiver of sovereign immunity—such a claim, if in excess of $10,000, must be heard by the Court of Federal Claims under the sovereign immunity waiver in the Tucker Act.

This jurisdictional analysis, though, is contingent on the specific waiver of sovereign immunity asserted by the plaintiff.  For example, courts have held that a district court may properly exercise jurisdiction over money claims against the federal government under other statutory

waivers of sovereign immunity.  *See Van Drasek*, 762 F.2d at 1071 n.10 (collecting examples).
The only requirement is that Congress granted the district court concurrent jurisdiction with the
Court of Federal Claims over the specific claim the plaintiff brings.  *See Bowen*, 487 U.S. at 910
n.48; *Van Drasek*, 762 F.2d at 1071 n.10; *see also C.H. Sanders Co., Inc. v. BHAP Hous. Dev.
Fund Co., Inc.*, 903 F.2d 114, 119 (2d Cir. 1990).  Therefore, if a plaintiff brought claims under
both the APA and one of these other statutory waivers, a court would apply *Megapulse* to evaluate
only the former.  The latter class of claims would not fall subject to a *Megapulse* analysis because
the district court would have an independent jurisdictional basis to hear those claims.

So for Plaintiffs to overcome the Tucker Act analysis for Counts III through V, they must
rely on a non-APA waiver of sovereign immunity or another exception to that doctrine.  For these
remaining claims, Plaintiffs seem to appeal to the sovereign immunity exception that operates
through the doctrine of nonstatutory review.  Compl. ¶ 107 ("Federal courts possess the power in
equity to grant injunctive relief 'with respect to violations of federal law by federal officials.'"
(quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015))); *see also
Widakuswara*, 2025 WL 1288817, at *12 (Pillard, J., dissenting) (contending that certain
constitutional claims in a case involving grant terminations would "face no sovereign immunity
bar, per the *Larson-Dugan* exception"); Daniel Jacobson & John Lewis, *Overcoming the Tucker
Act After Department of Education v. California*, Lawfare,
https://www.lawfaremedia.org/article/overcoming-the-tucker-act-after-department-of-education-
v.-california (Apr. 17, 2025) (last accessed August 1, 2025) (recommending that litigants consider
asserting a nonstatutory cause of action following *California*).

The Second Circuit has observed that "the precise scope and contours of the court's
equitable powers of this nature are ill-defined."  *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*,

954 F.3d 118, 133 (2d Cir. 2020). The Court will first provide some background on the doctrine of nonstatutory review, before turning to its application in this case.

### 1. Nonstatutory Review: Background

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326; *see generally Ex parte Young*, 209 U.S. 123 (1908). "But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. These kinds of suits are known as "nonstatutory review" actions. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327; *see* Roger C. Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant*, 68 Mich. L. Rev. 387, 394 (1970) (observing that "[t]he common law had been a rich storehouse" of "non-statutory and nonmonetary remedies against official action" but that "the extraordinary remedies available in England and in most of the states before the Revolution survived America's transformation into a federal republic only in reduced numbers"). "Until the turn of the century, the availability of non-statutory review of executive action was uncertain. The Supreme Court from 1870 to 1900 'entertained considerable doubt, in the absence of statutory provision, as to the propriety of judicial control of "executive" action.'" *Reich*, 74 F.3d at 1327 (quoting Louis L. Jaffe, Judicial Control of Administrative Action 337 (1965)). But "[i]n the early part of the twentieth century, nipping at the heels of the Supreme Court's first broad statement of federal sovereign immunity in [*United States v. Lee*, 106

U.S. 196, 207 (1882)],” the Supreme Court began to recognize the availability of injunctive relief against federal officials “even in the absence of a statutory review provision.”  Kathryn E. Kovacs, *Revealing Redundancy: The Tension Between Federal Sovereign Immunity and Nonstatutory Review*, 54 DRAKE L. REV. 77, 87 (2005) (footnotes omitted).

Notwithstanding that “[b]efore enactment of the APA, those challenging agency action often lacked a statutory cause of action[,] . . . courts sometimes entertained ‘a bill in equity to attack administrative action when no statutory review was available.’”  *Nuclear Regul. Comm’n v. Texas*, 605 U.S. ----, 145 S. Ct. 1762, 1775 (2025) (quoting 3 K. Hickman & R. Pierce, ADMINISTRATIVE LAW § 20.7, p. 2600 (7th ed. 2024)).  “In particular, courts recognized a right to equitable relief where an agency’s action was ultra vires—that is, unauthorized by any law and . . . in violation of the rights of the individual.”  *Id.* (internal quotation marks omitted).

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), is often cited as the seminal case recognizing the availability of nonstatutory review.  *See, e.g.*, *Armstrong*, 575 U.S. at 327; *Reich*, 74 F.3d at 1327.  *But see* Kovacs, *supra*, at 88 n.62 (remarking that the claim *McAnnulty* marked “a sudden and dramatic turn” in Supreme Court jurisprudence “was perhaps a bit overstated” given earlier cases in the same vein).  *McAnnulty* concerned a business located in Nevada, the American School of Magnetic Healing, which was “engaged in the business of healing diseases and ailments of the human family . . . through proper exercise of the faculty of the brain and mind” and mailed advertisements through the United States Post Office.  187 U.S. at 95-97. The Postmaster General determined that the business was “conducting a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises,” in violation of statute, and barred the business from advertising through the mail. *Id.* at 98-99.  The American School of Magnetic Healing sought an injunction to prevent postal

officials from stamping its mail with the word "fraudulent" and returning the mail to its sender. *Id.* at 99-100.

The Supreme Court held that a court could grant such an injunction. First, the Supreme Court determined that whether the American School of Magnetic Healing's homeopathic treatments were efficacious was a matter of opinion, with some people thinking they are and others thinking they are not. *Id.* at 103-106. On this basis, the Supreme Court determined the business's activities did not violate the statutes against using the mail for fraudulent purposes, since "these statutes were not intended to cover any case of what the Postmaster General might think to be false opinions, but only cases of actual fraud in fact, in regard to which opinion formed no basis." *Id.* at 106.

The Supreme Court then turned to whether a court could give a remedy for the Postmaster General's actions. *Id.* at 107-08. It determined that the judiciary could afford equitable relief in this circumstance, reasoning that "[t]he acts of all [an agency's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Id.* at 108. As the Supreme Court explained, "[o]therwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Id.* at 110. Several cases later followed *McAnnulty*'s reasoning and held that judicial review is available—even absent statutory authorization—where a government official is said to act outside his or her powers. *See Reich*, 74 F.3d at 1327 (collecting cases).

In a series of subsequent cases, the Supreme Court further elaborated on this doctrine. Courts have come to take the decisions in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), and *Dugan v. Rank*, 372 U.S. 609 (1963), to hold that "'suits for specific relief

against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (per curiam) (quoting *Larson*, 337 U.S. at 689, 693); *accord Pieczenik v. Cambridge Antibody Tech. Grp.*, No. 03 Civ. 6336 (SAS), 2004 WL 1118500, at *3 (S.D.N.Y. May 14, 2004) (applying *Larson* and *Dugan* in this District). This so-called *Larson-Dugan* exception to sovereign immunity "is based on the principle that such *ultra vires* action by a federal officer 'is beyond the officer's powers and is, therefore, not the conduct of the sovereign.'" *Pollack*, 703 F.3d at 120 (quoting *Larson*, 337 U.S. at 690). Accordingly, "a plaintiff [who] brings a suit for injunctive or declaratory relief against a federal officer for an *ultra vires* act" would not need to show a separate statutory waiver of sovereign immunity, since sovereign immunity cannot be asserted to bar such a suit. *Schilling*, 102 F.4th at 506 (citation modified).[28]

In between its decisions in *Larson* and *Dugan*, the Supreme Court decided *Leedom v. Kyne*, 358 U.S. 184 (1958), which the Supreme Court recently characterized as its "leading case on post-APA ultra vires review." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775. In *Kyne*, a voluntary unincorporated labor organization (the "Association") petitioned the National Labor Relations Board for certification as the exclusive collective bargaining agent of all nonsupervisory professional employees at a Westinghouse Electric Corporation plant in Cheektowaga, New York. 358 U.S. at 185. During a hearing on the petition, a competing labor organization asked the Board to expand the proposed certified bargaining unit to include employees who performed technical work and who the competing organization thought were professional employees under the

---

[28] For this reason, the same jurisdictional boundary which prevents this Court from hearing a disguised contract claim brought under the APA would not necessarily bar a constitutional or *ultra vires* claim for injunctive or declaratory relief brought under the doctrine of nonstatutory review. *See Widakuswara*, 2025 WL 1288817, at *12 (Pillard, J., dissenting) (advancing this argument).

National Labor Relations Act ("NLRA").  *Id.*  The Board found that these individuals were not professional employees under the NLRA, but that nine of these employees should nonetheless be included in the proposed unit.  *Id.* at 185-86.  The Board denied the Association's request for a vote on whether those nine nonprofessional employees should be included in the unit and denied a subsequent request by the Association to exclude the nonprofessional employees from the unit. *Id.* at 186.  After an election, the Association was certified as the collective bargaining agent for the unit.  *Id.*

The president of the Association then sued the Board, alleging "that the Board had exceeded its statutory power in including the professional employees, without their consent, in a unit with nonprofessional employees in violation of [the NLRA] which commands that the Board 'shall not' do so, and praying, among other things, that the Board's action be set aside."  *Id.*  The district court found the Board "had disobeyed the express command" of the NLRA and "in doing so had acted in excess of its powers to the injury of the professional employees."  *Id.* at 186-87. The district court determined it had jurisdiction to grant relief and set aside the Board's determination of the bargaining unit, the election, and the certification.  *Id.* at 187.

On appeal, the Board "did not contest the trial court's conclusion that the Board, in commingling professional with nonprofessional employees in the unit, had acted in excess of its powers and had thereby worked injury to the statutory rights of the professional employees."  *Id.* But the Board argued that the NLRA "foreclosed review of its action by an original suit in a District Court" because the Board's order in the certification proceedings was an interlocutory order which was not subject to judicial review.  *Id.*

The Supreme Court held that nonstatutory review of the Board's order was nonetheless available, reasoning that the suit was "one to strike down an order of the Board made in excess of

its delegated powers and contrary to a specific prohibition in" the NLRA. *Id.* at 188. The Board's decision to violate a specific statutory prohibition, which forbade the inclusion of the nonprofessional employees in the bargaining unit without a majority vote of the professional employees, "was an attempted exercise of power that had been specifically withheld." *Id.* at 188-89. As such, "[i]t deprived the professional employees of a 'right' assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given." *Id.* at 189. The Supreme Court reasoned that it "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id.* at 190. In sum, "[t]he message of this line of cases is clear enough: courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Reich*, 74 F.3d at 1328 (quoting *Bowen v. Mich. Academ. of Family Physicians*, 476 U.S. 667, 681 (1986)).

Two further aspects of the doctrine are relevant here. First, there may be a distinction drawn between nonstatutory review cases challenging Presidential action and those challenging agency action. While the cases cited above address actions taken by Executive Branch officials, the Supreme Court has entertained nonstatutory review challenges made against the President, most notably in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). *See* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 COLUM. L. REV. 1612, 1636 (1997) (characterizing *Youngstown* as "perhaps the most notable nonstatutory review case ever"); *see also* Lisa Manheim & Kathryn A. Watts, *Reviewing Presidential Orders*, 86 U. CHI. L. REV. 1743, 1806-07 (2019) (contending that nonstatutory review "arguably helps to explain how William Marbury was able to sue James Madison"). Other cases challenging Presidential action have

likewise been brought under this doctrine. *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796-97 (D.C. Cir. 2023) (applying the doctrine of nonstatutory review to the President's national monument designations). While both the President and executive officers are susceptible to nonstatutory review, federal agencies, unlike the President, are also subject to the strictures of the APA—a wrinkle of greater import discussed at *infra* III.B.2. *See Franklin v Massachusetts*, 505 U.S. 788, 800-01 (1992); *see also Am. Forest Res. Council*, 77 F.4th at 796 (explaining that while "the APA's general review provision does not permit review of presidential action . . . a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision").

Second, the Supreme Court has "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). In *Dalton*, the Supreme Court explained that its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* As an example, *Larson* "held that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers.'" *Id.* (quoting *Larson*, 337 U.S. at 691 n.11). Rather than supporting the view that "all executive actions in excess of statutory authority were *ipso facto* unconstitutional," *Larson* specified that "unconstitutional and ultra vires conduct a[re] separate categories." *Id.*

*Dalton* used *Youngstown* to further illustrate this distinction. As the *Dalton* Court explained, "[i]n *Youngstown*, the Government disclaimed any statutory authority for the President's seizure of steel mills," so "[t]he only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces."

*Id.* at 473 (citing *Youngstown*, 343 U.S. at 585, 587). "Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions." *Id.*; *see also id.* at 473 n.5 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), as another example of when the Supreme Court "reviewed the constitutionality of the President's actions," without "a claim that the President acted in excess of his statutory authority").

These cases "establish that claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to" a stronger presumption of reviewability, because "if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception [in favor of nonstatutory judicial review] would be broadened beyond recognition." *Id.* at 473-74. Where "[t]he President is said to have violated the terms of [a statute]," the plaintiff has raised a "statutory" claim, *id.* at 474, and that claim is subject to a lesser presumption of reviewability, *see Widakuswara*, 2025 WL 1288817, at *5 ("[T]hese constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims."); *see also Dalton*, 511 U.S. at 474-76 (holding that judicial review of *ultra vires* claims is unavailable where the statute in question vests discretion in the executive); *Am. Forest Res. Council*, 77 F.4th at 797 (elaborating on this point). Constitutional challenges, meanwhile, enjoy a stronger presumption of reviewability. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (discussing the general right to relief for a constitutional claim); *Webster v. Doe*, 486 U.S.

592, 603 (1988) (emphasizing the "heightened showing" which must be made to demonstrate statutory preclusion of judicial review of constitutional claims).[29]

With these principles in mind, the Court's attention turns to Plaintiffs' allegations in this case.

### 2. Nonstatutory Review: Application

In Counts III through V, Plaintiffs bring three non-APA challenges. First, Plaintiffs allege that the Priority Directive violates the separation of powers in the U.S. Constitution. *See* Compl. ¶¶ 106-118 (Count III). Plaintiffs' separation of powers claim is predicated on the theory that "where the Executive Branch overrides a statute or the legislative intent of Congress and declines to spend duly appropriated funds, it violates the separation of powers doctrine." *Id.* ¶ 112. Plaintiffs allege that the Priority Directive "reject[s]" the policies set forth in 42 U.S.C. Chapter 16 by "announc[ing] that [NSF] will only pursue projects that seek to broadly expand participation in STEM, not projects that specifically seek to expand participation by women, minorities, or people with disabilities." *Id.* ¶ 114. According to Plaintiffs, "Defendants do not have authority to categorically refuse to support research that comports with the Congressionally enacted policy of

---

[29] Defendants contend that the classification of a claim as statutory under *Dalton* means that the claim "cannot succeed." Opposition at 15. This is incorrect. Some cases do read *Dalton* to speak to the availability of a nonstatutory review challenge, depending on if the claim is characterized as statutory or constitutional. *See Am. Ctr. for Int'l Lab. Solidarity*, 2025 WL 1795090, at *28-29 (stating "an *ultra vires* claim likely would not be available" if the claim is statutory, while "plaintiffs could likely bring a viable *ultra vires* claim" if the claim is constitutional). But this misapprehends the doctrine of nonstatutory review, which has historically been available for either kind of challenge. *See, e.g., Kyne*, 358 U.S. at 188-89 (statutory); *Youngstown*, 343 U.S. at 585, 587 (constitutional). This would also impermissibly blend unconstitutional conduct with *ultra vires* conduct, which *Dalton* and other cases make clear are "separate categories." *Dalton*, 511 U.S. at 472. The import of the statutory versus constitutional distinction drawn in *Dalton* is not to the threshold issue of whether a plaintiff may bring a nonstatutory review claim, but instead to the degree to which judicial review of the agency's action is presumptive.

the United States.  Nor do they have the authority to unilaterally refuse to spend duly authorized and appropriated funds from Congress."  *Id.* ¶ 116.

Plaintiffs' second challenge alleges that the Priority Directive violates the Take Care Clause.  *Id.* ¶¶ 119-125 (Count IV); U.S. Const. art. II, § 3 ("[The President] shall take Care that the Laws be faithfully executed . . . .").  Plaintiffs' theory is that "[t]he Executive violates the Take Care Clause when it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes."  Compl. ¶ 121.  Plaintiffs claim that "[b]y rejecting the Congressionally mandated policy to expand STEM participation by women, minorities, and people with disabilities, and by determining that projects that specifically advance those Congressional goals can be terminated precisely for that reason, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause."  *Id.* ¶ 122.

Third, Plaintiffs claim that the Priority Directive is *ultra vires* by exceeding the scope of NSF's statutory authority.  *Id.* ¶¶ 126-131 (Count V).  Plaintiffs allege that "[t]he actions challenged herein are outside of Defendants' authority.  Defendants cannot unilaterally adopt policies contrary to those established for them by Congress.  Much less may Defendants then use that policy to justify refusal to sponsor projects precisely because those projects are consistent with the Congressional policies that Defendants have rejected."  *Id.* ¶ 129.

Plaintiffs rest these challenges on the doctrine of nonstatutory review.  *See* Compl. ¶¶ 107, 128.  Turning to the two distinctions set forth at *supra* III.B.1, Plaintiffs are plainly challenging agency action rather than Presidential action.  Plaintiffs and Defendants disagree, though, on whether Plaintiffs' claims are entirely statutory *ultra vires* challenges or if Plaintiffs have also asserted constitutional claims.  *Compare* Opposition at 14-15, *with* Reply at 6-7.

The Court concludes that Plaintiffs' claims in Counts III through V are statutory under the framework in *Dalton*, and therefore subject to a lesser presumption of judicial reviewability.  Each of these challenges rests upon the premise that the Priority Directive is inconsistent with the statutory framework that governs NSF and its grant awards.  In Plaintiffs' words, the Priority Directive and its implementation violate the separation of powers because "Defendants may not unilaterally refuse to spend [appropriated funds] by improperly terminating grants or by refusing to fund a class of congressionally mandated projects in the future."  Motion at 19; *see id.* at 18 (arguing that the Priority Directive "violates separation-of-powers principles by contravening Congress's direction that NSF spend appropriations while prioritizing equity in STEM").  Plaintiffs' Take Care Clause theory likewise is predicated on the contention that Defendants' actions are inconsistent with "the laws directing NSF to support programs and fund projects designed to increase STEM participation by women, minorities, and people with disabilities."  *Id.* at 19-20; *see id.* at 20 (arguing Defendants have violated the Take Care Clause by "rejecting congressionally mandated policy to expand STEM participation by women, minorities, and people with disabilities, and terminating projects because they advance those congressionally mandated goals").  Similarly, Plaintiffs argue that Defendants' actions are *ultra vires* because "no constitutional or statutory authority allows NSF to entirely eliminate one of its congressionally articulated objectives."  *Id.* at 20; *see id.* (arguing the Priority Directive "directly contravenes the statutory mandates Congress provided").[30]  These claims contend that the Priority Directive and NSF's terminations of certain grants have violated statutes directing NSF to award grants to

---

[30] In their post-hearing letter, Plaintiffs suggested that they consider their *ultra vires* claim to also be a constitutional claim.  *See* July 10 Letter at 1 ("Plaintiffs' constitutional and ultra vires claims are not statutory claims in disguise.").  Plaintiffs offer no explanation for the premise that an *ultra vires* challenge is anything but just that.

increase the participation of underrepresented populations in STEM fields.  *See* Compl. ¶¶ 106-131; *see also supra* I.A.

Thus, in each of these three claims, Defendants are "said to have violated the terms of" various statutes.  *Dalton*, 511 U.S. at 474; *see* July 10 Letter at 1 (explaining that these claims are based on the premise that "the directive and NSF's implementation countermand specific Congressional mandates and appropriations").  Plaintiffs' purported constitutional claims in Counts III and IV "simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims."  *Widakuswara*, 2025 WL 1288817, at *5 (citing *Dalton*, 511 U.S. at 472-74).[31]  Accordingly, notwithstanding Plaintiffs' styling of Counts III and IV in constitutional terms, these claims, like Count V, are "statutory" claims under *Dalton*, which Supreme Court jurisprudence also refers to as *ultra vires* challenges. *Dalton*, 511 U.S. at 472-74; *accord Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763

---

[31] Plaintiffs' citation to *Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020), *vacated as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021), is unpersuasive.  *See* Reply at 6-7. Plaintiffs rely on an out-of-context quotation from that opinion to support the contention that *Dalton* "does not mean that action outside the scope of statutory authority can *never* give rise to a constitutional violation." *Id.* at 6.  But the Ninth Circuit's discussion of *Dalton* in *Sierra Club* is more nuanced than Plaintiffs suggest.  As the Ninth Circuit explained, "*Dalton* does not hold that *every* action in excess of statutory authority is *not* a constitutional violation.  Rather, *Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not.  Specifically, *Dalton* suggests that a constitutional violation may occur when an officer violates an express prohibition of the Constitution." *Sierra Club*, 963 F.3d at 889-90.  The Ninth Circuit went on to explain that "*Dalton* . . . do[es] not address situations in which the President exceeds his or her statutory authority, and in doing so, *also* violates a specific constitutional prohibition, as [was] the case [in *Sierra Club*]." *Id.* at 890.  Plaintiffs do not suggest that Defendants have violated "an express prohibition of the Constitution." *Id.*  Instead, Plaintiffs' claims are entirely confined to the theory that Defendants' actions are inconsistent with the NSF Act.  Such claims are properly considered "statutory" under *Dalton*, 511 U.S. at 474, and therefore are not entitled to a heightened presumption of judicial review.

(D.C. Cir. 2022) (observing that nonstatutory review "on the ground that the agency has acted patently in excess of its statutory authority" is "commonly known as an *ultra vires* claim").

Plaintiffs thus seek nonstatutory review of *ultra vires* agency action in Counts III through V.  This runs Plaintiffs into several merits issues.

### i.    Availability of Nonstatutory Review of *Ultra Vires* Agency Action

A threshold issue is whether a court sitting in equity may entertain nonstatutory review of *ultra vires* agency action notwithstanding Congress's creation of a means to remediate these kinds of claims through the APA.  As the Second Circuit has noted, "whether the APA in any way displaces suits in equity" remains a "thorny legal issue[]."  *Fed. Defs. of N.Y.*, 954 F.3d at 133.

The APA was enacted in 1946 and the Supreme Court approved the use of nonstatutory *ultra vires* review of agency action in 1958 in *Kyne*, suggesting that the doctrine survived the APA's initial enactment.  *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1775-76 (characterizing *Kyne* as the Supreme Court's "leading case on post-APA ultra vires review").  Yet, because *Kyne* concerned "an interlocutory order not subject to review under the judicial-review provisions of the APA," *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775, that decision does not necessarily establish that executive actions may be subject to nonstatutory review if they are also reviewable under the APA's procedures.  The use of nonstatutory review in the mid-twentieth century "yielded considerable confusion in the federal courts," and ultimately was a factor motivating Congress to expand the APA's waiver of sovereign immunity in 1976.  Kovacs, *supra*, at 92.

"The United States Supreme Court has not yet decided if a claim that the President acted in excess of his statutory authority is subject to non-statutory review.  When facing such a claim, the Court generally assumes review is available and rejects the claim on the merits."  *Am. Forest Res. Council*, 77 F.4th at 796 n.13; *see Dalton*, 511 U.S. at 474 ("We may assume for the sake of

argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA.").  The D.C. Circuit has taken the position that "[j]udicial review for *ultra vires* agency action . . . survived the enactment of the APA."  *Fed. Express Corp.*, 39 F.4th at 763; *see Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).  The Second Circuit has suggested that it holds the same view, though it has not clearly decided the issue.  *See Olegario v. United States*, 629 F.2d 204, 224 n.9 (2d Cir. 1980); *Nat'l Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 332-33 (2d Cir. 1979); *see also Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (evaluating a challenge brought under the doctrine).  There also appears to be scholarly consensus that, in general, nonstatutory review survived both the APA's passage and the statute's 1976 amendments.  *See* Siegel, *supra*, at 1665-70 ("There is, in fact, general judicial and scholarly agreement that nonstatutory review was never eliminated and may still be used today."); *see also* Kovacs, *supra*, at 93-94 & nn.100, 103 (observing that while courts generally consider nonstatutory review "still available in cases alleging constitutional violations[,] . . . in cases alleging ultra vires conduct, courts more often decline to exercise nonstatutory review" (collecting cases)).

Thus, a fair amount of authority supports the availability of nonstatutory review of *ultra vires* agency action after the APA's enactment and 1976 amendments.  Yet, this specific application of nonstatutory review finds some tension with the Supreme Court's contemporary decisions addressing how the availability of statutory remedies affects a court's ability to exercise its equitable jurisdiction.  Most notably, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court curtailed the power of courts to employ equitable relief under *Ex parte Young* "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right."  *Id.* at 74.  The Court held that "[w]here Congress has prescribed a detailed remedial scheme

for the enforcement . . . of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action" under the court's equitable jurisdiction. *Id.* The Supreme Court reinforced this admonition in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). While the Supreme Court in *Armstrong* acknowledged that federal courts may sometimes grant injunctive relief "with respect to violations of federal law by federal officials," the Court emphasized, relying on *Seminole Tribe*, that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 326-28.

     *Seminole Tribe* and *Armstrong* raise questions about the availability of nonstatutory review in this case. Congress has prescribed a detailed remedial scheme through the APA, which expressly provides a mechanism for judicial review of agency action that is alleged to be contrary to law or in excess of statutory authority. *See* 5 U.S.C. § 706(2)(A)-(C); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (explaining that the APA "establishes a basic presumption of judicial review for one suffering legal wrong because of agency action" (internal quotation marks omitted)). Even if the APA did not displace this kind of suit in equity, Plaintiffs here face the more strenuous task of showing that the Tucker Act also does not serve as an implied statutory limitation on their ability to challenge *ultra vires* grant terminations. In fact, the Fourth Circuit recently intimated that, through *Armstrong*'s logic, the Tucker Act limits the availability of equitable relief in just this situation. *See Sustainability Inst.*, 2025 WL 1587100, at *2 (citing *Armstrong*, 575 U.S. at 327-328, and *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991) (circumscribing *Kyne*'s holding)).

     Certain kinds of nonstatutory review, like employing the doctrine to challenge Presidential action or to bring constitutional challenges to agency action, may not necessarily be displaced by

the APA.  Nor would claims for nonstatutory review of *ultra vires* agency action necessarily be displaced where, like in *Kyne*, the challenged agency action falls outside the APA's judicial review scheme.  But where a plaintiff brings claims for nonstatutory review of *ultra vires* agency action, the remedial scheme in the APA may constrain a court's equitable powers if the agency action challenged is subject to judicial review under that statute's auspices.  A plaintiff bringing *ultra vires* claims challenging grant terminations may face another obstacle in the Tucker Act.

Yet, these statutes do not have "the clarity of the congressional preclusion of review" that the Supreme Court has said limits the availability of traditional equitable relief, even if they do provide "meaningful and adequate opportunity for judicial review of the validity of the" agency action challenged.  *MCorp Fin.*, 502 U.S. at 43-44.  The best understanding of this caselaw may be that while nonstatutory review of *ultra vires* agency action is not displaced by the APA, the availability of such an adequate statutory remedy indicates that equitable relief should not typically issue for these kinds of claims.  *See infra* III.B.2.ii.  This presents a lingering question as to the viability of Plaintiffs' *ultra vires* claims.

### ii.     Plaintiffs' Nonstatutory Review Claims Are Not Likely To Succeed, Even if Available

Setting aside issues with the availability of Plaintiffs' *ultra vires* claims, Plaintiffs are unlikely to succeed under the strictures of the doctrine governing nonstatutory *ultra vires* review.

As the Supreme Court has explained, "[b]ecause *ultra vires* review could become an easy end-run around the limitations of . . . judicial-review statutes," its "cases have strictly limited nonstatutory *ultra vires* review to the painstakingly delineated procedural boundaries of *Kyne*." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775-76 (internal quotation marks omitted); *see Vera Inst. of Just.*, 2025 WL 1865160, at *17 (applying the *Kyne* standards to evaluate an *ultra vires* claim challenging grant terminations).  Nonstatutory review under *Kyne* is "narrow" and "does not apply simply because an agency has arguably reached a conclusion which does not comport with the law." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (internal quotation marks omitted).  "Rather, it applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (internal quotation marks omitted).  "Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (internal quotation marks omitted).

For this reason, claims under this doctrine are "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* (internal quotation marks omitted).  The Second Circuit has explained:

> An ultra-vires claim under *Kyne* is only available in the "extremely limited" circumstance "when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."

*Becerra*, 56 F.4th at 26-27 (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)).

Plaintiffs fail the second and third of these requirements. Starting with the second requirement—that "there is no alternative procedure for review of the statutory claim," *id.* at 27— Plaintiffs would have to show why both the APA's and the Tucker Act's "statutory review scheme" would not provide them "with a meaningful and adequate opportunity for judicial review" of the Priority Directive and its implementation. *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (internal quotation marks omitted). Plaintiffs have not done so. In fact, that Plaintiffs brought APA claims in Counts I and II suggests that they appreciate that a procedure exists for them to challenge the Priority Directive and its implementation through that statute.

While the Court concludes that the APA is unlikely to afford Plaintiffs the primary specific relief they seek in their preliminary injunction motion, that is because, at its essence, Plaintiffs seek preliminary relief that reverses the grant terminations and reinstates those grants at the Plaintiff states' IHEs. *See supra* III.A. But an action merely contending that the Priority Directive runs afoul of the APA, and seeking an order vacating that policy and enjoining its prospective implementation, without seeking monetary relief through the payment of previously-awarded grant funds, would not necessarily encounter this jurisdictional obstacle. *See supra* III.A.2.i.b & III.A.2.ii.b. Indeed, any argument that "the APA should be set aside entirely, and the Court should permit plaintiffs to rely on traditional forms of pre-APA equitable review" would "ignore[] the fact that Congress has specifically enacted a statute to provide a catch-all cause of action for plaintiffs who seek to challenge agency decisionmaking where none otherwise exists (*i.e.*, the APA)." *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 65-66 (D.D.C. 2019) (Jackson, J.) (internal quotation marks and emphasis omitted). And Plaintiffs' requests to have their grants

reinstated and to be awarded those grant funds may be brought in an action before the Court of Federal Claims under the Tucker Act. *See Bd. of Educ. for Silver Consol. Schs. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 2017177, at *11 (D.N.M. July 18, 2025) (holding that the Tucker Act constitutes an adequate statutory review scheme under *Kyne*). The availability of these separate waivers of sovereign immunity in the APA and the Tucker Act provide Plaintiffs with "a meaningful and adequate opportunity for judicial review of the validity of the" Priority Directive and subsequent grant terminations. *MCorp. Fin.*, 502 U.S. at 43; *see Sustainability Inst.*, 2025 WL 1587100, at *2 (holding that the district court likely lacked jurisdiction over an *ultra vires* claim); *Widakuswara*, 2025 WL 1288817, at *5 (holding that the district court likely lacked jurisdiction even where a plaintiff brought "mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers, and *ultra vires* claims").

Turning to the third requirement for review of an *ultra vires* claim under *Kyne*, Plaintiffs must show "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Becerra*, 56 F.4th at 27 (internal quotation marks omitted). This requirement is only satisfied where there is "extreme agency error, not merely garden-variety errors of law or fact." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509 (citation modified). "Even if the [agency] has misinterpreted or otherwise evaded its statutory obligation . . . its action is not the kind of 'extreme' error that would justify reliance on the *Leedom v. Kyne* exception." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). To bring a successful *ultra vires* challenge, Plaintiffs must demonstrate that the Priority Directive "is patently a misconstruction of the [NSF] Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute [to] support relief." *Fed. Express Corp.*, 39 F.4th at 764 (citation modified); *see Nuclear Regul.*

*Comm'n*, 145 S. Ct. at 1776 (explaining that nonstatutory review under *Kyne* "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute" (internal quotation marks omitted)).

Plaintiffs do not point to a "specific prohibition" which NSF is alleged to have violated. *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1776; *Becerra*, 56 F.4th at 27.  In *Kyne*, the National Labor Relations Board was alleged to have "exceeded its statutory power in including the professional employees, without their consent, in a unit with nonprofessional employees in violation of [the NLRA] which commands that the Board *'shall not'* do so."  358 U.S. at 186 (emphasis added).  Such clear disregard of the statute's prohibitory language "was an attempted exercise of power that had been specifically withheld."  *Id.* at 188-89.  In contrast to this extreme type of agency action, Plaintiffs point to no similar prohibitory language in the NSF Act that the agency's actions could be said to violate.

Instead, Plaintiffs' theory appears to be that the Priority Directive "disregards a specific and unambiguous statutory directive," or "violates some specific command of a statute."  *Fed. Express Corp.*, 39 F.4th at 764 (citation modified).  Even assuming violating a specific statutory command is a cognizable theory under *Kyne*, *see Nyunt*, 589 F.3d at 449 ("Even if the [agency] has . . . evaded its statutory obligation, its action is not the kind of 'extreme' error that would justify reliance on the *Leedom v. Kyne* exception.") (Kavanaugh, J.), Plaintiffs have not shown that the agency's action here amounts to extreme error.

In assessing Plaintiffs' theory that the Priority Directive and its implementation are contrary to the NSF Act, a few statutory provisions governing NSF's mission and funding priorities seem relevant.  First, Congress declared a "policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds, including people with

disabilities, to acquire skills in" STEM, 42 U.S.C. § 1885(a), and declared "that the highest quality science and engineering over the long-term requires substantial support . . . for increased participation in science and engineering by women, minorities, and persons with disabilities," *id.* § 1885(b). The Priority Directive announced that "NSF will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates, with the core goal of creating opportunities for all Americans." Priority Directive at 2. On its face, NSF's announcement that it would be pursuing a "core goal of creating opportunities for all Americans" is not inconsistent with these statutory provisions calling for the agency to broadly increase participation in STEM.

The NSF Act further requires NSF to employ a core strategy of developing intellectual capital "with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1). As Plaintiffs acknowledge, "the applicable Congressional mandates do not require NSF to preference certain grant applicants based on their race or gender." July 10 Letter at 1.[32] The Priority Directive likewise mandates equal treatment: "[NSF]'s efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups." Priority Directive at 2. Indeed, Acting Director Stone attests that, following the issuance of the Priority Directive and "[c]onsistent with the NSF Act of 1950, NSF continues to support increased participation in science and technology by U.S. populations, including women and minorities." Stone Decl. ¶ 21.

---

[32] The Court notes that a contrary interpretation of the NSF Act may encounter issues with the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), and other similar cases. As the *amicus curiae* points out, a reading of the pertinent statutes as requiring NSF to express preferences for racial minorities and women in making grant decisions may run afoul of the Equal Protection Clause. *See* Amicus Br. at 5-10.

While the Priority Directive may not reflect Plaintiffs' preferred means of achieving the congressional objective, it does not on its face disregard a specific and unambiguous statutory command.

The NSF Act additionally directs the agency to "award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(d)(1), with continued support for programs directed at increasing minority participation in STEM, *id.* § 1862p-4. Similarly, Congress has directed NSF to support "[e]xpanding participation of women and individuals from unrepresented groups in STEM" to further the agency's broader impacts. *Id.* § 1862p-14(a)(7). Presumably, Plaintiffs believe the Priority Directive violates this mandate by directing that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." Priority Directive at 2. But a directive that the agency avoid supporting research whose impact is narrowly limited to certain groups hardly precludes the agency from promoting the participation of previously underrepresented groups in STEM. Acting Director Stone explains that "NSF is continuing grants that broadly encourage increased participation in science and technology, which necessarily have the effect of supporting participation of particular groups, including women and minorities." Stone Decl. ¶ 21.

Plaintiffs dismiss Acting Director Stone's statements as "rhetorical sleight of hand," Reply at 6, insisting that the agency in fact has ceased funding a "class of congressionally mandated projects," Motion at 19, presumably projects seeking to increase the participation in STEM of underrepresented minorities, women, and people with disabilities. *See* Compl. ¶ 116 ("Defendants do not have authority to *categorically* refuse to support research that comports with the Congressionally enacted policy of the United States." (emphasis added)); *see also* Reply at 6

(arguing that Plaintiffs' claims are contrary to law under the APA because "[t]reating such projects as *categorically* ineligible for NSF support simply is not consistent with the law, regardless of whether NSF continues to fund projects aimed at broadly encouraging increased participation in STEM" (emphasis added)).  Plaintiffs' counsel similarly explained at the July 9 hearing that their objection to the Priority Directive arises from its supposed "eliminati[on of] the prioritization of that promotion [*i.e.*, the participation of women, minorities, and people with disabilities] in STEM."  Hearing Tr. at 29:22-30:3.

But the Priority Directive by its terms does not require NSF to cease supporting projects aimed at expanding participation in STEM by women, minorities, and people with disabilities.  *See* Priority Directive at 2 ("NSF will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates, with the core goal of creating opportunities for all Americans.").  Moreover, Acting Director Stone's assurance that NSF "continues to support increased participation in science and technologies by U.S. populations, including women and minorities," Stone Decl. ¶ 21, finds corroboration in Plaintiffs' own evidence.

The record demonstrates that, since the issuance of the Priority Directive, NSF has continued to fund a number of projects at IHEs in the Plaintiff states which promote the participation of women, minorities, and people with disabilities in STEM.  For example, the Associate Vice President of Research at the University of Northern Colorado reported that "overall NSF funding supported nine (9) programs within University of Northern Colorado that specifically seek to promote participation in STEM fields by women, minorities, and people with disabilities.  As of the date of this declaration, one (1) of those ha[s] had [its] funding canceled."  Ranucci Decl., Exh. 12 ¶ 12.  So based on Plaintiffs' own evidence, it would seem that NSF continues to support

eight "programs within University of Northern Colorado that specifically seek to promote participation in STEM fields by women, minorities, and people with disabilities." *Id.*

Likewise, the Vice President for Research and Innovation Partnerships at Northern Illinois University declared that "[p]rior to April 18, 2025, just over $5M (inclusive of multi-year funding) of the $24M in overall NSF funding supported 11 programs within [Northern Illinois University] that specifically seek to promote participation in STEM fields by women, minorities, and people with disabilities.  As of the date of this declaration, one of these projects has its funding canceled." *Id.*, Exh. 28 ¶ 14.  Here too, Plaintiffs' own evidence indicates that NSF continues to support ten "programs within [Northern Illinois University] that specifically seek to promote participation in STEM fields by women, minorities, and people with disabilities." *Id.*

Declarations from several other administrators at IHEs likewise reveal that NSF's grant terminations—and specifically the terminations of grants geared towards advancing the participation of women, minorities, and people with disabilities in STEM—are nowhere near as categorical as Plaintiffs suggest.  *See id.*, Exh. 14 (declaration of the Chancellor of the University of Colorado Boulder) ¶ 11 ("Prior to April 18, 2025, $19.4M of this overall NSF funding supported 13 projects at the University of Colorado Boulder that specifically seek to promote participation in STEM fields by women, minorities and people with disabilities.  As of the date of this declaration, 7 of those have had their funding canceled."); *id.*, Exh. 25 (declaration of the Associate Provost at Chicago State University) ¶ 11 ("Prior to April 18, 2025, the NSF expenditures for fourteen grants totaled approximately $2.49 million, for around twenty programs within [Chicago State University] that specifically seek to promote participation in STEM fields.  As of the date of this declaration, six of those have had their funding canceled."); *id.*, Exh. 29 (declaration of the Chief Deputy General Counsel for the University of Massachusetts) ¶ 123 ("Prior to April 18,

2025, $12,733,053 of this overall NSF funding supported 12 programs within UMass Boston that specifically seek to promote participation in STEM fields by women, minorities and people with disabilities.  As of the date of this declaration, 4 of those have had their funding canceled."); *id.*, Exh. 33 (declaration of the Vice President of Research at Kean University in New Jersey) ¶ 10 ("Prior to April 18, 2025, $2 million of this overall NSF funding supported eight (8) programs within Kean that specifically seek to promote participation in STEM fields by women, minorities and people with disabilities.  As of the date of this declaration, three (3) of those have had their funding canceled.").

NSF's continued support for programs consistent with its congressional directives is perhaps most clearly illustrated by the declaration of the Chief Deputy General Counsel in the University of Massachusetts system.  *Id.*, Exh. 29.  She reported that "[p]rior to April 18, 2025, active NSF awards overall supported 275 active projects at UMass Amherst," *id.* ¶ 11, and that "[m]ore than 25% of the currently active NSF awards to UMass Amherst support" promoting participation in STEM fields by women, minorities, and people with disabilities, *id.* ¶ 12.  That is roughly sixty-eight grants awarded to the "class" of projects Plaintiffs claim had their funding cut. Motion at 19.  But as of May 16, 2025, only seven of UMass Amherst's projects had their funding cancelled.   Ranucci Decl., Exh. 29 ¶ 13.[33]  This evidence powerfully undermines Plaintiffs' argument that the Priority Directive renders this class of projects categorically ineligible for

---

[33] To be sure, other declarations identify that all similar projects at certain universities had their grants terminated.  *See* Ranucci Decl., Exh. 29 ¶ 203 (declaring that UMass Dartmouth had one such project, which was terminated); *see also id.*, Exh. 43 ¶ 13; *id.*, Exh. 50 ¶ 12; *id.*, Exh. 62 ¶ 10; Ranucci Supp. Decl., Exh. 72 ¶ 13; *id.*, Exh. 73 ¶ 7.  But such inter-university variance only underscores that this "class," Motion at 19, of impacted projects is not as class-like as Plaintiffs suggest.

funding.[34]  To the contrary, the record makes clear that, under the Priority Directive, NSF continues to fund many projects that advance the congressional objectives reflected in the NSF Act.[35]

In sum, the APA and Tucker Act provide adequate judicial procedures for Plaintiffs' claims so nonstatutory *ultra vires* review does not appear to be available.  Even if those statutes did not afford meaningful opportunities to review the actions in question, Plaintiffs have not established that NSF has plainly acted contrary to a clear and mandatory statutory prohibition or otherwise has disregarded a specific statutory command.  The agency's actions therefore do not appear to constitute extreme error warranting nonstatutory *ultra vires* review.  For these reasons, Plaintiffs have failed to show that the Priority Directive and its implementation are likely to merit relief under *Kyne*.

\*        \*        \*

Even if available, the doctrine of nonstatutory review is unlikely to harbor Plaintiffs' non-APA claims.  As explained at *supra* III.A, Plaintiffs also have not shown at this preliminary stage that the Court likely has jurisdiction over their APA claims.  Plaintiffs thus have not shown a likelihood of success on the merits.  Preliminary relief cannot issue.  *See Pharaohs GC*, 990 F.3d at 231-32.

---

[34] This is not to say that total termination of these kinds of grants is necessary to create an issue of compliance with the statutory commands.  The Court need not pass on whether 100%, 90%, 80%, or some other number would suffice to bring a cognizable challenge, given Plaintiffs' categorical framing of their theory and the overwhelming evidence of NSF's continued support for projects that further the objectives of the NSF Act.

[35] At the July 9 hearing, Plaintiffs' counsel appeared to argue at one point that Defendants were violating the Appropriations Clause of the U.S. Constitution by declining to spend funds on the kinds of projects mandated by Congress.  Hearing Tr. at 27:19-28:8; *see* U.S. Const. art. I, § 9, cl. 7.  Plaintiffs do not bring an Appropriations Clause claim in their Complaint, as they recognized at the hearing.  Hearing Tr. at 28:10-12.  The factual discrepancies cited above—in addition to a lack of evidence regarding the totality of NSF's spending on such programs—would also undercut such a claim even if properly asserted.

### IV.  Conclusion

Plaintiffs' motion for a preliminary injunction is denied.  Defendants shall respond to the

Complaint within twenty-one days from the date of this Opinion and Order.  The Clerk of Court

is respectfully directed to close the motion at Docket Number 5.

SO ORDERED.

Dated:  August 1, 2025
        New York, New York

_____
                    JOHN P. CRONAN
                United States District Judge